623

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :   Case No. 1:12-cr-394
                              :
                              :
LORENE CHITTENDEN,            :
             Defendant.       :
                              :
------------------------------:
```

V O L U M E   4 of 7

TRIAL TRANSCRIPT

April 28, 2014 - May 7, 2014

Before:   Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

James P. Gillis and Julia Martinez,
Counsel for the United States

John S. Davis and Frank D. Ross,
Counsel for the Defendant

The Defendant, Lorene Chittenden, in person

624

## INDEX

| WITNESS | EXAMINATION | PAGE |
|---------|-------------|------|
| RONY ORDONEZ | | |
| | DIRECT | 625 |
| | CROSS | 629 |
| FELICITO ARANA | | |
| | DIRECT | 635 |
| | CROSS | 640 |
| | REDIRECT | 643 |
| ROCIO REYES | | |
| | DIRECT | 646 |
| | CROSS | 652 |
| DAVID M. BEST | | |
| | DIRECT | 664 |
| | CROSS | 671 |
| | REDIRECT | 682 |
| | RECROSS | 684 |
| | REDIRECT | 684 |
| DENNIS G. HITE | | |
| | DIRECT | 686 |
| | CROSS | 726 |
| | REDIRECT | 774 |
| | RECROSS | 782 |
| SPENCER BROOKS | | |
| | DIRECT | 784 |
| | CROSS | 804 |
| | REDIRECT | 839 |

R.M. Ordonez - Direct

625

```
 1              NOTE:  The May 1, 2014 portion of the case begins in

 2    the absence of the jury as follows:

 3    JURY OUT

 4              THE COURT:  All right.  Good morning to all counsel.

 5              MR. DAVIS:  Good morning, Your Honor.

 6              MR. ROSS:  Good morning, Your Honor.

 7              MR. GILLIS:  Good morning, Your Honor.

 8              MS. MARTINEZ:  Good morning, Your Honor.

 9              THE COURT:  Any preliminary matters?

10              MS. MARTINEZ:  I don't think so, Your Honor.

11              THE COURT:  All right, let's get our jury.

12              NOTE:  At this point the jury returns to the

13    courtroom; whereupon the case continues as follows:

14    JURY IN

15              THE COURT:  All right, please be seated.

16              Good morning, ladies and gentlemen.  Did you all heed

17    my request that you not do any investigation, or research, or

18    talk to anybody?  A nod of heads?  All right.  Thank you.

19              Next witness.

20              MS. MARTINEZ:  Rony Ordonez, Your Honor.

21              NOTE:  The witness is sworn.

22              RONY M. ORDONEZ, called by counsel for the United

23    States, first being duly sworn, testifies through an

24    interpreter as follows:

25         DIRECT EXAMINATION
```

1    BY MS. MARTINEZ:

2    Q.   Good morning, sir.

3    A.   Good morning.

4    Q.   Thank you for being here this morning.

5    A.   Thank you.

6    Q.   If you will lean in just a little bit closer to the

7    microphone so we can make sure to hear you.  Thank you.

8         Could you state your name.

9    A.   Rony Miguel Ordonez.

10   Q.   Mr. Ordonez, what city do you live in?

11   A.   Sterling.

12   Q.   Where do you work?

13   A.   I work for Hertz Rental Car.

14   Q.   What do you do at Hertz?

15   A.   At the present time I am a security guard.

16   Q.   How long have you worked at Hertz Rental Car?

17   A.   In total it is about 35 years.

18   Q.   At some point in the past did you buy a house on Applegate

19   Drive in Sterling?

20   A.   Yes.

21   Q.   Did you work with a real estate agent when you bought that

22   house?

23   A.   Yes.

24   Q.   Who was that real estate agent?

25   A.   Rodolfo.  I don't remember his last name clearly.

R.M. Ordonez - Direct

627

1    Q.    Did you also at some point buy a house on Margate Court

2    also in Sterling?

3    A.    That was my first one.

4    Q.    If we could show the witness, I think we can just do it on

5    the screen, 49-D.  I am going to show you a couple exhibits

6    here on the screen.  If we could go to page 2.

7             And at the bottom of this page, is that your

8    signature, sir?

9    A.    Allow me a second to get my glasses.

10   Q.    Absolutely.

11   A.    I'm ready now.

12   Q.    Is that your signature, sir?

13   A.    Yes.

14   Q.    If we could go back to the first page.

15            Did you fill out this form?

16   A.    It's not my handwriting.

17   Q.    Could you take a look at, I think it will be easiest on

18   paper, and we will do it in bulk to save some time.  49-H1, H2,

19   H3, H4, H5, H6 and K.

20            COURT SECURITY OFFICER:  What number was that,

21   counsel?

22   Q.    49.  Go ahead and take a look at those, sir.  When you are

23   ready, my question is going to be whether these are your

24   documents.

25            Are those your documents, sir?

1    A.   Yes.

2    Q.   Are they generally employment or income records for you

3    and your wife?

4    A.   That is correct.

5    Q.   Is the information in them accurate?

6    A.   Yes.

7         MS. MARTINEZ:  Your Honor, these are already entered,

8    but the we will just put up one in the series so the jury can

9    see what we are talking about.

10        THE COURT:  Go ahead.

11        MS. MARTINEZ:  Thank you.

12   BY MS. MARTINEZ: (Continuing)

13   Q.   Now, if we could go to Exhibit 50-D.  I will do that on

14   the screen as well.  And if we could go to the fourth page.

15        At the bottom of this page here, is that your

16   signature, sir?

17   A.   Yes.

18   Q.   And if we could zoom out.  Did you write this note on the

19   top here?

20   A.   I cannot write English, no.

21   Q.   If we could go back to page 2.  At the top.

22        Around the time of 2006 or 2007 or 2005, any time in

23   that time period, did you make $6,250 a month?

24   A.   That's impossible.

25   Q.   And in that same time period at any point did your wife

1    make $3,333 a month?

2    A.    I don't think so.

3    Q.    Did you ever tell anyone that you made that much money in

4    connection with getting these loans?

5    A.    No.  What I provided as proof were the checks I got.

6              MS. MARTINEZ:  Thank you, Mr. Ordonez.

7              Thank you, Your Honor.

8              THE WITNESS:  Thank you.

9         CROSS-EXAMINATION

10   BY MR. DAVIS:

11   Q.    Good morning, Mr. Ordonez.

12   A.    Good morning.

13   Q.    You were a client of Mr. Rodolfo Balarezo?

14   A.    Yes.

15   Q.    Now, did Mr. Balarezo in connection with your transactions

16   we've discussed, provide you with a lease agreement to sign?

17   A.    No.

18   Q.    Let me show you, if I could, Mr. Ordonez, Exhibit 49-Q?

19             Mr. Ordonez, would you like the translator to

20   translate the top part of that document for you?

21   A.    Please, yes.

22             THE INTERPRETER:  How far would you like for me to

23   go?

24             MR. DAVIS:  Just to the landlord and tenant and then

25   the rent part.

R.M. Ordonez - Cross

630

```
1              NOTE:  The interpreter reads the exhibit to the
2    witness.
3              THE INTERPRETER:  Down to rent?
4              MR. DAVIS:  Yes.
5    BY MR. DAVIS:  (Continuing)
6    Q.    Mr. Ordonez, did you sign Exhibit 49-Q?
7    A.    No, I did not sign this.
8    Q.    Showing you the bottom of the document.
9    A.    My initials are here.
10   Q.    Do you recall whether you initialed it?
11   A.    I remember having put my initials, but all of this was not
12   written here when I was given this paper to sign.
13             I recall having put my initials here, but when I did,
14   all of this was not written here when I was given this paper to
15   sign.
16   Q.    And who gave you the paper to sign?
17   A.    Mr. Rodolfo.
18   Q.    Did you in fact have a lease with Ms. Figueroa?
19   A.    I have never done such a contract.
20   Q.    And is Ms. Figueroa related to you and your family?
21   A.    She is my wife's sister.
22   Q.    Thank you.  Okay.  Now, you refinanced the Margate Court
23   property in March of 2006, is that correct?
24   A.    It has never been refinanced.  It is a condo, and it has
25   never been refinanced.
```

R.M. Ordonez - Cross

631

Q.   Okay.  Did you purchase the Margate Court property in March of 2006?

A.   Margate Court, that was bought on August 25, 2003.

Q.   Okay.  I don't mean to -- I want to show you 49-E.

A.   I would rather look at it on paper.

Q.   Please.

A.   This form is not completed in any of its portions with my handwriting.

Q.   Okay.  Could we see the last page.

     Do you recognize your handwriting on the last page?

A.   This is my signature.

Q.   Okay.  And is that your wife's signature next to yours?

A.   Yes, sir.

Q.   And you will agree with me that the date on that purchase or transaction is March 24 of 2006, is that correct?

A.   Yeah, but I would like to know which property this refers to because this paper is just a blank copy.

Q.   I believe it's the Margate Court property, Mr. Ordonez.

A.   I don't think so because this says 2006 here.

Q.   Do you not recall whether you -- you don't believe you refinanced Margate Court in 2006?

A.   It has never been refinanced.  That property, I never touched it.

Q.   And we're talking about 1037 Margate Court, Sterling, Virginia?

R.M. Ordonez - Cross

632

1   A.   Yes, I know.

2   Q.   After you bought it in 2003, did you get any mortgage loan

3   for that property?

4   A.   No.

5   Q.   Do you know what the documents in front of you, 49-E,

6   represent?

7   A.   This is D, what I have here.

8   Q.   I am sorry, I thought it was E.

9   A.   This is D.

10   Q.   E is on the screen.  Mr. Ordonez, it's okay.

11   A.   I cannot read it, sir, on the screen.

12   Q.   All right.

13        THE INTERPRETER:  The witness says he cannot read the

14   screen.

15   Q.   Okay.  Can he be shown, please, 49-E in paper.  49-E, as

16   in Edward.

17        And please ask for any translation if you need it,

18   Mr. Ordonez.

19   A.   That is what I was going to ask for.

20        THE INTERPRETER:  What would you like the interpreter

21   to translate?

22   Q.   I really don't have questions about this beyond does he

23   know anything about this transaction, about this property?

24   A.   I have never done that.

25   Q.   Okay.  Let me ask you about May of 2006 because that's

1  when you did buy the property at Applegate Drive in Sterling,

2  is that right?

3  A.    That was on May 12, 2006.

4  Q.    Okay.  Now, do you remember working with Mr. Balarezo to

5  get a mortgage loan to buy that property on Applegate Drive?

6  A.    He is the real estate agent that helped me buy that

7  property.  I don't know whether he contributed anything to help

8  me buy it, but I did put a down payment on the property.

9  Q.    I am not asking about that.  I am asking whether Mr.

10  Balarezo helped you to shop for a mortgage to buy the Applegate

11  property?

12  A.    No.

13  Q.    Mr. Ordonez, didn't you -- Mr. Balarezo had an office in

14  Ashburn, Virginia, is that right?

15  A.    Yes.

16  Q.    Okay.  And you wanted to get the best interest rate you

17  could when you bought the Applegate property, right?

18  A.    The interest rate at the time was around 6.5 percent.

19  That was not a special rate.  That was the going rate.

20  Q.    I am not asking if it was a special rate.  I'm asking if

21  Mr. Balarezo helped you shop at different banks to find the

22  best mortgage rate when you bought the Applegate property?

23  A.    I did not talk with any banker.

24  Q.    I'm not asking if you spoke to a banker.  I am sorry, I

25  don't mean to belabor it.

1          Mr. Ordonez, you were interviewed by the FBI in

2    September of 2013, do you recall that?

3    A.   Yes.

4    Q.   Okay.  Do you recall telling them, and I'm just asking if

5    you told them this, that Balarezo took you and your wife to his

6    office in Ashburn and they shopped for mortgages at a couple

7    different banks.

8          THE INTERPRETER:  Interpreter's clarification.  Who

9    is they?

10   Q.   In context, it's Mr. Ordonez and his wife.

11   A.   Let me explain you something.

12   Q.   Please.

13   A.   This gentleman came to my home.  We spoke about this deal.

14   We went to his office to sign some documents.  I don't know

15   anything beyond that.

16   Q.   When you say this gentleman, do you mean Mr. Balarezo?

17   A.   Yes, sir.

18   Q.   But when you met with the FBI, you told them the truth,

19   right?

20   A.   As I am telling you now.

21   Q.   Okay.  Last thing, Mr. Ordonez.  Well, two last things.

22        Do you see my client, Ms. Chittenden, at the end of

23   the table in the white sweater?

24   A.   Yes.

25   Q.   Have you ever met her before?

F. Arana - Direct

635

1   A.   No.

2   Q.   And the Applegate Drive property, do you still live there?

3   A.   Yes, sir.

4   Q.   And do you still pay the mortgage on that property?

5   A.   Yes.

6        MR. DAVIS:  Nothing further.  Thank you, Mr. Ordonez.

7        THE COURT:  Any redirect?

8        MS. MARTINEZ:  No, Your Honor.

9        THE COURT:  All right.  You are excused with our

10  thanks, sir.  Please don't discuss the testimony you have given

11  with anyone until our trial is over.

12       THE WITNESS:  Thank you so much.

13       NOTE:  The witness stood down.

14       THE WITNESS:  Have a good day.

15       NOTE:  The witness stood down.

16       MS. MARTINEZ:  Felicito Arana.

17       NOTE:  The witness is sworn.

18       FELICITO ARANA, called by counsel for the United

19  States, first being duly sworn, testifies through an

20  interpreter as follows:

21       DIRECT EXAMINATION

22  BY MS. MARTINEZ:

23  Q.   Good morning, sir.

24  A.   Good morning.

25  Q.   Could you tell us your name.

F. Arana - Direct

636

1   A.   Felicito Arana.

2   Q.   Mr. Arana, could you lean in just a little closer to the

3   microphone.

4   A.   That's good?

5   Q.   What city do you live in, sir?

6   A.   Woodbridge, Virginia.

7   Q.   I am so sorry, sir, but you are going to have to speak up

8   just a little bit more so everyone can hear you.  Okay?

9   A.   That's good.

10   Q.   Perfect, thank you.  Where do you work?

11   A.   I work for the public schools in the County of Fairfax,

12   and the school is Great Falls Elementary School.

13   Q.   What do you do for that elementary school?

14   A.   I am a custodian/building supervisor.

15   Q.   How long have you worked there?

16   A.   About 23 years.

17   Q.   At one point in the past did you own a property on

18   Arkansas Street in Woodbridge?

19   A.   Yes.

20   Q.   And at some point did you refinance that property?

21   A.   Yes.

22   Q.   Did you also own a property on St. Charles Court in

23   Stafford?

24   A.   Yes.

25   Q.   Did you refinance that one too?

F. Arana - Direct

637

1   A.    Yes.

2   Q.    Did you work with a real estate agent when you got those

3   loans?

4   A.    Yes.

5   Q.    Who was that Realtor?

6   A.    Rodolfo Balarezo.

7   Q.    At the time you got these refinance loans, where were you

8   working?

9   A.    At the same place.

10  Q.    Approximately how much money were you making at the time?

11  A.    About 16 or 17.

12  Q.    Does that include the income for you and your wife, or is

13  that just your income?

14  A.    I don't remember whether it was the two of us together.

15  Q.    If we could go to 47-D.

16        I am going to show you a couple documents on the

17  screen, sir, and the CSO is handing them to you in paper too.

18  You can look wherever is easiest for you.  If you can go to the

19  bottom of page 3.

20        Is that your signature there, sir?

21  A.    Page 3, let me see.  Yes.

22  Q.    If we could just zoom back on page 1.  Or you can flip to

23  page 1, whatever is easier.

24        Did you write any of this information here on this

25  form?

1    A.    No.

2    Q.    Are you able to write in English, sir?

3    A.    No.

4    Q.    If you would go to page 2.  At the top of the screen

5    there.

6              When you got those loans, did you make over $7,000 a

7    month, or over $84,000 a year?

8    A.    I don't remember how much I was making at that time.

9    Q.    Did you ever tell anyone -- did you ever give anyone false

10   information about how much money you were making at that time?

11   A.    No.  I provided as proof my income tax returns and also my

12   check stubs.

13   Q.    If we go to the last page of this document.

14             Is that your signature at the bottom of the page,

15   sir?

16   A.    This one?

17   Q.    Yes.

18   A.    Yes.

19   Q.    And on the rest of that page, did you write that note?

20   A.    No.

21   Q.    If we could go now to 48-D.

22             And on the last page of that document, is that your

23   signature, sir?

24   A.    Yes.

25   Q.    And on page 2 of the document?

F. Arana - Direct

639

1   A.   I think so.

2   Q.   Did your income increase dramatically between the time

3   when you got the two loans for the two properties?

4   A.   No.  It increased by a very small amount because raises

5   were very small.

6   Q.   Those two loans, they were very close in time together, is

7   that right?

8          MR. DAVIS:  Objection, leading.  They are six months

9   apart.

10         THE COURT:  It is leading.

11  BY MS. MARTINEZ: (Continuing)

12  Q.   Did you get those same two loans in the same year?

13  A.   I don't remember if it was in the same year.

14  Q.   If we could go a little further down on page 2.

15         When you got the second loan, did you have an account

16  at Apple Federal Credit Union?

17  A.   Yes.

18  Q.   Did you have $137,000 in it?

19  A.   No.

20  Q.   Did you ever tell anyone that you did?

21  A.   No.

22  Q.   Mr. Arana, do you still own either of these properties?

23  A.   No.

24  Q.   What happened to them?

25  A.   They were sold as a short sale.

F. Arana - Cross

640

1  Q.   About how long was that after you got these loans?

2  A.   To tell you the truth, I don't remember exactly how much

3  time past.

4  Q.   Was it a long time or a shorter time, if you remember?

5  A.   Several years.

6        MS. MARTINEZ:  Thank you, Mr. Arana.

7        Thank you, Your Honor.

8        THE COURT:  Cross-examination.

9    CROSS-EXAMINATION

10 BY MR. DAVIS:

11 Q.   Mr. Arana, you refinanced the Arkansas Street property in

12 March of 2006, is that right?

13 A.   Yes.

14 Q.   And did you get a cash payment out of that refinance in

15 March of 2006?

16 A.   Yes.

17 Q.   And was that cash payment $73,000 and some change?

18 A.   What was that?

19 Q.   I am sorry.  Was it a little more than $73,000 that you

20 got as the cash out of your refinance in March of '06?

21 A.   Yes.

22 Q.   And what was the reason you had for refinancing the

23 Arkansas Street property at that time?

24 A.   To put down a down payment for the other house.

25 Q.   You knew you wanted to buy another house, and that's why

1    you were refinancing Arkansas Street?

2    A.   Yes, because I have a large family, and the house was very

3    small for my entire family.

4    Q.   Okay.  And whose idea was it to refinance the Arkansas

5    Street property to get the down payment for the other house?

6    A.   I consulted Rodolfo to see whether I could refinance so

7    that I could get a down payment for the other house.

8    Q.   Now, when did you identify the St. Charles house as the

9    house you wanted to buy?

10   A.   When I began looking around for houses.

11   Q.   And you bought the house in October of 2006, is that

12   right?

13   A.   I don't remember the month that it was exactly.

14   Q.   Okay.  Do you remember how long before you bought it when

15   you first identified it as where you wanted to go?

16   A.   What was that?

17   Q.   Strike that.  Not a good question.

18          Mr. Arana, did you keep the $73,000 in an account

19   between when you refinanced the Arkansas Street property and

20   when you bought the St. Charles property?

21   A.   I think so.

22   Q.   So you had a lot of money in an account when you bought

23   the St. Charles Street property in October of 2006, or whenever

24   you bought it?

25   A.   Yes, because I had already been told more or less how much

1  I needed to make the down payment for the other house.

2  Q.   Okay.  And, Mr. Arana, I would ask you to look at my

3  client in the white sweater at the table.

4          Have you ever seen her before?

5  A.   I don't remember.

6  Q.   Oh, two other things.  I wanted to show you 47-G, and move

7  it in evidence.

8          THE COURT:  Is there anything objection?

9          MS. MARTINEZ:  No objection, Your Honor.

10         THE COURT:  It is received.

11         MS. MARTINEZ:  Your Honor, may I discuss something

12 with counsel real quick?

13         THE COURT:  Yes.

14         MR. DAVIS:  I have a hard copy, Your Honor.  It is a

15 two-page document.

16 BY MR. DAVIS: (Continuing)

17 Q.   So, Mr. Arana, you did work at Fairfax County Public

18 Schools as of March 2006, right?

19 A.   Yes.

20 Q.   All right.  And the second page of 47-G, please.

21         And you also worked at Holy Trinity Lutheran Church

22 as of March 2006?

23 A.   Yes.

24 Q.   Okay.  Thank you.  And I wanted to show you also 48-G.

25 And move it in evidence.  48-G, as in Giraffe, Gulf.

1          MS. MARTINEZ:  No objection to moving it in, Your

2    Honor.

3          THE COURT:  It is received.

4    BY MR. DAVIS: (Continuing)

5    Q.    Mr. Arana, you again were working at Holy Trinity

6    Lutheran Church as of September of 2006, right?

7    A.    Correct.

8    Q.    And the other document in 48-G, you also were still

9    working at Fairfax County Public Schools as of October 23,

10   2006, right?

11   A.    Correct.

12         MR. DAVIS:  Nothing further.  Thank you, Mr. Arana.

13         THE COURT:  Any redirect?

14         MS. MARTINEZ:  Briefly, Your Honor.

15         THE COURT:  Yes.

16      REDIRECT EXAMINATION

17   BY MS. MARTINEZ:

18   Q.    If we could go back to Exhibit 48-D, page 2.  If you could

19   look just right on the screen there.

20         Mr. Arana, even after you put the money from the

21   Arkansas Street refinance in your bank account, I think you

22   said that was approximately 60,000, is that right?

23         MR. DAVIS:  Objection, leading.

24         THE COURT:  I will allow it.

25   BY MS. MARTINEZ: (Continuing)

F. Arana - Redirect

644

1  Q.   Let me clarify.  Mr. Arana, I believe you said that the

2  money that you got from your first refinance was around 60,000,

3  is that correct?

4  A.   I don't remember how much the amount was.

5  Q.   Why don't we just look at the document so I can make sure

6  I am not stating the wrong number on it.  Let's go to 48-C.

7           And at the bottom of that -- 47-C, I am sorry.  I

8  apologize, Your Honor.  All right.

9           Do you see that number at the bottom of the screen on

10 the left?

11 A.   Yes.

12 Q.   It says about 73,000?

13 A.   I am sorry, what is this for, the 73,000?

14 Q.   Do you see that number there?

15 A.   I do, yes.

16 Q.   Let's zoom out on the whole page.  Or, Mr. Arana, the

17 paper document is write there in that folder in front of you if

18 you want.

19           And do you see that that's for your Arkansas Street

20 property?

21 A.   Yes.

22 Q.   Does that sound like about how much money you made from

23 that refinance, a little over 73,000?

24 A.   It looks that way.  I don't remember the exact amount, but

25 it could be that, yes.

1  Q.   Okay.  If we could go back to 48-D on page 2.

2         Even once you put the money from that Arkansas Street

3  refinance in your account, did you have $137,000 in your Apple

4  Credit Union Account.

5  A.   I have never had that amount of money in the bank.

6         MS. MARTINEZ:  Thank you.  Thank you, Your Honor.

7         THE COURT:  All right.  You are excused, sir, with

8  our thanks.  Please don't discuss the testimony you have given

9  with anyone until our trial is over.

10        THE WITNESS:  Thank you so much.

11        NOTE:  The witness stood down.

12        THE INTERPRETER:  May the interpreter be excused?

13        THE COURT:  Yes.

14        MS. MARTINEZ:  Yes, ma'am.

15        THE COURT:  Good morning, Mr. Gillis.  Next witness.

16        MR. GILLIS:  Good morning, Your Honor.  We call Rocio

17  Reyes, please.  She may now be known as Rosie Trochez.

18        MR. DAVIS:  Your Honor, we would request the same

19  instruction.  This is one of the noncharged loans.

20        THE COURT:  All right.  Ladies and gentlemen, this is

21  a transaction that wasn't charged in the indictment.  It is

22  evidence that you may consider for intent, motive, lack of

23  mistake.

24        NOTE:  The witness is sworn.

25        ROCIO REYES, called by counsel for the United States,

1    first being duly sworn, testifies and states:

2        DIRECT-EXAMINATION

3    BY MR. GILLIS:

4    Q.   Good morning, ma'am.  Nice to see you again.

5    A.   Good morning.

6    Q.   Could you tell us your name, please.

7    A.   My name is Rocio Reyes.

8    Q.   And where do you live?  What city do you live in?

9    A.   Centreville.

10   Q.   Where do you work?

11   A.   The Cleaning Authority.

12   Q.   What's your position there?

13   A.   Operations manager.

14   Q.   How long have you been in that position?

15   A.   Ten years.

16   Q.   Did you at one time buy a home on Betsy Ross Lane in

17   Centreville?

18   A.   Yes.

19   Q.   Do you recall about when that was?

20   A.   It was in 2006, November I would say.

21   Q.   Did you use a real estate agent to buy your house?

22   A.   Yes.

23   Q.   And who was that?

24   A.   Cristina Orozco.

25   Q.   What company was she with, do you recall?

1   A.   Re/Max.

2   Q.   How did you happen to choose her?

3   A.   I have a friend that knows her.

4   Q.   Did you get a loan to buy the property?

5   A.   Yes, I did.

6   Q.   Whom did you get the loan from?

7   A.   The first bank was Mason Mortgage, something like that.

8   Q.   Was there a particular loan officer that you worked with?

9   A.   I don't remember her name.  Yeah, I don't.

10  Q.   Okay.  Did you meet with her face-to-face?

11  A.   Yes.

12  Q.   And do you see that person in court today?

13  A.   I don't remember her face.

14  Q.   I beg your pardon?

15  A.   I don't remember her face.  I think I --

16          THE COURT:  Please come a little closer to the

17  microphone.

18  A.   Okay.  I am sorry.

19  Q.   Do you recall meeting with --

20  A.   Is it her?

21  Q.   I am sorry?

22  A.   Is it her?  That person.

23  Q.   Point her out and tell us where she is sitting and what

24  she is wearing.

25  A.   She is sitting there, like the orange blouse and sweater.

```
 1              MR. GILLIS:  Okay.  Your Honor, the record should

 2   reflect that she has not identified the defendant.

 3              THE COURT:  It will.

 4   BY MR. GILLIS: (Continuing)

 5   Q.   Now, can you describe -- well, when you met -- did you

 6   meet with the FBI?

 7   A.   Yes.

 8   Q.   And this was a little while ago?

 9   A.   Three, if not longer, years ago.

10   Q.   When you met with the FBI, do you recall describing the

11   person to the agent?

12   A.   Yes, I remember.

13   Q.   Now, when you -- where did you meet with the loan officer?

14   A.   At her office.

15   Q.   And did you go with anyone?

16   A.   The first time I went with Cristina.

17   Q.   And what language did you and the loan officer speak in?

18   A.   English.

19   Q.   Does Cristina or did Cristina speak Spanish?

20   A.   Yes.

21   Q.   Do you recall what the loan officer asked you that first

22   time?

23   A.   She asked me where I work, how much I was making, how long

24   I was working there.  That's it.  That's what I remember.

25   Q.   Did you answer all of her questions truthfully?
```

1   A.   Yes, I did.

2   Q.   Were you working at the Cleaning Authority at that time?

3   A.   Yes, I was.

4   Q.   Do you recall about how much you were earning then?

5   A.   Like $29,000 a year.

6   Q.   At some point did you give the loan officer information

7   about your bank account?

8   A.   I think I gave her -- she asked me for it, but I don't

9   remember if I provided that.  I provided the pay stubs for my

10  job.

11  Q.   You gave that to the loan officer?

12  A.   Yes.

13  Q.   Do you recall at that time -- well, first of all, do you

14  recall, did you have a bank account at that time?

15  A.   I did.

16  Q.   Do you recall about how much money you had in the bank

17  account?

18  A.   I would say like from $300 to a thousand dollars.

19  Q.   Do you recall -- actually, I am sorry, let me -- I beg

20  your pardon, Your Honor.

21          THE COURT:  Yes, sir.

22  Q.   Would you please look at Government's Exhibit 69-D.

23          Let me ask you this, Ms. Reyes.  If you were to see

24  the loan officer's name, do you think that you would recall it?

25  A.   I don't know, but I will try.

1   Q.   Okay.  Now, first of all, on the second page of that, the

2   bottom of that document, do you see your signature there?

3   A.   Yes, it's there.

4   Q.   And what's the date next to your signature?

5   A.   November 2, 2006.

6          MR. GILLIS:  Your Honor, I move to admit Government's

7   Exhibit 69-D.

8          MR. DAVIS:  No objection, subject to the prior

9   objection.

10          THE COURT:  It is received.

11  BY MR. GILLIS: (Continuing)

12  Q.   Can you tell us first, do you recognize the handwriting on

13  that first page?

14  A.   Yes.

15  Q.   And is part of it in your handwriting?

16  A.   Part of it, yep.

17  Q.   What part is in your handwriting, please?

18  A.   My name at the top.

19  Q.   Okay.

20  A.   My signature.  That's it.

21  Q.   So your name at the top and your signature?

22  A.   Yes.

23  Q.   And the rest, do you recognize any of it?

24  A.   No.

25  Q.   At the top, do you see a fax stamp on that document?

651

1   A.   Yes.

2   Q.   Do you recognize that fax stamp?

3   A.   Yes, my fax number at the office.

4   Q.   All right.  On the second page, it says there that you

5   were earning $7,450 per month when you bought your house.

6           Was that true?

7   A.   No.

8   Q.   Did you ever tell anyone at that time that you -- at the

9   time that you bought your house, that you were earning that

10  kind of money?

11  A.   No.

12  Q.   It also says that you had an account with $162,000 in it.

13          Was that true?

14  A.   No.

15  Q.   Did you tell anyone that?

16  A.   No.

17  Q.   On the third page of that document, at the bottom, do you

18  see your signature?

19  A.   Yes.

20  Q.   And below that, do you see a name handwritten there?

21  A.   Yes.

22  Q.   Let me ask you if -- and then if you would, please, look

23  at Government's Exhibit 69-E.

24          I beg your pardon, it would be 69-E1, Mr. Ruelas.

25          On the third page of 69-E1 at the bottom there, do

1  you recognize your signature?

2  A.   Yes.

3          MR. GILLIS:  Your Honor, I move in 69-E1.

4          MR. DAVIS:  No objection.

5          THE COURT:  Received.

6  BY MR. GILLIS: (Continuing)

7  Q.   Now, at the bottom -- or actually at the top of

8  Government's Exhibit 69-E1 on the fourth page, do you see --

9  well, first of all, do you see a name under where it is

10  Interviewer's Name?

11         You can look at the screen on your left if that is

12  easier.

13  A.   Okay, I see it.

14  Q.   Now, looking at that, does that refresh your memory as to

15  the name of the loan officer that you met with?

16  A.   Yes.

17  Q.   And what is the name of the loan officer that you met

18  with, ma'am?

19  A.   It says Lorene Chit -- I cannot pronounce her name, her

20  last name.  I am sorry.

21         MR. GILLIS:  Thank you very much.  That's all I have,

22  Your Honor.

23         THE COURT:  All right.  Cross-examination.

24     CROSS EXAMINATION

25  BY MR. DAVIS:

1    Q.   Good morning, Ms. Reyes.

2    A.   Good morning.

3    Q.   Ms. Reyes, let's go back to 69-D, briefly.

4         This document was faxed from the Cleaning Authority,

5    is that right?

6    A.   Yes.

7    Q.   So that was where you worked?

8    A.   Yes.

9    Q.   Okay.  And the document identifies Jose Reyes with a phone

10   number.  Do you see that?

11   A.   Yes, I see that.

12   Q.   Next to, I think it is in the co-borrower's area.  Do you

13   see that?

14   A.   I see that.

15   Q.   Who is Jose?

16   A.   Jose is my brother-in-law, my ex-brother-in-law.

17   Q.   Your ex-brother-in-law?

18   A.   Yeah.

19   Q.   Now, what did he have to do with this transaction?

20   A.   Nothing.  Nothing.

21   Q.   And did he -- what was Jose doing as of November 2006?

22   Did he live in a house?

23   A.   Yes.

24   Q.   And where?

25   A.   In Chantilly.

1    Q.    And was he working then?

2    A.    Yes.

3    Q.    And was he part of this purchase?

4    A.    No.  No.

5    Q.    Okay.  Do you know or do you recognize the handwriting for

6    Jose Reyes?

7    A.    The handwriting?

8    Q.    Yes.

9    A.    No.

10   Q.    You don't know who wrote Jose Reyes?

11   A.    No.

12   Q.    And do you know that you did not write it?

13   A.    I know that it is not my handwriting.

14   Q.    That's not your handwriting.  Because we can see your

15   handwriting where?  At the top?

16   A.    My name on top.

17   Q.    Okay.  And do you remember if when you sent this

18   application, when you faxed it, it was before or after the

19   first time you met with the loan officer who helped you with

20   the loan?

21   A.    I don't remember if it was the first time or second time.

22   Q.    Okay.  Now, you were dating someone named Trochez at that

23   time?

24   A.    Yes.

25   Q.    And was that Eddie Trochez?

1    A.    Yes.

2    Q.    And is he now your husband?

3    A.    Yes, he is.

4    Q.    And did you and Eddie Trochez plan to move in together at

5    the Betsy Ross Lane house when you bought it?

6    A.    Yes.

7    Q.    And that was your plan all along, right?  I mean, when you

8    applied for that loan, you were planning to move into the house

9    with Eddie?

10   A.    Yes.

11   Q.    Okay.  Now, why was the loan only in your name at that

12   time?

13   A.    He didn't have credit, Eddie.

14   Q.    Eddie did not have credit?

15   A.    No.

16   Q.    How did you know that?

17   A.    Because I had talked to him.

18   Q.    You had talked to him?

19   A.    Yeah.

20   Q.    Okay.  Did he, Eddie Trochez, have a Social Security

21   number?

22   A.    No.

23   Q.    Okay.  Did you plan to have Eddie assist with the mortgage

24   payments after you moved into the Betsy Ross Lane house?

25   A.    He will help pay.

1    Q.   He would help pay, right?

2    A.   Yes.

3    Q.   Eddie works?

4    A.   Uh-hmm.

5    Q.   At that time -- and do please say yes or no.  Don't say

6    uh-hmm for the court reporter.

7    A.   Okay.

8    Q.   What was Eddie's job back in November of 2006, do you

9    know?

10   A.   Stone work, construction.

11   Q.   Stone work, construction?

12   A.   Yes.

13   Q.   Was he making a good living?

14   A.   Yes.

15   Q.   Now, did you talk -- when you met with Cristina Orozco,

16   your Realtor, did you tell Cristina about Eddie and that Eddie

17   would be moving in and Eddie would help with the payments?

18   A.   I will say yes, I talked to her about that, that he will

19   move in with me.

20   Q.   Okay.  And did you talk with Cristina Orozco about Eddie's

21   income, how much money Eddie was making?

22   A.   I don't think she asked me because all the things, the

23   papers are going to be on my name.

24   Q.   Okay.  Did you talk with Cristina Orozco about any

25   savings, money that Eddie had in a bank account?

R. Reyes - Cross

657

1    A.    No.

2    Q.    Did you know if he had any saved?

3    A.    No, he didn't have.

4    Q.    He didn't have any savings?

5    A.    No.

6    Q.    Okay.  You recall that the first time you met with the

7    loan officer, you met with Cristina Orozco, that is the three

8    of you?

9    A.    Yes, she took me there, to the loan officer.

10   Q.    And did Cristina Orozco actually introduce you and sit

11   with you and the three of you talk together?

12   A.    Yes.

13   Q.    Okay.  And the second time you met with the loan officer,

14   you just met on your own without Cristina?

15   A.    Cristina wasn't there, I just dropped off some papers.

16   Q.    Okay.  You didn't really talk to the loan officer that

17   time?

18   A.    I don't recall.

19   Q.    Okay.  Now, at that time, November 2006, were you a United

20   States citizen?

21   A.    No.

22   Q.    Have you since become a U.S. citizen?

23   A.    I am now.

24   Q.    Did you know whether at that time you needed to be a U.S.

25   citizen in order to qualify for the loan you were receiving?

R. Reyes - Cross

658

1   A.   No, I didn't know.

2   Q.   Sorry?

3   A.   I didn't know.

4   Q.   Did you ask Cristina?

5   A.   No.

6   Q.   Okay.  Now, do you remember when the loan closed?

7   A.   The exact date?  It was in 2006, in November, but I don't

8   remember the date.

9   Q.   Okay.  Now, do you remember that shortly before the

10  closing for the Betsy Ross Drive house, you and Eddie asked

11  that Eddie Trochez be added to the title since he was going to

12  live at the property?

13  A.   Yes.

14  Q.   Tell the jury about that.  What happened there and what

15  occurred?

16  A.   Well, the loan was under -- it will be under my name.  And

17  then I asked if he can be on the title.

18  Q.   And who did you ask that?

19  A.   I don't remember who I asked that to.

20  Q.   Do you think it was Cristina?

21  A.   I don't remember.

22  Q.   I'm sorry, you don't remember?

23  A.   I don't remember.

24  Q.   Okay.  And you were trying to get Eddie's name added to

25  the title so that you would both be on the title?

1    A.    Yes.

2    Q.    And Eddie also wanted to do that, I assume?  You weren't

3    doing that without Eddie's knowledge?

4    A.    He wanted to do it, yes.

5    Q.    So what happened about that?

6    A.    What happened?  What do you mean by what happened?

7    Q.    I mean, was Eddie's name added to the title?

8    A.    It was, yeah, his name was added.

9    Q.    Okay.  And was that done with the loan officer or no?

10   A.    I don't know that.  Because when I went to sign, you know,

11   to the closing, his name was on the title.  So I don't remember

12   how or who was talked to, but the name was added.

13   Q.    Did Eddie Trochez also come to the closing now that his

14   name was on the title?

15   A.    He was there.

16   Q.    So you both went together?

17   A.    Yes.

18   Q.    Okay.  Was the loan officer you dealt with, was she at the

19   closing?

20   A.    I think she was there.

21   Q.    You think she was?

22   A.    I think she was there.  All right, she was there.  I don't

23   remember.  It has been a long time ago.

24   Q.    A long time ago.  Okay.  So what happened with the house

25   that you and Eddie Trochez bought?

1   A.   I still live there, we still live there.

2   Q.   You still live there now?

3   A.   Yes.

4   Q.   Okay.  Are you making payments on the mortgage?

5   A.   Yeah.  I almost lost the house.

6   Q.   Yes.

7   A.   So I have to work with the banks for six months to modify

8   the loan.

9   Q.   And you got a loan modification?

10  A.   Yes.

11  Q.   All right.  Now, Ms. Reyes, I wanted to ask you, had you

12  worked with Ms. Orozco before that purchase to buy an earlier

13  house?

14  A.   I remember with my husband, we sold some houses, but

15  before that, long before that.

16  Q.   Okay.  Do you remember -- when you say your husband, do

17  you mean Eddie Trochez?

18  A.   No, my ex-husband.

19  Q.   What was his name?

20  A.   Juan, Juan Reyes.

21  Q.   Juan Reyes?

22  A.   Yes.

23  Q.   Okay.  Do you remember qualifying, initially qualifying

24  for a loan with Cristina Orozco back in 2003?

25  A.   Qualifying?

1   Q.   Yes.

2   A.   I don't think we went that far.

3   Q.   Do you recall a home inspection in that earlier house

4   purchase?

5   A.   What I recall is that we went and see some houses in

6   Manassas.

7   Q.   And this is with Cristina Orozco?

8   A.   With Cristina, yes.

9   Q.   And what happened?

10   A.   I think the loan was not approved.

11   Q.   Did you on that occasion provide Cristina with a false

12   Social Security number?

13   A.   What year was that?  What year was that?  I don't remember

14   what year was that.

15   Q.   2003, approximately.  I actually don't know.  I think

16   2003.

17   A.   I don't know if it was the Social Security because we were

18   working with getting our legal status here.  So I don't know

19   what we provide.  I don't know if we had it by that time.  We

20   were getting our work permit.

21   Q.   Do you remember that you gave information to Cristina

22   Orozco back then that turned out not to be true and so the deal

23   didn't go through?

24   A.   I don't remember why, why it was that.  I just don't

25   remember.

1  Q.   Was all the -- do you recall providing any information to

2  Cristina Orozco, again back in '03, that turned out not to be

3  true?

4  A.   What I remember was we went and saw some houses, and that

5  was it.  For some reason, we didn't buy the house.  Yeah, but I

6  don't remember why.

7  Q.   Okay.  When you worked with Cristina for this house in

8  2006, you had a valid Social Security number at that point,

9  right?

10 A.   Yes.

11 Q.   And had that situation changed from what you had before?

12 A.   What do you mean by that?

13 Q.   That is, did you now have a valid Social Security number?

14 A.   Yes.

15 Q.   As of 2006?

16 A.   Yes.

17 Q.   So you knew you could buy a house then?

18 A.   Yes.

19 Q.   And you hadn't before, is that right?

20 A.   I don't understand your question because that has nothing

21 to do with this.  I mean, with what we are here now.

22 Q.   What do you mean?

23 A.   Because I don't remember why, the reason why on 2003 you

24 are saying I couldn't buy the house because of the information

25 that I provided.  So --

1   Q.   I am just asking you what you remember.

2   A.   If I remember giving her --

3   Q.   Yes.

4   A.   I probably did give her something.  But what I remember is

5   this.  I went and saw some houses, that is what I remember,

6   yes.

7   Q.   But then it didn't go through?

8   A.   I would say it didn't go through.

9   Q.   Okay.  If I may have just one moment.

10          Do you know what bank you obtained the loan

11  modification with for Betsy Ross Lane, the house you live in

12  still today?

13  A.   That is now, the mortgage now?  It is Chase.

14  Q.   Chase?

15  A.   Yes.

16          MR. DAVIS:  Okay.  Nothing further.  Thank you.

17          THE COURT:  Any redirect?

18          MR. GILLIS:  No, Your Honor.

19          THE COURT:  Ms. Reyes, you are excused at this time

20  with our thanks.  Please don't discuss the testimony you have

21  given with anyone until our trial is over.  All right.  Have a

22  good day.

23          THE WITNESS:  Thank you.

24          NOTE:  The witness stood down.

25          THE COURT:  Next witness.

1        MR. GILLIS:  Your Honor, we call David Best.

2        NOTE:  The witness is sworn.

3        DAVID M. BEST, called by counsel for the United

4   States, first being duly sworn, testifies and states:

5   DIRECT-EXAMINATION

6   BY MR. GILLIS:

7   Q.   Good morning, sir.  Nice to meet you.

8   A.   Hi.

9   Q.   Mr. Best, could you tell us your full name, please.

10  A.   David M. Best.

11  Q.   What city do you live in, please?

12  A.   Reston, Virginia.

13  Q.   I understand you are retired now, but what have you done

14  for a living?

15  A.   I am retired Army.  After that I started or started into

16  accounting and tax.  '91 set up a small business in Reston.

17  Sold it at the end of '97, and been working sort of part-time

18  ever since with the company that bought it.

19  Q.   Okay.  Did you prepare -- well, first of all, do you know

20  Dennis Hite?

21  A.   Yes.

22  Q.   Did you prepare Mr. Hite's tax returns for the years, tax

23  years 2002 through at least 2006?

24  A.   There are some still out that haven't been prepared yet.

25  I think we finished through '05.  I am not positive about '06

D.M. Best - Direct

665

1   off the top of my head.  But, no, I don't think we did.

2   Q.   Okay.  If I could, let me ask you to look at Government's

3   Exhibits 58-H1, H2, and H3.

4        COURT SECURITY OFFICER:  I don't have the H series.

5   I only through F.

6        MR. GILLIS:  We have them here, Mr. Ruelas.  The

7   Court's indulgence, please.

8        THE COURT:  Yes, sir.

9        THE WITNESS:  Okay.

10  BY MR. GILLIS: (Continuing)

11  Q.   Do you have those in front of you?

12  A.   Yes, I do.

13  Q.   Do those appear to be the completed tax returns for Mr.

14  Hite for 2004, '5 and '6?

15  A.   '4, yes.  Not '5.  The reason I say that -- wait a minute,

16  it is self-employed -- yeah.  No, I didn't sign it.  So this

17  wouldn't be the -- wouldn't be the one.

18        As a tax preparer, I am required to sign.  And here

19  is '06.  And I haven't signed this one.

20  Q.   May I have a moment?

21        Now, the 2004 one is one that you did prepare?

22  A.   Yes.

23  Q.   Do the 2005 and '6 ones appear to be from your office,

24  although not complete?

25  A.   Yes, I am pretty sure.  I mean, there is nothing on here

1    that would tell me that. But, yes, I feel comfortable with

2    that.

3    Q.    Okay.  Now, if you could look at Government's

4    Exhibit 58-F, as in Foxtrot.

5    A.    Okay.

6    Q.    Do you recognize the letterhead on that document?

7    A.    Yes.

8    Q.    And did you sign it?

9    A.    Yes.

10   Q.    And does that concern Dennis Hite?

11   A.    Yes, it does.

12          MR. GILLIS:  Your Honor, I move in Exhibit 58-F.

13          MR. DAVIS:  No objection.

14          THE COURT:  It is received.

15   BY MR. GILLIS: (Continuing)

16   Q.    Have you prepared similar letters for other clients?

17   A.    Yes.

18   Q.    And have you heard this kind of letter referred to as a

19   CPA letter or a tax preparer letter?

20   A.    Yes.

21   Q.    Do you recognize the fax stamp at the top of that page?

22   A.    Yes.

23   Q.    Is that something that your fax machine puts on there?

24   A.    Yes, this is our fax number.

25   Q.    I beg your pardon?

1  A.   This is our fax telephone number up at the top.

2  Q.   Now, if you would look, please, at Government's

3  Exhibit 60-Z1.  Z as in Zulu, sir.

4        Can you tell us what that is.

5  A.   This a fax from the desk of Ms. Chittenden.

6        MR. GILLIS:  Your Honor, I move in Government's

7  Exhibit 60-Z1.

8        THE COURT:  Any objection?

9        MR. DAVIS:  None.

10        THE COURT:  It is received.

11 BY MR. GILLS: (Continuing)

12 Q.   Now, do you recall, did this come from your files, sir?

13 A.   Yes, it did.

14 Q.   On the second page there is what appears to be a draft

15 letter.

16 A.   Yes.

17 Q.   Did those two pages come together with the fax?

18 A.   Yes.  The fax heading on the very top are the same.  Yes.

19 Q.   Is that draft something you prepared?

20 A.   Yes.

21 Q.   That particular draft that they faxed to you, that is

22 something that you prepared?

23 A.   Yes.  Wait a minute, let me see.

24        No, no, I did not prepare.  I am sorry.  I didn't

25 read it all.  This is a -- this is what they sent me.

D.M. Best - Direct

668

1   Q.   Okay.

2   A.   Because I said here, please, give me something that is

3   going to go --

4   Q.   We will get there.

5   A.   Yes.

6   Q.   My question is only is that --

7   A.   Yes.  It's not from us.

8   Q.   I'm sorry.  Is that draft that is attached to that fax

9   something that you prepared?

10  A.   No.

11  Q.   Now, you were interviewed by the FBI at some point?

12  A.   Yes, I was.

13  Q.   And did you recently review your file for Mr. Hite?

14  A.   This portion of it, yes.

15  Q.   Okay.  And if we could look at the second page there.  And

16  in particular that last sentence.

17       Did Mr. Hite have a rental history for the previous

18  two years of May 2006?

19  A.   Not that I know of in those two years, no.

20  Q.   Okay.  Was there any rental income -- well, I withdraw

21  that question.

22       If you could look at the third page.

23       Can you tell us what that is.

24  A.   This is a fax cover sheet.  It appears that it came to our

25  office.  Our office is the fax number 703-476-0714.

1    Q.    Okay.

2    A.    And it's from, it looks like the same people that page 1

3    is.

4    Q.    Thank you.  On the first page in the lower left, there is

5    a handwritten note there.

6              Do you recognize the handwriting?

7    A.    Is that the one with Dave's signature?

8    Q.    If you look to your left there, you will see it.

9    A.    Yes, yes.

10   Q.    Do you recognize that handwriting?

11   A.    Yes, I do.

12   Q.    Whose is it?

13   A.    That's mine.

14   Q.    Could you read that handwriting to the jury, please.

15   A.    Lorene, I hope this --

16   Q.    You can read it from there, but you have to speak into the

17   microphone, sir.

18   A.    Okay.  I hope this will work.  Let me know what they

19   absolutely need if this doesn't work.

20   Q.    I am sorry, what was the first part of that, the name that

21   is written there?

22   A.    Lorene.

23   Q.    Now, off to the right there is a note there under the word

24   "thanks."

25              Do you know what that is?

D.M. Best - Direct

670

1  A.    That's a note, that's an office administrative note that

2  was originally mailed on the 26th of May, May 26, '06.

3  Q.    That is a note from your office?

4  A.    Yes, an administrative type note.

5  Q.    All right.  If you would, please, look at Government's

6  Exhibit 60-Z2.

7  A.    Yes, I have it.

8  Q.    And can you tell us what that is.

9  A.    This is a letter on the letterhead from our office.  From

10  our office.

11  Q.    And is that associated with that note that you just read

12  to the jury?

13  A.    Yes.  I would say most likely, right.  This is -- this

14  letter was what we --

15  Q.    I am sorry.  Can I just move in Government's Exhibit

16  60-Z2.

17            THE COURT:  Any objection?

18            MR. DAVIS:  None.

19            THE COURT:  All right.  It is received.

20  BY MR. GILLIS: (Continuing)

21  Q.    I am sorry, you were saying this letter is --

22  A.    This letter would be in response to the last exhibit we

23  had that you showed.

24  Q.    And is that your signature on the document?

25  A.    Yes, it is.

1          MR. GILLIS:  One moment, Your Honor.

2          THE COURT:  Yes, sir.

3          MR. GILLIS:  Thank you, Your Honor.

4          THE COURT:  All right.  Cross-examination.

5     CROSS-EXAMINATION

6  BY MR. DAVIS:

7  Q.   Good morning, Mr. Best.

8  A.   Good morning.

9  Q.   You have known Mr. Hite for a long time?

10 A.   Yes, I have.

11 Q.   When did you first meet him?

12 A.   I first met him, and I don't remember how I got his name,

13 but I got his name to come and help me take an oil tank out of

14 my yard because I was switching from oil to electricity.

15 Q.   Do you remember what year that was, roughly?

16 A.   Yes, 2000, 2001.

17 Q.   Do you remember when Mr. Hite became your regular client?

18 A.   After that because people like that would come in and do

19 work for me, I usually give them -- at that time I gave them a

20 card saying I do accounting work, tax work.  So it would have

21 been after that.

22 Q.   And you certainly started doing taxes for him for the 2002

23 tax year?

24 A.   I would say so, yes.

25 Q.   What sort of business was Mr. Hite in over the years that

1    you worked for him?

2    A.   He was in an oil service business.  I think he collected

3    oil, used oil and stuff, and sold that.  He also did -- what he

4    did for me was dug out tanks and installed tanks, I am sure

5    both ways.

6    Q.   Was he self-employed?

7    A.   Yes, he was.

8    Q.   He actually was self-employed, right?

9    A.   Yes.

10   Q.   And did he have a company?

11   A.   Yes.

12   Q.   What was the company called?  It doesn't matter.  But was

13   it something about oil?

14   A.   Yeah, I think it was Southern Oil, yeah.

15   Q.   Was he the head of it?

16   A.   Yes.

17   Q.   Did he have employees?

18   A.   Not that I know of, no.

19   Q.   Okay.  Did he -- go ahead.

20   A.   No, not I knew.  He didn't have any when he was there.

21   Q.   And did he develop other business interests beyond the oil

22   business?  For instance, real estate?

23   A.   Yes.

24   Q.   Okay.  And what was the real estate interest that he

25   developed?

1   A.   Well, basically he was buying property, is the best that I

2   know, because it was a surprise when he came in with that.  I

3   don't mean that in any way really because he hadn't talked to

4   me about it, is really what I meant.  He started buying

5   property and said he was going to fix them up and sell them.

6   Q.   And was he buying single-family houses or other kinds of

7   property?

8   A.   I think most of them were single-family houses.

9   Q.   All right.  And did his taxes start getting complicated?

10  A.   Yes, more complicated, yes.

11  Q.   And you are a tax guy.  What generally -- how did they get

12  more complicated?

13  A.   Well, there was more to do.  There was a different portion

14  of the tax return that had to be done.  It was rentals.  When

15  he got them into rentals, if he got them into rentals.  And

16  keeping track of all the expenses that he had on those

17  properties, what he paid for them, and all the closing costs

18  and all this type of stuff, fix-up costs and everything.

19  Q.   Okay.  And did you understand that Mr. Hite was buying

20  real estate to fix it up and rent it out?

21  A.   That's what he told me when he came in, you know, for

22  taxes and things like that.  That's what he was planning to do.

23  Q.   Okay.

24  A.   To the best of my knowledge.

25  Q.   When did Mr. Hite first start to buy rental property?

1    A.   Oh, that's a long time ago.  I would say 2006.

2    Q.   Okay.  Now, the first letter we see is 58-F.  Do you see

3    that document?

4              And that was one faxed by your office in May of 2005,

5    right?

6    A.   Yes.

7    Q.   And Mr. Hite was your client and you had in fact done his

8    tax return for the last two years.  You were confirming he had

9    been self-employed for those two years, right?

10   A.   Yes.

11   Q.   And do you remember where you faxed this particular

12   letter?

13   A.   To the best of my knowledge, it would have been the same

14   location that we did the '06 letter.

15   Q.   You think to George Mason Mortgage?

16   A.   Yes, I think so.

17   Q.   Let me ask you about that.  Did you get to know any of the

18   people at George Mason by name?

19   A.   No, never met anybody.

20   Q.   Did you know people well enough on the phone to recognize

21   them?

22   A.   Voice?  No.

23   Q.   Did you know a Loretta Micale or Micale, that M-i-c-a-l-e

24   name you see?

25   A.   Just through Mr. Hite.  And what she needed, trying to get

1   what she needed to get the loan to go through.  I didn't know

2   her any other way.

3   Q.   So you didn't know a Loretta to speak to on the phone at

4   George Mason?

5   A.   No.

6   Q.   All right.  Did you a Lorene Chittenden at George Mason?

7   A.   Well, I guess I did, it was on there.  But, I mean, just

8   from the standpoint of business, need this, you know.  Turned

9   down in one letter type thing, you know, because we had a lot

10  of that, not just with George Mason, but they want it said a

11  different way, you know.

12  Q.   I am asking about my client, who is wearing the white

13  sweater at the end of the table.  Do you recognize her?

14  A.   No, I don't.

15  Q.   You don't think you ever met her?

16  A.   No.

17  Q.   In your business dealings, might you write someone's first

18  name on a note like the note we've seen, Lorene, without

19  actually knowing them?

20  A.   Yes.

21  Q.   Just an informal polite way to correspond, right?

22  A.   Yes.

23  Q.   Okay.  Is this letter that we're looking at, which is

24  58-F, what you would call a self-employment letter?

25  A.   Well, that's the big thing all brokers are looking for, is

1    if somebody is self-employed, they want to know that.  But I

2    wouldn't have called it that necessarily because they just

3    wanted to know if we had done their tax returns and were they

4    self-employed, state that.

5    Q.   You said all brokers.  Are you referring to mortgage

6    brokers back in the mid-2000s?

7    A.   Yes, that's when we had a lot of them, yes.

8    Q.   And were there a lot of different mortgage brokers who

9    were asking for self-employment letters?

10   A.   Yes.

11   Q.   And did this become a routine thing that you issued?

12   A.   Not as routine as doing a normal tax return, but, yes, it

13   wasn't unusual.

14   Q.   Did Mr. Hite originally ask you for this letter?

15   A.   Yes, to the best of my knowledge.  It has been a long

16   time.

17   Q.   Anything that --

18          MR. GILLIS:  Excuse me, which letter?

19   Q.   This is 58-F, in May of 2005 that we're looking at.

20          That is Mr. Hite asked to you issue that for him?

21   A.   Yes.  Clients usually, when they went to get their loans,

22   they were told we need this, so they would come back and give

23   us permission to do it.

24   Q.   Okay.  You had many clients who would ask you for similar

25   letters and you issued them, right?

1    A.    Yes.

2    Q.    And you weren't committing fraud when you did that, right?

3    A.    Not that I know of.

4    Q.    Okay.  Now, let's look at 60-Z1.  And that's a fax

5    document from the desk of Lorene Chittenden, right?

6    A.    Yes.

7    Q.    And that's the one that has the note from you back to

8    Lorene, I hope this will work, right?

9    A.    Yes.

10   Q.    Okay.  And attached to that in the second page is the

11   draft letter with the language in it for your signature, right?

12   A.    Yes.

13   Q.    And that shows it was faxed -- now this is a whole year

14   later from the first letter we saw?

15   A.    Yes.

16   Q.    But it's faxed to you from the fax of Micale, do you see

17   that?

18   A.    Yes.

19   Q.    May 25, 2006, right?

20   A.    Yes.

21   Q.    And then it has proposed language for you to use in doing

22   a self-employment letter with rental history, right?

23   A.    Yes.

24   Q.    Was it unusual for you to get a letter from a broker, a

25   mortgage broker -- strike that.

```
 1              Was it unusual for you to get a fax with proposed
 2    language that your client needed for a loan to ask you to write
 3    and sign?
 4    A.   At times it was.  We would sent out a draft.  We knew what
 5    -- basically we thought we knew what they wanted.  But they
 6    would want a comma someplace else.  Usually it didn't change
 7    anything, but it was different order or whatever, you know,
 8    that type thing.
 9    Q.   So mortgage brokers -- and I am not just asking about
10    George Mason Mortgage.  But the mortgage brokers in Northern
11    Virginia in the mid-2000s would send you draft language that
12    they asked you to put in a letter, right?
13    A.   Sometimes they would.  And sometimes I would ask them to
14    because we had so much trouble getting it through, they kept
15    changing --
16    Q.   So, there are cases where you appreciate it when they send
17    you the language needed to get the loan through, right?
18    A.   It got to the point sometimes where if they didn't, we
19    wouldn't -- we weren't going to keep changing it.  You know,
20    tell us what you have to have.
21    Q.   There is nothing fraudulent about a mortgage broker
22    sending you draft language for a self-employment letter, right?
23    A.   If -- fraudulent?  This bothered me because they had
24    rental history in the past two years, which they didn't, and
25    that bothered me.  It bothers me even more now when I see it
```

1   than it did then.

2           So if you're putting things and want me to sign it

3   that is not true, then I would say, yes, that's getting pretty

4   shady.

5   Q.   All right, let's go back with that.  Mr. Hite was dealing

6   with George Mason Mortgage on his own, right?

7   A.   Yes.

8   Q.   He was communicating to George Mason Mortgage in applying

9   for a series of loans, right?

10  A.   Yes.

11  Q.   And he is telling George Mason Mortgage information about

12  his own finances?

13          MR. GILLIS:  Objection, Your Honor, there is no

14  foundation for these questions.

15          THE COURT:  Sustained.

16  BY MR. DAVIS: (Continuing)

17  Q.   You were not involved, Mr. Best, and weren't expected to

18  be involved in communicating information to George Mason

19  Mortgage about all of his various financial dealings except for

20  this one letter, right?

21  A.   And tax returns.

22  Q.   And you don't know if -- you don't know what Mr. Hite told

23  George Mason Mortgage about whether he had rental income or

24  not, right?

25  A.   That's true.

1  Q.   You did know he was buying a lot of property and hoping to

2  fix it up and rent it, right?

3  A.   Yes, he said he was.  I didn't have any proof at that

4  time, but he said he was buying property.  He didn't say how

5  many, didn't say how many he wanted to get or anything.  He

6  just said he wanted to do that.

7  Q.   Okay.  Now, what does rental history mean?  What does that

8  mean?

9  A.   Well, I don't know.  The only thing I did is that I

10  changed, in the letter that went back signed by me, I changed

11  that somewhat and didn't say had rental history in the past two

12  years.

13  Q.   Okay.  And that -- sorry.

14  A.   For me, that meant, with me signing this, this meant that

15  in the past two years we had rental on his tax return.  We

16  actually had a form that says so-and-so, you know, we rented

17  this place, or he rented this place, and here is what he took

18  in, here is what he spent, here is the profit or loss.

19  Q.   Okay.  Showing you 60-Z2.

20          This is the letter that you sent back to George Mason

21  Mortgage?

22  A.   Yes.

23  Q.   And it is changed slightly, right?  It says he has been

24  self-employed for the past two years, which he had been, and

25  has had rental history.  Which he had, right?

1    A.    That's what he said, yes.

2    Q.    Okay.

3    A.    But not in my lifetime.

4    Q.    Not in your lifetime?

5    A.    You know, not since I worked with him.

6    Q.    Okay.  When you sent the letter, did you have any further

7    conversation with George Mason Mortgage about exactly how it

8    was worded?

9    A.    No, I don't recall that.

10   Q.    Did you call George Mason Mortgage and say, you know, I am

11   troubled by exactly how I have worded this?

12   A.    I am not sure, sir.  I can't remember.

13   Q.    Did you talk to Mr. Hite about the issue?

14   A.    Most likely I did, yes.

15   Q.    Do you remember what Mr. Hite told you?

16            MR. GILLIS:  Objection, Your Honor, calls for

17   speculation.

18            THE COURT:  I will allow it.

19            MR. DAVIS:  I am asking what he remembers, Your

20   Honor.

21            THE COURT:  If you recall.

22            THE WITNESS:  I really don't.

23            THE COURT:  All right.

24   BY MR. DAVIS: (Continuing)

25   Q.    You certainly didn't deliberately commit fraud in

D.M. Best - Redirect

682

1    connection with this self-employment and rental letter,

2    correct?

3    A.    Not deliberately, no.

4    Q.    Okay.

5    A.    I had no interest in it.

6    Q.    You have to have intent, right, to commit fraud?

7    A.    I didn't have any interest in it.  That was --

8          THE COURT:  Wait for the next question.  Thank you.

9          MR. DAVIS:  If I may, Your Honor.

10         THE COURT:  Yes, sir.

11         MR. DAVIS:  Nothing further.  Thank you, Mr. Best.

12         THE COURT:  Any redirect?

13         MR. GILLIS:  Yes, Your Honor.

14      REDIRECT EXAMINATION

15   BY MR. GILLIS:

16   Q.   Mr. Best, when you were answering counsel's questions a

17   little bit ago, what you said first was that Dennis Hite was

18   buying property, and he said he was going to fix them up and

19   sell them, correct?

20   A.    Yes.

21   Q.   And you were saying that the taxes would get more

22   complicated if he had rentals, is that what you are saying?  If

23   he rented them?

24   A.    If he rented them, it would make it, you know, more

25   difficult because there are more things to do on the tax

1   return.  But if he just fixed them up and sold them, it would

2   also make it more difficult.

3   Q.   And, sir, do you recall that we talked earlier?

4   A.   Yes.

5   Q.   We talked by phone?

6   A.   Yes.

7   Q.   You also talked with the FBI?

8   A.   Yes.

9   Q.   Do you recall talking with them in March of 2014?

10  A.   Yes.

11  Q.   And do you recall telling the FBI that Mr. Hite's plan was

12  to fix up the properties and sell them?

13  A.   That was -- at that time that's what I, you know, that's

14  what I understood.

15  Q.   And that's what you told them?

16  A.   Yes.

17  Q.   And when I spoke with you, do you recall saying that you

18  could not recall checking -- whether you did check with Mr.

19  Hite about any rental before you -- before you sent those

20  letters?

21  A.   No, I don't.  I don't remember -- I know that I didn't

22  like the way it was worded because we did not do any tax

23  returns with rentals in them in the -- you know, since I have

24  been doing taxes with him.  But I cannot remember if I

25  discussed it with -- you know, what I did then.

D.M. Best - Redirect

684

1   Q.   Do you recall back on March 27 when you spoke with the

2   FBI, that you told them that you cannot remember having a

3   conversation with Hite about Hite collecting rental income?  Do

4   you recall that?

5   A.   That, yes, I do.

6        MS. MARTINEZ:  Thank you, Mr. Best.

7        MR. DAVIS:  One question, Your Honor, recross?

8        THE COURT:  Yes, go ahead.

9        RECROSS-EXAMINATION

10  BY MR. DAVIS:

11  Q.   Mr. Best, Mr. Hite's 2005 tax return had not been

12  completed as of May of 2006, right?

13  A.   Most likely not, no.

14  Q.   It is still not completed, right?

15  A.   That could very well be true.

16       MR. DAVIS:  Thank you.

17       MR. GILLIS:  One question, Your Honor.

18       THE COURT:  Yes, sir.

19       REDIRECT EXAMINATION

20  BY MR. GILLIS:

21  Q.   Your 2005 and 2006 drafts for Mr. Hite do not reflect any

22  rental income, is that true?

23  A.   That's true.

24  Q.   And your 2004 income tax return that you did prepare and

25  did sign does not reflect any rental income, does it?

```
 1   A.    That's true.
 2              THE COURT:  All right.  Thank you, sir.  You are
 3   excused at this time.  Please don't discuss the testimony you
 4   have given here today until our trial is over.
 5              THE WITNESS:  All right.
 6              THE COURT:  Have a good day.
 7              NOTE:  The witness stood down.
 8              THE COURT:  All right.  We are going to take our
 9   mid-morning break now.  I can see it is a little overdue.  And
10   we will come back in 15 minutes.
11              All right, you are excused.  Thank you.
12              NOTE:  At this point the jury leaves the courtroom;
13   whereupon the case continues as follows:
14   JURY OUT
15              THE COURT:  How many more witnesses does the
16   Government have?
17              MR. GILLIS:  Two, Your Honor.
18              THE COURT:  All right.  And you have got witnesses
19   here today prepared to --
20              MR. DAVIS:  We will have them at 2 o'clock, Your
21   Honor.
22              THE COURT:  2 o'clock?  That will be fine.  Okay.
23              All right, we're going to take 15 minutes.
24              NOTE:  At this point a recess is taken; at the
25   conclusion of which the case continues in the absence of the
```

1    jury as follows:

2    JURY OUT

3            THE COURT:  All right.  Ready for our jury?

4            MS. MARTINEZ:  Yes, sir.

5            THE COURT:  Joe, let's get our jury, please.

6            NOTE:  At this point the jury returns to the

7    courtroom; whereupon the case continues as follows:

8    JURY IN

9            THE COURT:  Next witness, Mr. Gillis.

10           MR. GILLIS:  Your Honor, the Government calls Dennis

11   Hite, please.

12           NOTE:  The witness is sworn.

13           DENNIS G. HITE, called by counsel for the United

14   States, first being duly sworn, testifies and states:

15       DIRECT-EXAMINATION

16   BY MR. GILLIS:

17   Q.   Good morning, sir.  Good to see you again.  Could you

18   please tell us your name.

19   A.   Dennis G. Hite.

20   Q.   And what city do you live in, sir?

21   A.   Gainesville.

22   Q.   What do you do for a living?

23   A.   Self-employed.

24   Q.   What is it that you do?

25   A.   I am in the oil service business.

1  Q.   Did you at one time own property on Blackstone Road in

2  Manassas?

3  A.   Yes.

4  Q.   Do you recall approximately when you purchased that

5  property?

6  A.   I think it was June of 2005.

7  Q.   Did you get a loan to buy it?

8  A.   Yes.

9  Q.   From whom?

10 A.   George Mason Mortgage.

11 Q.   Did you deal with a particular loan officer?

12 A.   Yes, Lorene Chittenden.

13 Q.   Do you see Lorene Chittenden in the courtroom today?

14 A.   Yes, I do.

15 Q.   Could you point her out and describe what she is wearing.

16 A.   Sitting at the end of the table here, she has a white

17 sweater on.

18        THE COURT:   I will note the identification of the

19 defendant.

20 Q.   What was your occupation at that time?

21 A.   Still had the same business that I have now.

22 Q.   Now, can you tell us about what your annual income was at

23 the time in May 2005?

24 A.   I think that year was approximately about $75,000.

25 Q.   And do you recall if the defendant asked you information

1    about your income?

2    A.   Yes.

3    Q.   Was there other information she asked for from you?

4    A.   Basically at that time she asked if I could get some type

5    of a letter from my accountant stating that my tax returns, he

6    had prepared them for the last two years.

7    Q.   And what did you do?

8    A.   I contacted David Best and spoke to him.  And he said he

9    would.  And I put those two together.

10   Q.   Now, was all the information that you gave the defendant

11   entirely truthful?

12   A.   For what I put on the application that I filled out, yes.

13   Q.   That's what I'm asking.  The information that you

14   communicated to the defendant, was it all truthful?

15   A.   Yes.

16   Q.   Now, around February 24, 2006, did you refinance the

17   mortgage on Blackstone Road property?

18   A.   Yes.

19   Q.   Did you work with a loan officer?

20   A.   Yes, I did.

21   Q.   Who was that?

22   A.   Lorene Chittenden.

23   Q.   Did you sign a loan application for the Blackstone Road

24   property?

25   A.   Yes.

1    Q.    Where did you get it?

2    A.    It came from Lorene Chittenden.

3    Q.    Do you recall how you received it?

4    A.    It was faxed.

5    Q.    And did you fill it out?

6    A.    No, I did not.

7    Q.    And did she give you any instructions when she faxed the

8    application to you?

9    A.    Just to sign it on the places with the Xs and to fax it

10   back to her.

11   Q.    And what did you -- sorry.  And did you do that?

12   A.    Yes.

13   Q.    Did you review the application before you faxed it back to

14   the defendant?

15   A.    Not thoroughly, no.

16   Q.    And was there -- up until this point, did you provide any

17   additional income to the defendant in connection with this

18   refinance?

19   A.    No.

20   Q.    Were there documents, any documents related to your bank

21   accounts?

22   A.    Yes, the two months prior bank statements.

23   Q.    Now, if you would look, please, at Government's

24   Exhibit 58-D, D as in Delta.

25         Do you have that with you?

```
 1   A.   Yes, I do.

 2   Q.   Can you tell us what that is?

 3   A.   That would be the loan application for the Blackstone Road

 4   property.

 5           MR. GILLIS:  Your Honor, I move in 58-D.

 6           THE COURT:  Any objection?

 7           MR. ROSS:  None, Your Honor.

 8           THE COURT:  It is received.

 9   BY MR. GILLIS: (Continuing)

10   Q.   Do you recognize the signature at the bottom of the first

11   page?

12   A.   Yes.  That's mine.

13   Q.   And do you see the date next to your signature?

14   A.   Yes.

15   Q.   Is that in your handwriting?

16   A.   Yes.

17   Q.   And if you would look, please, at the signatures on the

18   third, fourth -- second, third, and fourth pages.

19           Are those also your signatures?

20   A.   Yes.

21   Q.   Now, do you recognize the handwriting on the rest of that

22   document?

23   A.   No, I do not.

24   Q.   Do you see a fax stamp at the top of the application?

25   A.   Yes.
```

1   Q.   Can you tell us what that is.

2   A.   That's my fax number that I had at that time.

3   Q.   And whom did you fax this document to?

4   A.   Lorene Chittenden.

5   Q.   Does it show the date that you faxed it to her?

6   A.   Yes, February 10, 2006.

7   Q.   Now, in February of 2006 you had the same oil business?

8   A.   Yes.

9   Q.   And actually, if you could just describe a little more

10  thoroughly what it is that you do with your company.

11  A.   Basically I provide services for residents changing over

12  from oil heat to a different heating source.  Usually it is the

13  removal of an old heating oil tank and/or doing a new

14  installation.

15  Q.   Okay.  Now, in February of 2006, can you estimate what

16  your income was at that time?

17  A.   Not really.  I don't have any information in front of me

18  for that.

19  Q.   Okay.  Near the top of the second page it says that you

20  were making in February 2006 $19,000 per month, or close to

21  120,000 -- pardon me, 240,000 a year.

22       Was that correct?

23  A.   No, it was not.

24  Q.   Did you ever tell the defendant that you were making that

25  money at the time of this loan?

1    A.   No, I did not.

2    Q.   At the top of the third page of the application there is a

3    schedule of real estate owned.

4         Do you see that there?

5    A.   Yes, I do.

6    Q.   Do you recognize the properties listed there?

7    A.   Yes.  The top property, Dumfries Road, was my residence.

8    And the other two were properties that I had purchased.

9    Q.   It says there that you were renting out the Blackstone

10   Road property for 3,000 a month.

11        Was that true?

12   A.   No, it was not.

13   Q.   It says you were renting out the Sycamore Drive property

14   for 2,100 a month.

15        Was that true?

16   A.   No, it's not.

17   Q.   Did you provide those rental figures to the defendant?

18   A.   No, I did not.

19   Q.   Were you renting out any of those properties in

20   February 2006?

21   A.   No, they weren't.

22   Q.   If you would look at, please, Government's Exhibit 58-E1.

23        Does that appear to be the typed loan application

24   relating to this loan?

25   A.   Yes, it does.

1    Q.   Do you recognize the -- Your Honor, I move in

2    Exhibit 58-E1.

3              MR. ROSS:  No objection, Your Honor.

4              THE COURT:  It is received.

5    BY MR. GILLIS: (Continuing)

6    Q.   If you would look at the third page of the application.

7              Do you see your signature there?

8    A.   Yes.

9    Q.   Does that look to be the final one that you signed at

10   settlement?

11   A.   Yes, it does.

12   Q.   Do you see the schedule of real estate owned at the top of

13   the third page?

14   A.   Yes.

15   Q.   Now, there it shows for the Sycamore Drive property, the

16   $2,100 per month that we saw in the handwritten application.

17             Do you see that?

18   A.   Yes, I do.

19   Q.   And then for the Blackstone Road property, however, it

20   says now that the rental was zero, which is different from the

21   handwritten application we looked at.

22   A.   Yes.

23   Q.   Did you have any discussion with the defendant concerning

24   the rental income of the Blackstone Road property that would

25   account for that change?

1   A.   No, I did not.

2   Q.   If you would look now at Government's Exhibit 58-F.

3        Do you recognize the letterhead there?

4   A.   Yes.

5   Q.   Does that appear to be the kind of letter the defendant

6   asked you to get?

7   A.   Yes, from my accountant.

8   Q.   Did you ask Mr. Best to prepare that?

9   A.   Yes, I did.

10  Q.   Is that letter true?

11  A.   Yes.

12  Q.   If you would look now, please, at Government's

13  Exhibit 58-M2.

14       That's an Operating Income Statement for the

15  Blackstone Road property, is that right?

16  A.   Yes.

17  Q.   That's the address you see there for one of your

18  properties?

19  A.   Yes, I do.

20       MR. GILLIS:  I move to admit Government's

21  Exhibit 58-M2.

22       THE COURT:  Any objection?

23       MR. ROSS:  None, Your Honor.

24       THE COURT:  It is received.

25  BY MR. GILLIS: (Continuing)

1    Q.    Mr. Hite, did you prepare that document?

2    A.    No, I did not.

3    Q.    Did you know anything about it when you were dealing with

4    the defendant about this loan?

5    A.    No, I did not.

6    Q.    It says there that you were renting the Blackstone

7    property for 21,600 per year.

8              Was that true?

9    A.    No, it was not.

10   Q.    Did you ever tell the defendant that you were planning to

11   rent the Blackstone property?

12   A.    No, I did not.

13   Q.    At some point did you purchase property on Dover Road in

14   Warrenton, Virginia?

15   A.    Yes.

16   Q.    And that was around March 29, 2006?

17   A.    Correct.

18   Q.    Did you get a loan for that?

19   A.    Yes, I did.

20   Q.    Did you work with a loan officer?

21   A.    Yes, I did.

22   Q.    Who was that?

23   A.    Lorene Chittenden.

24   Q.    Did you fill out an application for that loan, do you

25   recall?

1    A.   No, I did not.

2    Q.   If you would look, please, at Government's Exhibit 59.

3         Does that appear to be -- do you have it with you

4    there?

5         COURT SECURITY OFFICER:   59-D?

6    Q.   59-D, yes.  You are a step ahead of me, Mr. Ruelas.

7         Do you recognize the signature at the bottom of that

8    page?

9    A.   Yes, that's my signature.

10   Q.   Is the date next to the signature in your handwriting?

11   A.   No, it's not.

12   Q.   Now, if you would compare the first page of Government's

13   Exhibit 59-D to Government's Exhibit 58-D, the one on the

14   bottom is in your handwriting, that date?

15   A.   Yes.

16   Q.   And the one on the top is not?

17   A.   No, it's not.

18   Q.   And do you recognize the handwriting on the rest of the

19   application, 59-D?

20   A.   No, I do not.

21   Q.   In other words, the one for the Dover Road property?

22   A.   No, I do not.

23   Q.   On the second page there is the income figure again of

24   $19,000 per month.  Did you ever tell the defendant or anyone

25   else that you earned that in connection with this loan?

1    A.   No, I did not.

2    Q.   On the third page there is again the rental amount shown

3    for the Blackstone and Sycamore properties.

4             Were those properties rented at the time?

5    A.   No, they were not.

6    Q.   Did you tell the defendant that they were rented?

7    A.   No, I did not.

8    Q.   Did you provide those income figures?

9    A.   No, I did not.

10   Q.   Is any of that in your handwriting?

11   A.   No.

12   Q.   At the bottom of the left -- pardon me, the bottom left of

13   the third page, it says there that you met face to face with

14   the defendant when this application was taken by her.

15            Was that true?

16   A.   No, it was not.

17   Q.   Had you met her up until this time?

18   A.   No, I had not.

19   Q.   If you would look, please, at Government's Exhibit 59-E1.

20            Do you have it there?

21   A.   Yes.

22   Q.   Is that the corresponding typed application?

23   A.   Yes.

24            MR. GILLIS:  Your Honor, I move to admit 59-E1.

25            MR. ROSS:  No objection, Your Honor.

1          THE COURT:  It is received.

2     BY MR. GILLIS: (Continuing)

3     Q.   Would you look at the third page.

4          Do you see your signature there?

5     A.   Yes, I do.

6     Q.   Now, on the top of 59-E1 it says that you were renting the

7     Blackstone Road property for $3,000, while on the typed

8     application for the Blackstone refi, which is Exhibit 58-E1 --

9     if you want, you can look to your left there at that screen.

10         Comparing the two, do you see that one says that

11    Blackstone was rented for 3,000, and the earlier one says that

12    it was not rented?

13    A.   Yes, I see that.

14    Q.   I beg your pardon?

15    A.   I see that.

16    Q.   Did you have any discussion with the defendant concerning

17    the rental income or lack of rental income for the Blackstone

18    property that would account for that change?

19    A.   No, I did not.

20    Q.   The property was not rented?

21    A.   No, it was not.

22    Q.   May I have one moment, Your Honor?

23         THE COURT:  Yes, sir.

24    Q.   Now, when you first dealt with the defendant, did you own

25    property then?

1  A.    Yes.

2  Q.    What did you own?

3  A.    4115 Dumfries Road, it was personal residence.  And there

4  was a second property on that property of 4127 Dumfries Road.

5  Q.    Did anyone live there?

6  A.    No.  It was being remodeled for my mother.

7  Q.    And what plans did you have for your mother's house?

8  A.    For her to be able to move into it.  That was going to be

9  her home.

10         THE COURT:  I need to you speak up a little bit, Mr.

11  Hite.

12  A.    Sorry.

13  Q.    If you would like, you can pull your chair a little

14  closer, perhaps.

15         I'm sorry, your plans for that house were?

16  A.    That was where my mother was going to live.

17  Q.    Now, if you could please tell me if you owned property on

18  Blake Lane in Bealeton at one time?

19  A.    Yes, I did.

20  Q.    Did you refinance that in about June of 2006?

21  A.    Yes.

22  Q.    Sir, can you tell the jury what you were planning to do

23  with these properties when you bought them?

24  A.    I planned on trying --

25  Q.    Not just this one, but these properties that we've talked

1    about and are going to talk about.

2    A.    I planned on keeping a couple of them as rental

3    properties, and then fixing and selling the other properties.

4    Q.    Who was going to do the fixing?

5    A.    Myself and other contractors I would bring in.

6    Q.    Now, in the case of the Blake Lane property in Bealeton,

7    Virginia, if you would look, please, at Government's

8    Exhibit 60-D.

9          MR. ROSS:  Pardon me one second, counsel.

10         Your Honor, this is one that is not in indictment.

11   So if Your Honor would just advise the jury, please.

12         THE COURT:  Again, as counsel stated, this is not

13   part of the indictment.  And you may consider it for purposes

14   of showing motive, intent, lack of mistake.  Thank you.

15   BY MR. GILLIS: (Continuing)

16   Q.    Does that look like the loan application for the

17   refinancing of Blake Lane?

18   A.    Yes, it does.

19         MR. GILLIS:  Your Honor, I move to admit 60-D.

20         MR. ROSS:  No objection, Your Honor.

21         THE COURT:  It is received.

22   BY MR. GILLIS: (Continuing)

23   Q.    Mr. Hite, do you recognize your signature on the third

24   page?

25   A.    Yes, I do.

1   Q.   And on the other pages as well?

2   A.   Yes.

3   Q.   I beg your pardon, could you go back to the -- up until

4   this time, had you met face to face with the defendant?

5   A.   No, I had not.

6   Q.   Do you see the fax stamp at the top of the application on

7   the fourth page?

8   A.   Yes.

9   Q.   Is that something that your fax puts on there?

10  A.   Yes, it does.

11  Q.   Whom did you fax this to?

12  A.   Lorene Chittenden.

13  Q.   And you faxed -- does it show on there or on one of the

14  other pages what day you faxed it to her?

15  A.   Yes, it looks like -- it's the 17th of '06 something -- I

16  can't read it, the first part of it.

17  Q.   Now, on that fourth page, your signature there, is that in

18  your handwriting?

19  A.   Yes, it is.

20  Q.   And how about the date next to it?

21  A.   Yes.

22  Q.   Do you see some handwriting on that document?

23  A.   Yes, I do.

24  Q.   Was that handwriting there when you faxed it to the

25  defendant?

1    A.   Not that I remember, no.

2    Q.   Is that in your handwriting?

3    A.   No, it's not.

4    Q.   Is that statement there true?

5    A.   No, it's not.

6    Q.   Now, on the fifth page there appears to be the same

7    statement, but the date next to your signature is different.

8         Do you see that?

9    A.   Yes, I do.

10   Q.   Do you recognize the handwriting of that date?

11   A.   No, I do not.

12   Q.   Is it yours?

13   A.   No.

14   Q.   On the rest of that application, do you recognize the

15   handwriting on the rest of it?

16   A.   No, I do not.

17   Q.   Apart from your signature?

18   A.   Correct.

19   Q.   Near the top of the third page of the loan application,

20   there is a Schedule of Real Estate Owned.

21        Do you recognize the properties listed there?

22   A.   Yes, I do.

23   Q.   In addition to the Blackstone Road and Sycamore

24   properties, it now says that you were renting out the Dover

25   Road property for $3,600 per month.

```
 1              Was that true?

 2   A.   No, it was not.

 3   Q.   Is any of that in your handwriting?

 4   A.   No, it's not.

 5   Q.   And what do you know about those rental figures there?

 6   A.   Absolutely nothing.

 7   Q.   What did you tell the defendant about renting these

 8   properties?

 9   A.   There was never a discussion.

10   Q.   Okay.  Now, if you would look, please, at Government's

11   Exhibit 60-E1.

12              Can you tell us what that is?

13   A.   That was an application for a second mortgage on the Blake

14   Lane property.

15   Q.   Is that the same loan we've just been talking about?

16   A.   Previously, yes.

17              MR. GILLIS:  Your Honor, I move 60-E1.

18              THE COURT:  Any objection?

19              MR. ROSS:  None, Your Honor.

20              THE COURT:  It is received.

21   BY MR. GILLIS: (Continuing)

22   Q.   Look at the third page, if you will.

23              Do you see your signature there?

24   A.   Yes, I do.

25   Q.   And do you recall when you signed that?
```

1   A.   It looks like it's June 13, 2006.

2   Q.   At settlement?

3   A.   Yes.

4   Q.   Now, do you see at the top of that page the Schedule of

5   Real Estate Owned?

6   A.   Yes.

7   Q.   And the list then continues on to the fifth page or the

8   last page, do you see that?

9   A.   Yes, I do.

10  Q.   So now in addition to the Blackstone Road, Sycamore, and

11  Dover Road properties, it says that you were renting out the

12  Blake Lane property for $1,259.

13          What did you tell the defendant about that?

14  A.   There was no discussion about the rentals.

15  Q.   Did she -- did you provide her with this information?

16  A.   No, I did not.

17  Q.   What information did you provide her about renting these

18  properties?

19  A.   Nothing.

20  Q.   And what did you tell the defendant about what your plans

21  were for renting these properties?

22  A.   Well, I was still in the process of working on these

23  properties and hadn't made up my mind which ones were going to

24  be kept or sold.

25  Q.   Now, the exhibit -- pardon me, Exhibit 60-F.

1          Can you tell us what that is.

2    A.   It looks like --

3    Q.   Can you recognize the letterhead on the document?

4    A.   Yes, it came from David Best, my accountant.

5          MR. GILLIS:  Your Honor, I move in 60-F.

6          MR. ROSS:  No objection, Your Honor.

7          THE COURT:  Received.

8    BY MR. GILLIS: (Continuing)

9    Q.   Now, any time around this loan, did you see this document?

10   A.   No, I did not.

11   Q.   Did you ask Mr. Best to write the letter for you?

12   A.   I don't remember asking him, no.

13   Q.   Well, did you ask him to write a letter saying that you

14   had rental history?

15   A.   No, I did not.

16   Q.   Was that true in May of 2006, did you have any rental

17   income?

18   A.   No, I did not.

19   Q.   Did you have any discussion -- well, let me ask it this

20   way.

21          What discussion did you have with the defendant about

22   getting a letter that would say that you had rental income?

23   A.   I don't recall any discussion.

24   Q.   Did she ever tell you that she was going to ask Mr. Best

25   for such a letter?

1    A.    No, she did not.

2    Q.    Please look at Government's Exhibit 61-D.

3          Does that appear to be a loan application for a

4    refinance of the Dumfries Road property?

5    A.    Yes, it is.

6          MR. GILLIS:  Your Honor, I move in 61-D.

7          MR. ROSS:  No objection, Your Honor.

8          THE COURT:  Received.

9    BY MR. GILLIS: (Continuing)

10   Q.    Now, on the second page -- first of all, if we go to the

11   top of that for a second.

12         Is that your fax signature?

13   A.    Yes, it is.

14   Q.    Now, what's the date of this loan application?

15   A.    September 26, 2006.

16   Q.    And on the second page at the top, now it shows your

17   income to be $29,000 per month.

18         Was that true?

19   A.    No, it's not.

20   Q.    Did you ever tell that to the defendant?

21   A.    No, I did not.

22   Q.    If we could look, please, at Government's Exhibit 61-E1.

23         Do you have that in front of you?

24   A.    Yes, I do.

25   Q.    Does that appear to be the typed loan application that you

1    signed at settlement?

2    A.   Yes.

3              MR. GILLIS:  Your Honor, I would move in 61-E.

4              MR. ROSS:  No objection, Your Honor.

5              THE COURT:  It is received.

6    BY MR. GILLIS: (Continuing)

7    Q.   Now, on the second page of that document at the top it

8    shows your income to be $20,000.

9              Did you ever have any conversation with the defendant

10   about your income going from 29,000 to 20,000 --

11   A.   No, I did not.

12   Q.   -- per month?  Was either one of those figures true?

13   A.   No.

14   Q.   Now, there are on the third page at the top and then

15   carrying over, a Gross Rental Income column there for six

16   properties, all showing gross rental amounts.

17             Do you see that on that page and on the continuation

18   page?

19   A.   Yes.

20   Q.   To be clear, did you own all of those properties?

21   A.   Yes.

22   Q.   Okay.  Were you renting any one of them?

23   A.   No, I was not.

24   Q.   Did you ever tell the defendant that?

25   A.   No.

1   Q.   Could you look, please, at Government's Exhibit 62-D.

2          Does that appear to be a loan application for the

3   refinance of Dumfries Road?

4   A.   The 4127 Dumfries Road property, yes.

5   Q.   That's correct.  Okay, these are the properties that you

6   told us about, the one that you were living in and the one that

7   you planned for your mom to live in?

8   A.   Correct.

9   Q.   Okay.  And so, do you recall why you were refinancing

10  these at the time?

11  A.   Both properties previously were on one parcel of land.  To

12  separate the two, I had to get mortgages for both properties.

13  Q.   And what was the point of separating the two parcels?

14  A.   In case something was to happen to me, that the other

15  property would go transfer over to my mother.

16  Q.   Now, did this loan take place at the same time then as the

17  other Dumfries Road property?

18  A.   Yes, same day.

19  Q.   Okay.  I'm sorry, between these two, if we could refer to

20  them, the one, the first one that we talked about, was that for

21  your mom or --

22  A.   4115 was my primary residence.

23  Q.   Okay.  I am only trying to stop referring to the exact

24  address, but if it's easier for you and if it is all right with

25  you, you can certainly say it.

1          And then the second one, that was for your mom?

2   A.   Correct.

3   Q.   Okay.  And these were -- these loan applications, do you

4   recall, did you submit them at the same time?

5   A.   Yes.

6   Q.   And who was the loan officer for those two loans?

7   A.   Lorene Chittenden.

8   Q.   If you would look, please, at Government's Exhibit 62-D.

9          Do you have that in front of you?

10  A.   Yes.

11         MR. GILLIS:  Can I move that into evidence, Your

12  Honor.

13         THE COURT:  Yes.  Any objection?

14         MR. ROSS:  No, sir.

15         THE COURT:  It is received.

16  BY MR. GILLIS: (Continuing)

17  Q.   Now, if you would look at the fax -- let's say at the fax

18  signature of that one first.

19         If it is easier to have it on paper, I can ask you to

20  look at 61-D, or you can look at it on the screen.

21  A.   I have 62-D here, and it is my fax stamp on it.

22  Q.   Okay.  Does it have a page number on it at the end of the

23  fax stamp there?

24  A.   Page 1.

25  Q.   Okay.  And for the 61-D loan application, the handwritten

1   loan application, does that have -- 61-D.

2          Do you notice that the time stamp and the page --

3   does it appear to be that you faxed these all at one time?

4   A.   Yes, it does.

5   Q.   And whom did you fax them to?

6   A.   Lorene Chittenden.

7   Q.   On the last page of 62-D -- first, is that your signature

8   at the bottom?

9   A.   Yes, it is.

10  Q.   Okay.  And the rest of the handwriting there, is any of

11  that in your handwriting?

12  A.   No, it's not.

13  Q.   Was any of that there when you faxed it to the defendant?

14  A.   Not that I recall.

15  Q.   It shows that those two properties listed there have rent

16  of $2,500 and $3,500.

17         Is that true?

18  A.   No, it's not.

19  Q.   Did you give any of that information to the defendant?

20  A.   No, I did not.

21  Q.   On page 3, there is some additional rental properties at

22  the top there.

23         Any of that in your handwriting?

24  A.   No, it is not.

25  Q.   Did you provide any of those figures to the defendant?

D.G. Hite - Direct

711

1    A.   No, I did not.

2    Q.   Now, if you would look and compare that part of 61-D to

3    the same part -- pardon me, of 62-D -- if we can do through the

4    magic of technology here.

5          Do you see -- and maybe we can leave the fax stamp

6    and signature in it.

7          Do you see there on the one at the top, the one

8    that has the page 9, the Gross Rental Income figures there --

9    that column is not filled in.  Whereas on the one on the

10   bottom, the Gross Rental Income is provided there for three of

11   the properties.

12         Now, first, you've already told us that none of these

13   is accurate, is that right?

14   A.   Correct.

15   Q.   Did you have any discussion about any of this -- actually,

16   let me ask it this way.

17         What discussion did you have with the defendant that

18   would account for there being these figures in here in one

19   where there wasn't in the other?

20   A.   I had no conversation with her about it.

21   Q.   And none of this is in your handwriting?

22   A.   No, it is not.

23   Q.   Could you look at 62-E1.

24         62-E1, does that appear to be the typed loan

25   application for the property we were last discussing?

1    A.   Yes, it does.

2              MR. GILLIS:  Your Honor, I move in 62-E1.

3              THE COURT:  Any objection?

4              MR. ROSS:  No objection, Your Honor.

5              THE COURT:  It is received.

6    BY MR. GILLIS: (Continuing)

7    Q.   Is that your signature on the third page?

8    A.   Yes, it is.

9    Q.   At the top, do you see that the Blake Lane gross rent is

10   shown to be $2,500?

11   A.   Yes, I see that.

12   Q.   Now, if I could ask you to look, please, at Government's

13   Exhibit 60-E1.

14             And if I could ask my colleague, Ms. Porter, to put

15   that up there as well.

16             So for 60-E1, which we were discussing earlier, do

17   you see that the Blake Lane gross rental is shown to be $1,259?

18   A.   It's not on this page.

19   Q.   Well, that's a good point, it's not on that page.  I beg

20   your pardon, my mistake.  And I apologize to you as well, Ms.

21   Porter.

22             What I would like is if you could look, please, at

23   62-E1, the third page, and 60-E1, the fifth page.

24             Okay.  Now, on 60-E1, which we were talking about for

25   one of your loans, it shows the Blake Lane gross rent to be

1   $1,259.

2            Do you see that?

3   A.   Yes, I do.

4   Q.   And then on 62-E1, at the top, it shows the Blake Lane

5   gross rental to be 2,500.

6            Do you see that?

7   A.   Yes, I do.

8   Q.   And what conversations did you have with Ms. Chittenden

9   that would account for the difference in those two alleged

10  rental figures?

11  A.   We never had a conversation.

12  Q.   Ever tell her any of those figures?

13  A.   No, I did not.

14  Q.   And was either of those figures true?

15  A.   No, it was not.

16  Q.   Indeed, was Blake Lane being rented at that time?

17  A.   No, it was not.

18  Q.   Were any of these properties being rented at that point?

19  A.   No, they weren't.

20  Q.   Now, at some point did you get a second mortgage on this

21  Dumfries Road property?

22  A.   Yes, I did.

23  Q.   Look at Government's Exhibit 65-D, if you would, please.

24            MR. ROSS:  Pardon me, Your Honor.  If I may, this is

25  another one that is not the indictment, please.

1          THE COURT:  All right.  Again, ladies and gentlemen,

2     this is not part of the indictment, so you may consider it for

3     purposes of intent, motive, lack of mistake.   Thank you.

4     BY MR. GILLIS: (Continuing)

5     Q.   Can you tell the jury what that is, please.

6     A.   This is a second mortgage for the 4127 Dumfries Road

7     property.

8     Q.   Do you see the fax stamp at the top of that -- well, let's

9     start with the top of the first four pages there.

10          I am sorry, I am reminded that I need to move this

11     in, Your Honor.

12          THE COURT:  Any objection?

13          MR. ROSS:  No, Your Honor.

14          THE COURT:  It is received.

15     BY MR. GILLIS: (Continuing)

16     Q.   If we can just look at the top fax stamp there.

17          That is your fax signature?

18     A.   Yes, it is.

19     Q.   Whom did you fax this loan application to?

20     A.   Lorene Chittenden.

21     Q.   Now, looking at the last page there, do you see, first of

22     all, that there is -- is your signature there on that last

23     page?

24     A.   No, there is not.

25     Q.   And looking at the whole document, is there any fax stamp

D.G. Hite - Direct

715

1   on that document?

2   A.   No, there is not.

3   Q.   Now, looking at the third and last -- before we leave

4   there, is any of this in your handwriting?

5   A.   No, it's not.

6   Q.   Now, looking at the third and last pages, it shows that

7   you now have seven properties being rented, each with gross

8   rental figures.

9            Any of that true?

10  A.   No, it is not.

11  Q.   Any of that something that you told the defendant?

12  A.   No, I did not.

13  Q.   Any of that in your handwriting?

14  A.   No, it is not.

15  Q.   Were any of these being rented?

16  A.   No, they weren't.

17  Q.   The Court's indulgence.

18            THE COURT:  Yes, sir.

19  Q.   Could you go back to 60-D, please, that last page.  Can

20  you read that to the jury.

21  A.   To whom it may concern:  The moneys in my bank account are

22  funds I received from my income.  Several customers pay

23  quarterly and have very large paid receipts.  After all

24  expenses, I issue myself a bonus.  And these bonuses are large

25  and are the reason for the fluctuation in my accounts.

1    Q.    Mr. Hite, what kind of bonuses do you issue yourself?

2    A.    None.

3    Q.    No bonuses in your job?

4    A.    Never.

5    Q.    You are a lousy employer?

6    A.    I know.

7    Q.    How about the several customers who pay quarterly and have

8    very large receipts, paid receipts.

9    A.    I have no customers like that.

10   Q.    Did you give any of this information to the defendant?

11   A.    No, I did not.

12   Q.    Could you look at Government's Exhibit 63-D, please.

13             I beg your pardon, I have the wrong exhibit there.

14             Could you look, please, at Government's Exhibit 64-D.

15             MR. ROSS:  Your Honor, one more time, this is one

16   that is not in the indictment.

17             THE COURT:  This also is not part of the indictment,

18   but it may be considered by you for motive, intent, lack of

19   mistake.

20             A JUROR:  Your Honor --

21             THE COURT:  Yes, sir.

22             A JUROR:  What's the third thing you are saying?

23             THE COURT:  Lack of mistake.

24             A JUROR:  Lack of mistake?

25             THE COURT:  Yes.  And there will be an instruction at

1   the close of the case which will more fully explain the

2   admissibility of this information.

3            Go ahead, Mr. Gillis.

4            MR. GILLIS:  Thank you, Your Honor.

5   BY MR. GILLIS: (Continuing)

6   Q.   Did you refinance property that you owned on Oak Shade

7   Road in Bealeton?

8   A.   Yes, I did.

9   Q.   Could you look at 64-D, please.

10           Do you have that in front of you?

11  A.   Yes, I do.

12  Q.   Does that look to be a loan application for that

13  refinance?

14  A.   Yes, it does.

15  Q.   Look, please, at the fifth page of that document.

16           And while he is doing that, Your Honor, I would move

17  in 64-D.

18           MR. ROSS:  No objection, Your Honor.

19           THE COURT:  It is received.

20  BY MR. GILLIS: (Continuing)

21  Q.   I don't think we need to zoom in on anything on the

22  document at this point, but looking at the top of it, do you

23  see your fax signature there?

24  A.   Not on the last page, no.

25  Q.   No, exactly, not on the last page, but on the other four

1    pages?

2    A.    Yes.

3    Q.    And you faxed that on February 7, 2007?

4    A.    Yes, I did.

5    Q.    Whom did you fax that to?

6    A.    Lorene Chittenden.

7    Q.    Now, on that fifth page where you just observed that there

8    was no fax signature, is any of that in your handwriting?

9    A.    No, it is not.

10   Q.    Your name is written at the top there.

11            Is that your signature?

12   A.    No, it's not.

13   Q.    Is any of the handwriting on this in yours?

14   A.    No, it is not.

15   Q.    Could you like at Government's Exhibit -- I beg your

16   pardon, Your Honor.

17            Now, did you also at some time purchase property on

18   Kentwood Lane?

19   A.    Yes, I did.

20   Q.    Could you look, please, at Government's Exhibit 66-D.

21            At the top of 66 -- well, first of all, tell jury

22   what 66-D is, if you could.

23   A.    It is a loan application, but it's got TBD on the line, I

24   guess that is to be determined.

25   Q.    Do you see at the top a fax signature of February 7, '07?

1    A.   Yes, I do.

2    Q.   Could you compare that to the fax signature for 64-D, as

3    in Delta.

4         Do you have the two of them in front of you there?

5    A.   No, I do not.

6    Q.   Let me ask you to look first at 66-C1.

7         Can you tell us what that is.

8    A.   This is the typed application for the Kentwood Lane

9    property.

10   Q.   Can you -- I beg your pardon.  Mr. Ruelas, I am mumbling

11   again.  Could you please give him 66-C1, 66 Charlie 1.

12        Do you have 66-C1?

13   A.   Yes, I do.

14   Q.   All right.  Is that -- tell us what that is, if you would.

15   A.   It is the Settlement Statement.

16   Q.   For what property?

17   A.   That would be the Kentwood Lane property.

18   Q.   Okay.  And what is the -- what was the date of settlement?

19   A.   March 5, 2007.

20   Q.   All right.  Now, Mr. Ruelas, could he look, please, at

21   Government's Exhibit 64 Charlie 1.

22        COURT SECURITY OFFICER:  I have 64-C, no 1.

23   Q.   You are right, yes, sir.

24        Tell us what that is, please.

25   A.   Settlement Statement for the Oak Shade Road property.

D.G. Hite - Direct

720

1   Q.   And what's the date of that settlement?

2   A.   February 23, 2007.

3   Q.   About a week or so before the one we just looked at --

4   A.   Yes, approximately.

5   Q.   Okay.  Do you recall if you submitted one or more than one

6   application for those two loans?

7   A.   No, I do not.

8   Q.   Does the 66-D application with the TBD on it, does that

9   appear to be the application for this --

10          MR. ROSS:  I think it is leading at this point, Your

11  Honor.

12          THE COURT:  It is.  Sustained.

13          MR. GILLIS:  Your Honor, at this time I would move in

14  64-C and 66 Charlie 1.

15          THE COURT:  Any objection?

16          MR. ROSS:  No objections, Your Honor.

17          THE COURT:  They are received.

18  BY MR. GILLIS: (Continuing)

19  Q.   Now, look, if you will, at the fax signature for the top

20  of 66 Delta.

21  A.   That's my fax signature.

22  Q.   All right.  And if you would look at the top of the fax

23  signature for 64 Delta.

24  A.   Yes, that's my fax signature.

25  Q.   Actually comparing the two, are they identical?

1   A.   Yes, they are.

2   Q.   Are your signatures on the first page identical?

3   A.   Yes, they are.

4   Q.   On 66 Delta, do you see your signature on the third page

5   of that?

6   A.   Yes, I do.

7   Q.   And do you see -- and if you compare that signature to the

8   signature on 64 Delta on the third page, do those appear to be

9   identical?

10  A.   Yes, they do.

11            MR. GILLIS:  Okay.  Your Honor, I move in

12  Government's Exhibit 66 Delta.

13            THE COURT:  Any objection?

14            MR. ROSS:  No objection, Your Honor.

15            THE COURT:  It is received.

16  BY MR. GILLIS: (Continuing)

17  Q.   Now, on the first page of 66-D, and comparing that to

18  64-D, apart from the fact that the property address has

19  changed, and the figures above it regarding the loan, does that

20  appear to be the same document that you faxed on February 7,

21  2007?

22  A.   Yes, it does.

23  Q.   And whom did you fax that to, please?

24  A.   Lorene Chittenden.

25  Q.   And on that last page, those rental figures there -- first

1    of all, that page has no fax stamp on it?

2    A.    No, it does not.

3    Q.    As do the others?

4    A.    Yes, all the others have a fax stamp.

5    Q.    Any of that -- any of that in your handwriting?

6    A.    No, it is not.

7    Q.    Would you please take a look at Government's Exhibit 67-D.

8          Tell us, if you would, what that is.

9    A.    That's a loan application with TBD on it, to be

10   determined.

11   Q.    And what is the date of that application?

12   A.    It looks like it is 2/7/07.

13   Q.    Okay.  Would you compare the fax signature at the top of

14   that page -- or perhaps you recall, the fax signature at the

15   top of that page relative to the other two applications that we

16   were just looking at.

17   A.    It looks like my fax signature.

18   Q.    Okay.  And if you look at the -- do those appear to be --

19   well, let's take a look at the bottom, the signature on the

20   first page of 67-D.

21         Your Honor, first of all, I'm sorry, I move in 67-D.

22         THE COURT:  Any objection to it?

23         MR. ROSS:  None, Your Honor.

24         THE COURT:  It is received.

25   BY MR. GILLIS: (Continuing)

1    Q.    Okay.  Can you tell us, what is the date of this

2    application?

3    A.    It looks like it says 3/7/07.

4    Q.    Did you notice something about that when we met?

5    A.    Yes, I did.

6    Q.    Tell the jury, if you would.

7    A.    Well, it looks like somebody changed the 2 to a 3.

8    Q.    And if we could have Ms. Porter show us 66 Delta again,

9    and that signature and date.

10            Did you make that change?

11   A.    No, I did not.

12   Q.    And again at the end of that application, 67-D, we see

13   that -- well, perhaps it is the penultimate page.  The third

14   page, I beg your pardon.  No, I am sorry, the third page.

15            I beg your pardon, Your Honor, the fourth page.

16   Thank you.

17            Again, there is this -- this page has no fax

18   signature?

19   A.    No, it does not.

20   Q.    Any of that, those figures there, in your -- is any of it

21   in your handwriting, any of this document?

22   A.    None of it.

23   Q.    And those gross rental figures, any of those true?

24   A.    No, they are not.

25   Q.    One moment, sir.

```
 1              THE COURT:  Yes, sir.
 2   Q.   Look at 63-D, please.
 3              Can you tell the jury what that is, please.
 4   A.   It is a loan application with TBD on it.
 5   Q.   Who is the borrower on this property, or on this
 6   application?
 7   A.   I am.
 8   Q.   And who is the loan officer?
 9   A.   Lorene Chittenden.
10              MR. GILLIS:  Your Honor, I would move 63-D.
11              MR. ROSS:  No objection, Your Honor.
12              THE COURT:  It is received.
13   BY MR. GILLIS: (Continuing)
14   Q.   Now, on the last page of this document there is this
15   schedule again.
16              Any of that true?
17   A.   No, it is not.
18   Q.   Any of it in your handwriting?
19   A.   No, it is not.
20   Q.   If you would look, please, at 63-C1.
21              This is a Settlement Statement for what property?
22   A.   Oak Shade Road.
23   Q.   Did you work with a Realtor on this property, do you
24   recall?
25   A.   Yes, I did.
```

1    Q.   And who was that?

2    A.   Lorene Chittenden.

3    Q.   I am sorry, a real estate officer.  Take a look at the

4    second page of -- Your Honor, I move in 63-C1.

5              MR. ROSS:  No objection, Your Honor.

6              THE COURT:  It is received.

7    BY MR. GILLIS: (Continuing)

8    Q.   Take a look at the second page there of 63-C1.

9              Looking at that, does that refresh your memory as to

10   whether you worked with a real estate agent for this particular

11   transaction?

12   A.   Yes, I did.

13   Q.   And who was that?

14   A.   Saul Canas.

15   Q.   Now, this particular purchase was in November, it was on

16   November 21, 2006, is that right?

17   A.   Yes.

18   Q.   All right.  And so, on the properties that we were looking

19   at before this, did you work with Mr. Canas to find and get

20   those properties?

21   A.   One other property, Blake Lane.

22   Q.   Pardon me?

23   A.   Blake Lane, just the one other property.

24   Q.   Just that one?

25   A.   Yes.

1    Q.   And then we were looking also at loans that you got in

2    February of 2007, March 2007, and another in March 2007.

3              Did you use Mr. Canas for those properties?

4    A.   No, I did not.

5              MR. GILLIS:  Could I have one last moment, Your

6    Honor?

7              THE COURT:  Yes, sir.

8              MR. GILLIS:  Thank you, sir.  Thank you very much.

9              THE COURT:  Cross-examination.

10             MR. ROSS:  Thank you, Your Honor.

11       CROSS-EXAMINATION

12   BY MR. ROSS:

13   Q.   Good afternoon, Mr. Hite.

14   A.   Good afternoon.

15   Q.   My name is Doug Ross.  I represent, Ms. Chittenden.

16             We have not spoken before, have we?

17   A.   No, we have not.

18   Q.   You own your own business, correct?

19   A.   Yes, I do.

20   Q.   And how long have you done so, please?

21   A.   32 years.

22   Q.   32 years.  All right.  And in approximately 2003 did you

23   expand your business by buying approximately $250,000 of

24   equipment for your company?

25   A.   Yes.

1    Q.   And then at some point you decided to also get involved in

2    the real estate business, is that correct?

3    A.   Yes.

4    Q.   And that would be buying additional properties?

5    A.   Correct.

6    Q.   Some to renovate?

7    A.   Yes.

8    Q.   And some to sell?

9    A.   Yes.

10   Q.   And some to rent?

11   A.   Yes.

12   Q.   Okay.  And did you disclose that plan to Ms. Chittenden?

13   A.   Yes, I did.

14   Q.   Okay.  Now, let's take a look at -- and these are all in,

15   I believe, so we can go right to the screen.  58-C1.

16           Ms. Porter will put that up on the screen for you.

17   Thank you, Ms. Porter.

18           It is not in.  Then I am going to move it in, Your

19   Honor.

20           MR. GILLIS:  No objection, Your Honor.

21           THE COURT:  All right.  It is received.

22           MR. ROSS:  Thank you.

23   BY MR. ROSS: (Continuing)

24   Q.   This is a HUD-1 Settlement Statement, isn't it?

25   A.   Yes, it is.

1  Q.   And that's for the Blackstone Road property?

2  A.   Yes.

3  Q.   And that's your property?

4  A.   Correct.

5  Q.   And this was a refinance?

6  A.   Yes, it was.

7  Q.   In February of 2006, correct?

8  A.   Yes.

9  Q.   Now, to put it in context, you purchased this property, I

10 think you testified to, about a year earlier in 2005, is that

11 correct?

12 A.   Yes, June of 2005.

13 Q.   All right.  Thank you.  And you used Ms. Chittenden as

14 your loan officer for the loan to purchase this property,

15 correct?

16 A.   Yes.

17 Q.   And was that the first loan that you did with Ms.

18 Chittenden?

19 A.   Yes, it was.

20 Q.   Okay.  And did she fax you a blank loan application for

21 the 2005 purchase of Blackstone?

22 A.   Yes.

23 Q.   Okay.  And you filled out that application, correct?

24 A.   Yes, I did.

25 Q.   And that application is not one that you have been asked

1   about today, is it?

2   A.   No, it is not.

3   Q.   And you called Ms. Chittenden at least a couple of times

4   while you were filling out that application to ask for her help

5   in filling it out, correct?

6   A.   Yes.

7   Q.   All of the other applications that came to you from Ms.

8   Chittenden for the other properties, which we will talk about,

9   came to you filled out, is that correct?

10  A.   Yes.

11  Q.   And during the course of your dealings with Ms.

12  Chittenden, you spoke to her quite a bit, didn't you?

13  A.   Fair amount, yes.

14  Q.   Okay.  On a weekly basis, how many times do you think you

15  called her on a weekly basis during that year or so of your

16  activity?

17  A.   Not very often, except for when there was something to

18  deal with directly to a mortgage of a purchase or a refi.

19  Q.   So, let me ask a better question.  When there was a deal

20  that you and she were working on and there was something in the

21  pipeline, how frequently would you speak with her during those

22  times?

23  A.   One or twice.

24  Q.   Really, once or twice per transaction?

25  A.   Somewhere in that, possibly.

1    Q.   Not more than that?

2    A.   I don't think so.

3    Q.   Okay.  All right.  So let's take a look -- let's go back

4    to 58-C, please.  This is your refinance of Blackstone.

5              And you're taking out two mortgages in this

6    transaction, correct?

7              Could you scroll down, or maybe zoom out a little

8    bit, please, Ms. Porter.  Thank you, that's going to be good.

9    All right.

10             You took out a first mortgage of $339,200, correct?

11   A.   Yes, it looks that way.

12   Q.   And you took out, just a little below that, a second

13   mortgage, thank you, Ms. Porter, of $20,800-some odd dollars?

14   A.   Yes.

15   Q.   Okay.  And then if we can go down to the bottom, please.

16   The bottom of that left-hand column, perfect.

17             And you got cash back of just over $69,000, correct?

18   A.   Yes.

19   Q.   What did you do with that money?

20   A.   Went into the properties.

21   Q.   Into your other properties?

22   A.   This one also.  This was a major renovation.

23   Q.   Okay.  So you took the cash out to renovate this and other

24   properties?

25   A.   Yes.

D.G. Hite - Cross

731

1   Q.   Okay.  And this closing occurred February 24 of 2006,

2   correct?

3           It's right there on the HUD-1, the first page.  Ms.

4   Porter has it highlighted there for you.

5   A.   Yes.

6   Q.   Okay, great.  So let's go, please, to 58-D.

7           And if this is not in, I would move it in so we can

8   just publish it to, but I think it is in.

9           MR. GILLIS:  No objection if it isn't, Your Honor.

10          MR. ROSS:  I am pretty certain it is, actually.

11          MR. GILLIS:  It's in.

12  BY MR. ROSS: (Continuing)

13  Q.   This is your loan application for the Blackstone

14  refinance, correct?

15  A.   As best I can see.  I can't see this very well.

16  Q.   Let me see if we can zoom in a little bit toward the top

17  section there.  Thank you, Ms. Porter.

18          Does that help?

19  A.   Yes.

20  Q.   Okay.  So it's the refinance for the transaction that we

21  were just looking at the settlement sheet of?

22  A.   Yes, it is.

23  Q.   All right, great.  Could you zoom back out, please, Ms.

24  Porter.

25          And that's your signature on page 1?

1    A.   Yes, it is.

2    Q.   Okay.  And let's go to page 2, please.

3              That's your signature on page 2?

4    A.   Yes.

5    Q.   And could you zoom back out, please.

6              And when you signed it, it had the income figure of

7    19,000 on it at the top of that page, didn't it?

8    A.   Now, yes, I see it now.  A lot of these I did not look at

9    as thoroughly as I should have.

10   Q.   I understand.  And my question is, it was there though

11   when you signed it, wasn't it?

12   A.   Yes.

13   Q.   All right.  Let's go to page 3.

14             And that's your signature about three-quarters of the

15   way down the page, correct?

16   A.   Yes, it is.

17   Q.   All right.  And you were asked -- can you zoom back out

18   please, Ms. Porter.

19             You were asked questions by counsel about the Real

20   Estate Owned section at the top of that page.  Do you recall

21   that?

22   A.   Yes.

23   Q.   And that information was on that page when you signed it,

24   wasn't it?

25   A.   Yes, it was.

1  Q.    Okay.  Let's go back to page 2 for a moment of this

2  exhibit, if we may, please.

3         And, Ms. Porter, if we could focus on the BB&T

4  section about a third of the way down.  Thank you very much.

5         That is referring to a BB&T account with $17,000, is

6  that correct?

7  A.    Yes.

8  Q.    You had a BB&T account, didn't you?

9  A.    Yes, I did.

10 Q.    And did it have 17,000 in it, approximately, at this time?

11 A.    It is quite possible, yes.

12 Q.    Okay.  Are you familiar with the term "seasoned funds"?

13 A.    I learned that.

14 Q.    And you learned that from Ms. Chittenden?

15 A.    Yes.

16 Q.    What did you understand seasoned funds to mean?

17 A.    There had to be money in your account for I think at least

18 a minimum of 60 days.

19 Q.    So it couldn't be transient money that was just put in by

20 a friend or colleague, it had to be stuff that was there for a

21 period of time?

22 A.    Correct.

23 Q.    And you and she spoke a great deal about the fact that

24 that was necessary for your transactions, correct?

25 A.    Right.

1  Q.   Let's take a look, please-- Oh.  On occasion did Ms.

2  Chittenden also ask you to provide her with your bank

3  statements?

4  A.   Yes.

5  Q.   And if she did ask for it, you would do it, correct?

6  A.   Yes.  I would fax her over two months of the last bank

7  statements.

8  Q.   Okay.  Let's take a look, please, at 58-K.

9          I don't know that this is in, so I would move it in,

10 please, Your Honor.

11         MR. GILLIS:  No objection.

12         THE COURT:  It is received.

13 BY MR. ROSS: (Continuing)

14 Q.   And actually it may help you, Mr. Hite, would you mind

15 showing him the paper file so he can thumb through it.  Thank

16 you very much.

17         Take a moment and thumb through it.  Ultimately after

18 you have reviewed it, I am just going to ask you if those are

19 two months of your bank statements that you provided to Ms.

20 Chittenden in response to her request?

21 A.   Yes.

22 Q.   Okay.  And would you look at the -- Ms. Porter, could we

23 go to page 4 of that exhibit, please.  And could you blow up

24 the top half of the page -- that's great, thank you very much.

25         What we are showing you here is your BB&T account

1   statement.  And it shows the balance as of November 30 of 2005

2   of $46,000 and change, correct?

3   A.   Yes.

4   Q.   Okay.  And, Ms. Porter, if we could now go to the very

5   first page of the exhibit, please.  And the same portion of the

6   first page.

7           And that shows your balance in your BB&T account as

8   of December 30, '05, and it is $17,000 and change?

9   A.   Yes.

10  Q.   So that is consistent with what was written on the

11  handwritten loan application that we were just talking about?

12  A.   Yes.

13  Q.   Okay.  Let's take a look, please, at 58-E1, which I

14  believe is in.  So, we can go straight -- we can go straight to

15  the screen, Mr. Hite, if you would, please.

16          First of all, take a look page 2, please.  And, Ms.

17  Porter, if you could zoom in a little bit on the BB&T account

18  section, please.

19          All right.  And there -- this is the application that

20  gets signed at closing, correct?

21  A.   I didn't see the full page.  It is hard for me to see the

22  screen when it is stretched out on the full page.

23  Q.   Let me ask you to feel free to look at the hard copy.  Any

24  time if I ask you a question and I haven't given you a document

25  that you can read, just yell and I will fix it for you.

1  A.    So which page are we looking at?

2  Q.    Well, my first question was, this document is the one that

3  gets closed at closing, right?

4  A.    Yes, it is.

5  Q.    So it is later on in the loan process than the loan

6  application we were just talking about?

7  A.    Correct.

8  Q.    And if you look at page 2, this shows the BB&T account

9  having about 9,825 in it, correct?

10  A.    Yes.

11  Q.    And was that what was in your account at that time,

12  approximately?

13  A.    The final numbers closer to settlement time, possibly,

14  yes.

15  Q.    Sometimes the account goes up or down, and it may have

16  gone down from 17 to this, correct?

17  A.    Right.

18  Q.    Okay.  Now, let me ask you to take a look at page 3 of

19  that exhibit that you have in your hands, E1.

20        And that's your signature about three-quarters of the

21  way down, correct?

22  A.    Yes, it is.

23  Q.    All right.  And obviously since this was signed at

24  settlement, all of the rental information at the top of the

25  page that Mr. Gillis asked you about was on it when you signed

1    it, correct?

2    A.    Yes, it was.

3    Q.    And at this point in time, this is February of 2006, you

4    still have not met Ms. Chittenden?  You only dealt with her on

5    the phone, correct?

6    A.    Correct.

7    Q.    All right.  And let's take a look, please, at 58-F.  And

8    this one is definitely in.

9            This is the letter from Mr. Best, do you recall

10   testifying about that?

11   A.    Yes, it is.

12   Q.    And this confirms that you were self-employed for at least

13   two years, correct?

14   A.    Yes.

15   Q.    And that was true?

16   A.    Yes.

17   Q.    And it states that he had prepared your tax return for the

18   last two years.  And that was true, wasn't it?

19   A.    Yes.

20   Q.    Okay.  Let me show you -- again, you are welcome to have

21   the hard copy, 58-H, as in Harold, 1.  And this is in.  No,

22   apparently it didn't get moved in.

23            So I would move it in, Your Honor.  It is the '04 tax

24   return.

25            MR. GILLIS:  No objection, Your Honor.

1          THE COURT:  All right, they are received.

2          MS. MARTINEZ:  Can we have just a moment, Your Honor?

3  BY MR. ROSS:  (Continuing)

4  Q.   So, do you have 58-H1 in front of you, Mr. Hite?

5  A.   Yes, I do.

6  Q.   Do you recognize that as your 404(b) tax return?

7  A.   Yes, it looks like it.

8  Q.   And that was signed by Mr. Best on your behalf on page 2,

9  is that correct?

10  A.   I assume so, yes.

11  Q.   Okay.  And it shows your adjusted gross income for that

12  year as a minus $56,000, 56,771 to be exact, is that correct?

13  A.   Yes.

14  Q.   Have you filed your 2005 tax return yet?

15  A.   I think it has been filed.  I am not positive.  I have

16  some --

17  Q.   Do you recall when you filed it?

18  A.   No, I do not.

19  Q.   If I suggested to you that it was in or about October of

20  2013, would that seem about right to you?

21  A.   It's possible, because a bunch of those are behind because

22  of all the housing issues that were involved with it.

23  Q.   Okay.  Do you recall when the FBI -- strike that.

24          Did you meet with any of the FBI agents before the

25  trial?

1    A.    Yes, in November.

2    Q.    In November?

3    A.    Yes.

4    Q.    Are you sure it wasn't October?

5    A.    I don't think it was October.  I am not positive.

6    Q.    Okay.  All right.  Have you filed your 2006 tax return?

7    A.    Not yet, no.

8    Q.    Okay.  So '06 has not been filed.  You believe '05 was.

9    But '05 was never filed at any time before any of the

10   transactions that we're talking about today, correct?

11   A.    No.

12   Q.    Okay.  Let's go to 59-C1.  I believe this is in already.

13   No?  Excuse me.

14         Okay.  So I would move in 59-C1, which is the HUD-1

15   for Dover Road, Your Honor.

16         MR. GILLIS:  No objection, Your Honor.

17         THE COURT:  It is received.

18   BY MR. ROSS: (Continuing)

19   Q.    And do you have the hard file in front of you, Mr. Hite?

20   A.    59-E1?

21   Q.    C as in Charlie, please.  I am sorry, I will annunciate

22   better.  C as in Charlie.  I apologize.

23         Do you recognize this as the HUD-1 Settlement

24   Statement for your purchase of Dover Road in March of 2006, is

25   that correct?

1   A.   Yes.

2   Q.   And you testified about that earlier in response to some

3   of Mr. Gillis' questions, right?

4   A.   Yes.

5   Q.   All right.  So this is an acquisition of a new property

6   for you, correct?

7   A.   Yes.

8   Q.   And, Ms. Porter, could you zoom out a little, please.  And

9   then maybe go back in on the middle of the HUD-1.  Perfect.

10          And so, you took out a new loan of $280,000, do you

11  see that?

12  A.   Yes.

13  Q.   Okay.  Also took out a second mortgage of a little over

14  $68,000?

15  A.   Yes.

16  Q.   And this is in addition to the two loans that we talked

17  about that you took out on your refi of Blackstone just about a

18  month earlier?

19  A.   Yes.

20  Q.   Okay.  All right.  And let's look at 59-D, please.

21          I have got to get used to using the call letters.  I

22  will do that.

23          This is your loan application for the purchase of the

24  Dover Road property that we were just looking at, correct?

25  A.   Yes.

1   Q.   And that's your signature on page 1?

2   A.   Yes, it is.

3   Q.   And you received this by fax from Ms. Chittenden?

4   A.   Yes, I did.

5   Q.   And it was filled in when you received it?

6   A.   Yes.

7   Q.   Take a look at page 2, please.

8        You signed that page as well, didn't you?

9   A.   Yes.

10  Q.   All right.  And the BB&T information above your signature,

11  that was on there when you signed it, correct?

12  A.   Yes.

13  Q.   All right.  Thank you, Ms. Porter.  If we could zoom back

14  out.

15       And the income figure of 19,000, that was on there

16  when you signed it as well, wasn't it?

17  A.   Yes, it was.

18  Q.   Let's go to page 3, please.

19       That's your signature about three-quarters of the way

20  down?

21  A.   Yes.

22  Q.   And the rental information at the top that you were

23  questioned about, that was on there when you signed it?

24  A.   Yes.

25  Q.   Let's go back to page 2 for a moment, please.  And the

1    BB&T account.

2          The BB&T account was the same one that we were

3    talking about in connection with your application for

4    Blackstone Road, correct?

5    A.    Yes.

6    Q.    And did you have $144,000, or approximately that amount,

7    in your BB&T account at that time?

8    A.    It's quite possible, yes.

9    Q.    Because of the refis that you were doing, the cash that

10   you were pulling out of the other properties, correct?

11   A.    Yes.

12   Q.    Okay.  Let me ask you if you would take a look at the last

13   page of 59-D.  There is a handwritten note there.

14          I believe you testified that's not your handwriting.

15   A.    No, it's not.

16   Q.    All right.  But the statement in the note is correct,

17   isn't it?

18   A.    I hadn't had mortgages for four years prior to that.  The

19   mortgage on the 4115 Dumfries Road originally was in my

20   mother's name to start off with.

21   Q.    Okay.  And you were only on title, you weren't on the

22   mortgage, correct?

23   A.    On title in May of 2005.  Before that, no.

24   Q.    Okay.  And you weren't on the mortgage, correct?

25   A.    No.

1  Q.   Okay.  And did you give that information to Ms.

2  Chittenden?

3  A.   Something in that general, possibly, yes.

4  Q.   Okay.  And take a look at, if you would, please, 59-F.

5       THE COURT:  Have you got a bit more?  How much more

6  do you --

7       MR. ROSS:  I do have a bit more, Your Honor, but one

8  more question on this property and then it might be a good

9  break because we will go on to deal with some of the other ones

10 later.

11      THE COURT:  All right, that's fine.

12      MR. ROSS:  I would move in 59-F, Your Honor.  It's

13 Mr. Best's letter in this loan.

14      THE COURT:  All right, it's received.

15 BY MR. ROSS: (Continuing)

16 Q.   That's the same letter that we talked about previously

17 from Mr. Best, correct?

18 A.   Yes.

19 Q.   And it is truthful?

20 A.   Yes.

21      MR. ROSS:  That's all I have on these couple loans,

22 Your Honor.

23      THE COURT:  All right.  Let's break for lunch at this

24 time.  We will come back at 2 o'clock and continue hearing

25 evidence at that time.

1          Have a nice lunch.

2          NOTE:  At this point the jury leaves the courtroom;

3     whereupon the case continues as follows:

4     JURY OUT

5          THE COURT:  All right.  Mr. Hite, you are in the

6     middle of your testimony, sir, so don't discuss the testimony

7     you have given with anyone while we are at lunch recess.  All

8     right, sir?

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  All right.  Then we are in recess until

11     2 o'clock.

12          I have another hearing at 1:30 today as well, so I

13     don't know what you did for lunch yesterday, but we will be in

14     the same position at 1:30 today.

15          MR. ROSS:  Thank you, Your Honor.

16          MS. MARTINEZ:  Absolutely, Your Honor.

17          NOTE:  At this point a recess is taken; at the

18     conclusion of which the case continues in the absence of the

19     jury as follows:

20     JURY OUT

21          THE COURT:  All right.  Ready for our jury?

22          MR. ROSS:  Yes, Your Honor.

23          THE COURT:  Joe, let's get our jury, please.

24          You can come back on to the stand, please, sir.

25          NOTE:  At this point the jury returns to the

D.G. Hite - cross

1    courtroom; whereupon the case continues as follows:

2    JURY IN

3              THE COURT:  All right, please be seated.

4              Continue when you are ready, Mr. Ross.

5              MR. ROSS:  Thank you, Your Honor.

6    BY MR. ROSS: (Continuing)

7    Q.   Would you please show Mr. Hite 58-H, as in Harold, 2,

8    please.

9              Mr. Hite, take a minute, please, and thumb through

10   that, and then I will have a couple of questions about whether

11   you recognize that document, please.

12   A.   Yes.

13   Q.   I will note for you that it is not signed on page 2.

14   A.   Correct.

15   Q.   So this is not a trick question.  But my question is, is

16   this your 2005 tax return?

17   A.   To the best of my knowledge, yes.

18   Q.   And page 1 of that tax return at the bottom of the page --

19   well, strike that.

20             I would move in 58-H2, please, Your Honor.

21             MR. GILLIS:  No objection.

22             THE COURT:  It is received.

23   BY MR. ROSS: (Continuing)

24   Q.   Can you publish page 1 for me, please.

25             And at the bottom of page 1, either on the screen or

1    in the hard copy, whichever you prefer does it show your

2    adjusted gross income as being minus $72,466.

3    A.    Yes, it does.

4    Q.    And do I recall your testimony earlier that you told Ms.

5    Chittenden that your income in 2005 was around $75,000?

6    A.    The gross business income before any of these write-offs.

7    I purchased so much equipment in '03 that there were so many

8    write-offs for the equipment and everything else, that it just

9    took everything down.

10   Q.    So the figure you told her was a gross figure, not

11   actually what you made?

12   A.    That's what I had asked her about previously on this, was

13   looking at what is my gross income.  Which was basically the

14   income that came into my business.

15   Q.    And it is your testimony that you told her that your

16   adjusted gross income for 2005 was negative $72,000?

17   A.    No, I don't remember telling her that at all, no.

18   Q.    Okay.  Let's take a look, please, at Exhibit 60-C, as in

19   Charlie.  And if it is not in, I would move it in.  It is the

20   HUD-1 from the Blake Lane transaction.

21          MR. GILLIS:  No objection, Your Honor.

22          THE COURT:  It is received.

23          MR. ROSS:  Your Honor, I would just note that this is

24   one of the transactions that is not in the indictment.  So per

25   your earlier instruction.

1          THE COURT:  The same instruction, ladies and

2     gentlemen.  Thank you.

3          MR. ROSS:  Thank you, Your Honor.

4     BY MR. ROSS: (Continuing)

5     Q.   Do you recall testifying about this earlier?  This is the

6     HUD-1 from your refinance of the Blake Lane property, is that

7     correct?

8     A.   It is hard to see.

9     Q.   Okay.  60 Charlie 1, please.

10    A.   Yes, this is the refi for the Blake Lane property.

11    Q.   Okay.  And this was in June of 2006, correct?

12    A.   Yes.

13    Q.   So just a couple months after the Blackstone refinance

14    that we talked about and the Dover acquisition that we talked

15    about?

16    A.   Correct.

17    Q.   All right.  And here you're taking out a loan -- could you

18    scroll down just a little bit, please, Ms. Porter.  Perfect.

19         You are taking out a new loan of $29,450?

20    A.   Second mortgage, yes.

21    Q.   Yes, right.  But it is a new loan, correct?

22    A.   Yes.

23    Q.   So it is further debt?

24    A.   Yes.

25    Q.   Okay.  Let's take a look at 60-D.  And I believe this is

1    already in.  So we will publish, but it may be easier for you

2    just to work off the hard copy.  That's great, thank you.

3              This is the initial loan application for the Blake

4    Lane refinance that we were just talking about, correct?

5    A.   Yes.

6    Q.   All right.  And at the bottom of page 1, that's your

7    signature, correct?

8    A.   Yes.

9    Q.   And this is another application that came to you filled

10   out, correct?

11   A.   Yes.

12   Q.   All right.  Let's take a look at page 2.

13              And you signed page 2?

14   A.   Yes, I did.

15   Q.   And the income figure at the top of the page was on there

16   when you signed it?

17   A.   I assume so, yes.

18   Q.   That says 19,000 a month?

19   A.   Correct.

20   Q.   All right.  Let's take a look page 3.

21              You signed that as well, didn't you?

22   A.   Yes.

23   Q.   And the rental information at the top of the page was

24   there when you signed it?

25   A.   Yes.

D.G. Hite - Cross

1    Q.   All right.  Let's go back to page 2 for a moment, please.

2    The asset section, please, Ms. Porter.  Thank you.

3              This refers again to your BB&T account, correct?

4    A.   Yes.

5    Q.   And it says there is $130,000 in the account?

6    A.   I assume so.

7    Q.   You see the reference there?

8    A.   Yes, I do.

9    Q.   And do you believe there was $130,000 in the account at

10   that time?

11   A.   It is quite possible, yes.

12   Q.   All right.  Let me ask you to take a look at 60-J, as in

13   John, please.  I don't think this one is in yet.

14             MR. GILLIS:  No objection, Your Honor.

15             THE COURT:  All right, it will be received.

16             MR. ROSS:  Thank you.

17   BY MR. ROSS: (Continuing)

18   Q.   Mr. Hite, this purports to be a verification of deposit

19   from BB&T for your account saying that you have $130,000 and

20   some change in there.

21             Does that strike you as about what you had in your

22   account at that time?

23   A.   I really couldn't tell you exactly.  It has been so long

24   ago.  On top of the fact of the money coming in and out for

25   different things.

D.G. Hite - Cross

750

1  Q.   It doesn't strike you as unreasonable that you would have

2  had --

3  A.   No, not at that time.

4  Q.   Sorry, I didn't mean to talk over you.  All right, thank

5  you.

6       And let's go, please, to 60-E1.  And I believe that

7  is also in.

8       This is the final application for the Blake loan refi

9  that we have been discussing, correct?

10 A.   Yes.

11 Q.   All right.  This is the one that you signed at closing?

12 A.   Correct.

13 Q.   And if you would turn to page 3 for me, please.

14      And that is indeed your signature, correct?

15 A.   Yes, it is.

16 Q.   And the rental information is at the top of that page?

17 A.   I assume so, yes.

18 Q.   And turning back to page 2.  It shows your income at the

19 top of the page to be $19,000 and change per month?

20 A.   That's what I see on the application, yes.

21 Q.   All right.  Thank you.

22      Let's go to 61-C1, please.

23      I would move that in at this time, Your Honor.  It is

24 the HUD-1 that he testified about earlier.

25      THE COURT:  It is received.

1    BY MR. ROSS: (Continuing)

2    Q.   And are you looking at the hard copy, Mr. Hite?

3    A.   Yes.

4    Q.   All right.  Is this a -- is this the HUD-1 from your

5    refinance of the 4115 Dumfries property that you testified to

6    earlier?

7    A.   Yes.  That's when we did the separation of the two

8    properties.

9    Q.   All right.  And it looks like you paid off a first

10   mortgage of 592,000 and change.  Do you see that on line 04?

11   A.   Yes.

12   Q.   And looks like your new loan was a little below that,

13   $580,000?

14   A.   Yes.

15   Q.   So it didn't change the debt much, it was just part of

16   your division of the properties?

17   A.   I had to have two mortgages because there were two

18   separate pieces of property after that.

19   Q.   Okay.  All right.  So let's go to 61-D, as in David.

20          And this is the initial application for that loan

21   that we were just looking at, correct?

22   A.   Yes, it looks like it is.

23   Q.   All right.  Can we zoom out a little, please, Ms. Porter.

24          And you signed that on page 1?

25   A.   Yes.

```
1    Q.   Will you turn to page 2, please.

2         You signed page 2?

3    A.   Correct.

4    Q.   The income figure at the top of 29,000 was there when you

5    signed it?

6    A.   I assume so, yes.

7    Q.   Because this came to you filled out from Ms. Chittenden,

8    right?

9    A.   Yes.

10   Q.   Okay.  Page 3, did you sign that, please?

11   A.   Yes, I did.

12   Q.   And that had the rental information at the top filled in?

13   A.   Actually, it's blank on this one.

14   Q.   Oh, the rental column is, you are right, but the other

15   information was there, correct?

16   A.   Yes, I assume so.

17   Q.   Okay.  And go back to page 2 for a moment, please.  The

18   asset section, please, Ms. Porter.

19        Does that look to you to be $58,650.63?

20   A.   Yes.

21   Q.   And that's referring to your BB&T account again?

22   A.   Yes.

23   Q.   And do you believe that's what you had in your account at

24   that time?

25   A.   It is quite probable, yes.
```

1    Q.   All right.  Let me show you 61-J, as in John.

2              I would move this in, Your Honor.  It is a

3    verification of deposit for this loan.

4              MR. GILLIS:  No objection.

5              THE COURT:  It is received.

6    BY MR. ROSS: (Continuing)

7    Q.   Mr. Hite, this is a verification of deposit for your BB&T

8    account showing that the current balance was $58,650.63.

9              Do you see that?

10   A.   Yes, I do.

11   Q.   And that matches the figure on the handwritten

12   application, correct?

13   A.   Yes.

14   Q.   And your testimony is quite likely you did have that

15   amount in your account at that time?

16   A.   Yes.

17   Q.   And would you take a look, please, sir, at 61-E, as in

18   Elephant, 1, please.

19             This is the final application for this loan that we

20   were discussing, correct?

21   A.   Yes.

22   Q.   The one that gets signed at closing?

23   A.   Yes.

24   Q.   If you take a look at page 3, please.

25             That's your signature at the bottom of the page?

1    A.   Yes.

2    Q.   It has got the rental information on it at the top of the

3    page?

4    A.   Correct.

5    Q.   Okay.  Turn back to page 2.

6         Also has your monthly income as $20,000?

7    A.   It's on the application, yes.

8    Q.   Okay.  And it also refers to the $58,000 figure in the

9    BB&T account that we discussed?

10   A.   Yes.

11   Q.   Okay.  Thank you.  Let's go to 62 Charlie 1, please.

12        I beg your pardon, I wanted to ask you one last

13   question about 61 Charlie 1.  I apologize.

14        I know I messed that up.

15   A.   61-E1?

16   Q.   61-C, as in Charlie.

17   A.   You just gave that to me.

18   Q.   61-C?

19   A.   Yes.

20   Q.   Great.  Would you look at that, please.

21   A.   Yes.

22   Q.   Okay.  You added a second trust of $140,000 and change, is

23   that correct?  Second trust being a mortgage.

24   A.   This is different.  I have the application here or the

25   settlement sheet.  This is for the 4127 property, not the 4115.

1    Q.   Right.  The one that we were talking about a minute ago.

2    A.   No.  No.  This is the second property.

3    Q.   I am sorry, which exhibit do you have, please?

4    A.   I have 62-C1.

5    Q.   Right.  I need you to look at 61-C1, please.  That was my

6    mistake originally.

7              And you added -- this is when you were dividing the

8    properties that we were talking about a minute ago, correct?

9    A.   Right.

10   Q.   And we talked about the first mortgage being relatively

11   comparable to one that you paid off, correct?  592 was the

12   payoff, 580 was the new loan?

13   A.   Well, actually, you have a second mortgage that is on

14   there also for 109 under that.

15   Q.   That's what I was just going to ask.  The second mortgage

16   is actually for 140,000, correct?

17   A.   No.  If you look at the payoffs on these, there is a

18   CitiMortgage there for 109,000 also.

19   Q.   Right.

20   A.   With the 592 original loan.

21   Q.   Yes.

22   A.   Yes.

23   Q.   All right.  So let's take that from the top real quick.

24   You had a first mortgage of 582?

25   A.   92.

1  Q.   592, thank you.  And a second mortgage of 109,000?

2  A.   Correct.

3  Q.   You paid those both off, correct?

4  A.   Yes.

5  Q.   With a $580,000 first trust?

6  A.   Right.

7  Q.   And a $140,000 second trust?

8  A.   Correct.

9  Q.   Okay.  Thank you.  Now let's go to 62 Charlie 1, please.

10         Is this the HUD-1 Settlement Statement for your

11 refinance of 4127 Dumfries?

12 A.   This is the first mortgage for it.

13 Q.   Doesn't it say refinance on the first page?

14 A.   Right.  But, I mean, this is when the properties were

15 separated.

16 Q.   Yes.

17 A.   Yes.  This is actually the first mortgage.  Or maybe it is

18 the second mortgage.  Okay.

19 Q.   Well, no, you are putting a new mortgage on this property

20 because you have just divided it from the other one, correct?

21 A.   Correct.

22 Q.   Okay.  That's all I am asking.  All right.

23         And so, you put a new mortgage of $288,000 on it,

24 correct?

25 A.   Yes.

1  Q.   All right.  And then go to the bottom -- oh, excuse me.

2        Can I move in 62-C1, Your Honor?  I got ahead of

3  myself.

4        MR. GILLIS:  No objection, Your Honor.

5        THE COURT:  It is received.

6        MR. ROSS:  That way the jury can see it while we are

7  talking about it.

8  BY MR. ROSS: (Continuing)

9  Q.   All right.  And then at the bottom of the left-hand column

10 it says Cash to the Borrower, just under $195,000, correct?

11 A.   Yes.

12 Q.   That's what you received as a result of this transaction?

13 A.   Correct.

14 Q.   And what did you do with that money?

15 A.   That went into all the properties that I had.  The

16 renovations, mortgage payments, and such.

17 Q.   All right.  And so, there was a new loan of $288,000 on

18 this property?

19 A.   Yes.

20 Q.   All right.  Let's go to 62-D, as in David, please.

21        I will give you a second to look at that, but this is

22 the loan application for the loan closing that we just talked

23 about, right?

24 A.   Yes.

25 Q.   And this came to you filled in, correct?

1    A.    Yes.

2    Q.    All right.  And you signed at the bottom of page 1?

3    A.    Yes, I did.

4    Q.    And at the bottom of page 2?

5    A.    Yes.

6    Q.    And at the bottom -- well, near the bottom of page 3?

7    A.    Yes.

8    Q.    All right.  On page 3 it had the rental information on it

9    when you signed it?

10   A.    I assume so, yes.

11   Q.    On page 2, it showed your income as $29,000 a month.

12         And that was on there when you signed it, correct?

13   A.    I assume so, yes.

14   Q.    Let's go to 62-E1.  E as in Elephant, please.

15         This is the final loan application for this loan,

16   correct?

17   A.    Yes.

18   Q.    The one that gets signed at closing?

19   A.    Correct.

20   Q.    Look at page 3, please.  And you signed that?

21   A.    Yes, I did.

22   Q.    And the rental information was on it when you signed it?

23   A.    I assume so.

24   Q.    And look at page 2, please.

25         Your monthly income says $20,000 there?

1    A.   That's what it says on the application, yes.

2    Q.   That was there when you signed it?

3    A.   I assume so.

4    Q.   Okay.  There is actually no bank account information on

5    the final application, is there?

6    A.   No.

7    Q.   Let's go to 63 Charlie 1, please.

8         Your Honor, I would move this in.  This is the HUD-1

9    for the Oak Shade property acquisition.

10        MR. GILLIS:  No objection, Your Honor.

11        THE COURT:  It will be received.

12   BY MR. ROSS: (Continuing)

13   Q.   63 Charlie 1, please.

14   A.   63 Charlie 1?

15   Q.   Yes.

16   A.   That's what I have.

17   Q.   This is the HUD-1 Settlement Statement for your

18   acquisition of Oak Shade Road, correct?

19   A.   Yes.

20   Q.   Okay.  That was in November of 2006?

21   A.   Yes.

22   Q.   All right.  You took out a first mortgage of $248,000 to

23   purchase this property?

24   A.   Yes.

25   Q.   Looks like you also paid $67,000 in addition to that to

1    acquire the property, is that correct?

2    A.    Yes.

3    Q.    And perhaps from some of the refi proceeds that we talked

4    about earlier?

5    A.    Exactly.

6    Q.    Okay.  All right.  So you have added a debt of $248,000

7    for this property.

8              Let's take a look at 63 David.

9              You are welcome to take a minute, but my question is

10   going to be, is this the initial loan application for the loan

11   that we were just looking at the HUD-1 for?

12   A.    I have no idea.  It has TBD listed in there.

13   Q.    Okay.

14   A.    But just from the loan amount up there, yes.

15   Q.    So the loan amount matches.  But other than that, it is

16   hard to tell, isn't it?

17   A.    Exactly.

18   Q.    Okay.  So let's go to 63-E, as in Elephant, 1.

19             I would move this in, Your Honor.  Apparently it is

20   not in yet.  This is the final loan application for the Oak

21   Shade property.

22             MR. GILLIS:  No objection, Your Honor.

23             THE COURT:  Okay, it will be received.

24   BY MR. ROSS: (Continuing)

25   Q.    Am I right, Mr. Hite, is this the final application for

1  your purchase of the Oak Shade property?

2  A.  Yes.

3  Q.  Take a look at page 3, if you would, please.

4        And that's your signature at the bottom of the page?

5  A.  Yes, it is.

6  Q.  Once again, all the rental information at the top was

7  there when you signed it, wasn't it?

8  A.  I assume so, yes.

9  Q.  Okay.  Look back to page 2, if you would, please.

10       It shows your income as $20,000 a month?

11  A.  It's on the application, yes.

12  Q.  That was there when you signed it, wasn't it?

13  A.  I assume so.

14  Q.  Okay.  And also on page 2 there is the asset account

15  information that we have been talking about in some of the

16  earlier ones.  It shows your BB&T account information again,

17  doesn't it?

18  A.  Yes, it does.

19  Q.  And it lists $114,182.09?

20  A.  Yes.

21  Q.  Okay.  Did you have that much or approximately that much

22  in your account at that time?

23  A.  It's quite possible, yes.

24  Q.  All right.  Take a look, if you would, please, at 63-J, as

25  in John, please.

1            I would move this in, Your Honor.  It is a

2    verification for deposit of this loan.

3            MR. GILLIS:  No objection.

4            THE COURT:  It is received.

5    BY MR. ROSS: (Continuing)

6    Q.   Mr. Hite, this is a verification from BB&T confirming that

7    you had $114,182.09, and I think your thought was that quite

8    likely you did they've amount in your account?

9    A.   Yes.

10   Q.   And that matches the amount on the final loan application

11   that we were just talking about, doesn't it?

12   A.   Yes.

13   Q.   Thank you.  Let's go to 64 Charlie, please.  It could be

14   Charlie -- no, it is just Charlie, it is not Charlie 1.

15           COURT SECURITY OFFICER:  64 Charlie?

16           MR. ROSS:  Yes, sir.

17           Your Honor, if I may, this is one of the transactions

18   that is not in the indictment.

19           THE COURT:  All right.  Again, this may be considered

20   only for purposes of intent, motive, and absence of mistake.

21   BY MR. ROSS: (Continuing)

22   Q.   Mr. Hite, do you recognize this as the HUD-1 Settlement

23   Statement for your refinance of the Oak Shade Road property

24   that we talked about a moment ago?

25   A.   Yes, that was a second mortgage.

```
 1   Q.   All right.  You beat me to it.  I am going to come to that

 2   in one second.

 3            And this was in February of 2007, correct?

 4   A.   Yes.

 5   Q.   And you were taking out a new second mortgage on this

 6   property?

 7   A.   Yes.

 8   Q.   All right.  So an additional $31,000 of debt?

 9   A.   Yes.

10   Q.   Okay.  Let's take a look, please, at 64 David.

11            This is the initial loan application for the Oak

12   Shade refinance that we just spoke about, isn't it?

13   A.   Yes.

14   Q.   And you signed on the bottom of page 1?

15   A.   Yes.

16   Q.   And you signed on the bottom of page 2?

17   A.   Yes.

18   Q.   And you signed near the bottom of page 3?

19   A.   Yes.

20   Q.   And when you signed page 3, the rental information was on

21   there, wasn't it?

22   A.   I assume so, yes.

23   Q.   Because this came to you filled in, correct?

24   A.   Yes.

25   Q.   All right.  And looking back at page 2, the monthly income
```

1  figure of $20,000 was on there when you signed it?

2  A.   I assume so, yes.

3  Q.   And just below that there is the BB&T account again?

4  A.   Yes.

5  Q.   And it's referring to the 114,000 that we talked about

6  earlier?

7  A.   Yes.

8  Q.   All right.  Let's take a look at 64-E, as in Elephant,

9  please.

10          This is the final application for that loan, correct?

11 A.   Yes.

12          MR. ROSS:  All right.  And I would move in 64-E1,

13 Your Honor.

14          MR. GILLIS:  No objection.

15          THE COURT:  Received.

16 BY MR. ROSS: (Continuing)

17 Q.   Is that your signature on the top of page 1?

18 A.   Yes, it is.

19 Q.   Is it also your signature on the bottom of page 3?

20 A.   Yes.

21 Q.   And this is the one that you signed at closing, correct?

22 A.   Yes.

23 Q.   And it had the rental information on it when you signed it

24 on page 3?

25 A.   I assume so, yes.

1   Q.   And looking at page 2, had your monthly income figure of

2   $20,991.57 on there when you signed it?

3   A.   I assume so, yes.

4   Q.   All right.  And it again, it referred to your BB&T account

5   with the 114,000 that we have been talking about?

6   A.   Yes.

7   Q.   All right.  Let's take a look at 65 Charlie 1, please.

8        Your Honor, this is another one that is not in the

9   indictment, please.

10        THE COURT:  Same instruction, ladies and gentlemen.

11        MR. ROSS:  And I would move in 65-C1, Your Honor, at

12   this point.  Apparently it is not in yet.

13        THE COURT:  It is received.

14        MR. GILLIS:  No objection, Your Honor.

15   BY MR. ROSS: (Continuing)

16   Q.   And this is the HUD-1 Closing Statement for a refinance of

17   the Dumfries property, is that correct?

18   A.   4127, yes.

19   Q.   Yes.  Okay.  Thank you.  And you are taking out a new

20   $36,000 loan?

21   A.   Yes.

22   Q.   And you got proceeds of $33,553 and change?

23   A.   Yes.

24   Q.   And what did you do with those proceeds, please?

25   A.   Everything just goes right back into the properties.

1    Q.   Okay.  All right, let's take a look at 65 David, please.

2         Is this the initial application for the loan

3    transaction that we were just speaking of?

4    A.   Yes.

5    Q.   And is that your signature at the bottom of page 1?

6    A.   Yes.

7    Q.   And at the bottom of page 2?

8    A.   Yes.

9    Q.   And also near the bottom of page 3?

10   A.   Yes.

11   Q.   All right.  And the rental information was on there when

12   you signed it on page 3?

13   A.   I assume so.

14   Q.   All right.  And take a look at page 2, please.  It has got

15   the monthly income figure of 20,000 on there, right?

16   A.   It's on the application, yes.

17   Q.   And it was there when you signed it?

18   A.   I assume so.

19   Q.   Because this came to you filled out before you signed it,

20   right?

21   A.   Correct.

22   Q.   And right below that we have got the BB&T account again

23   for the $114,000 that we have talked about?

24   A.   Yes.

25   Q.   Okay.  Let's take a look at 65 Elephant 1, please.

1              This is the final loan application for this refinance

2    that we were discussing, right?

3    A.   Yes.

4    Q.   All right.  And this is the one you signed at closing?

5    A.   Yes.

6              MR. ROSS:  And I would move in 65-E1 at this point,

7    Your Honor.

8              THE COURT:  It is received.

9    BY MR. ROSS: (Continuing)

10   Q.   And you signed page 1?

11   A.   Yes.

12   Q.   You signed page 3?

13   A.   Yes.

14   Q.   And page 3 had the rental information on it that you

15   talked about earlier, correct?

16   A.   I assume it was there, yes.

17   Q.   Take a look back at page 2, if you would, please.

18             And that had the income figure, monthly income figure

19   of 20,991 on it when you signed it?

20   A.   I assume so, yes.

21   Q.   And it also had the BB&T account and the 114,000 that we

22   have talked about?

23   A.   Yes.

24   Q.   All right.  Let's go to 66 Charlie 1, please.

25             Is this the HUD-1 Settlement Statement for your

1    purchase of Kentwood Lane?

2    A.   Yes.

3    Q.   So here you are buying a new property?

4    A.   Correct.

5    Q.   All right.  And this was on March 5, 2007, was the

6    closing?

7    A.   Yes.

8    Q.   All right.  And you're taking out a first mortgage of

9    $280,000?

10   A.   Yes.

11   Q.   And a second mortgage of $33,662?

12   A.   Yes.

13   Q.   You also brought to closing $40,000 in change, correct?

14   A.   Yes.

15   Q.   Likely some of the refinance proceeds from earlier

16   transactions that we have been discussing?

17   A.   Yes.

18   Q.   Okay.  Thank you.  But you have added debt of a $280,000

19   first mortgage and a $33,000 second mortgage, correct?

20   A.   Yes.

21   Q.   Let's look at 66 David.

22         This is your initial loan application for that

23   acquisition, correct?

24   A.   It looks like it.  The numbers at the top of the page are

25   different though.

1    Q.   Which numbers are you referring to?

2    A.   The first and the second.  I guess it is split.

3    Q.   Pardon me?

4    A.   The first and the second.  It says 30-something and then

5    38.

6    Q.   Okay.  All right.  Does that have your signature at the

7    bottom of page 1?

8    A.   Yes.

9    Q.   And at the bottom of page 2?

10   A.   Yes.

11   Q.   And near the bottom of page 3?

12   A.   Yes.

13   Q.   And this came to you all filled out, correct?

14   A.   Yes.

15   Q.   And so, the rental information on page 3 was there when

16   you signed it?

17   A.   I assume so, yes.

18   Q.   And on page 2, the monthly income of $20,000 was there

19   when you signed it?

20   A.   I assume so, yes.

21   Q.   And a little bit below that, we have got the BB&T account

22   that we have been chatting about and the 114,000?

23   A.   Yes.

24   Q.   All right.  And let's take a look at 66 Elephant 1,

25   please.

1          I would move that in at this point, Your Honor.  This

2   is the final loan application for this loan transaction.

3          MR. GILLIS:  No objection.

4          THE COURT:  It is received.

5   BY MR. ROSS: (Continuing)

6   Q.   Am I correct, Mr. Hite, is that the final loan application

7   for this acquisition of the Kentwood Lane property?

8   A.   Yes.

9   Q.   All right.  And you signed on page 1, correct?

10  A.   Yes.

11  Q.   And turning to page 3, you signed there as well?

12  A.   Yes.

13  Q.   And it had the rental information on the top of page 3

14  when you signed it?

15  A.   I assume so, yes.

16  Q.   Looking back at page 2, it had the monthly $20,000 income

17  figure when you signed it?

18  A.   I assume so, yes.

19  Q.   And the same BB&T things that we have come to know at this

20  point?

21  A.   Yes.

22  Q.   All right.  All right.  Then let's go to 67 Charlie 1,

23  please.

24          I would move that -- well, excuse me, let me lay a

25  foundation.  I think you talked about this before.

1            MR. GILLIS:  No objection, Your Honor.

2            MR. ROSS:  Thank you, Mr. Gillis.

3            THE COURT:  It is received.

4    BY MR. ROSS: (Continuing)

5    Q.   Is this the HUD-1 Settlement Statement for your purchase

6    of Westmoreland Drive?

7    A.   Yes, it is.

8    Q.   So this is another new property that you are acquiring,

9    right?

10   A.   The final one, yes.

11   Q.   And you closed on that on March 16, 2007?

12   A.   Yes.

13   Q.   And you took on another first mortgage, correct?

14   A.   Yes.

15   Q.   $280,000?

16   A.   Yes.

17   Q.   And another second mortgage of a little more than $33,000?

18   A.   Yes.

19   Q.   Okay.  All right.  Let's look at 67 Elephant 1, please.

20            Is this the final loan application for your

21   acquisition of Westmoreland Drive?

22   A.   Yes, it looks like it.

23            MR. ROSS:  Okay.  And I would move that in at this

24   time, Your Honor, 67-E1.

25            MR. GILLIS:  No objection.

```
 1              THE COURT:  Received.

 2   BY MR. ROSS: (Continuing)

 3   Q.   And you signed page 1, Mr. Hite?

 4   A.   Yes.

 5   Q.   And turning to page 3 --

 6   A.   Yes.

 7   Q.   You signed that as well, didn't you?

 8   A.   Yes.

 9   Q.   And the rental information at the top of the page was

10   there when you signed it?

11   A.   I assume so, yes.

12   Q.   Take a look at page 2, please.

13              The monthly income of $20,000 was there when you

14   signed it?

15   A.   I assume so, yes.

16   Q.   And one last time, the BB&T account and the 114,000?

17   A.   Yes.

18   Q.   Okay.  All right.  So we have talked about a bunch of

19   loans.  The first one was the refinance of Blackstone in

20   February of 2006, correct?

21   A.   Yes.

22   Q.   And as you pointed out, this last one, your acquisition of

23   Westmoreland Drive, was in March of 2007?

24   A.   Yes.

25   Q.   So a little more than a year.  You had one transaction
```

1   where you were really just dividing up the properties, you

2   recall that one, right?

3   A.   Yes.

4   Q.   But then there were four acquisitions, Dover Road, Oak

5   Shade Road, Kentwood, and Westmoreland, correct?

6   A.   Yes.

7   Q.   And would you trust me if I told you the math on that was

8   that for those four transactions, you took out first mortgages

9   of about $1,222,000?

10  A.   Probably sounds about right, yes.

11  Q.   All right.  And the other transactions that we talked

12  about, there were five refinances out of the ten that we have

13  gone through, correct?

14  A.   Yes.

15  Q.   And again, would you trust my math if I told that the new

16  loans as part of those refinances were approximately $743,000?

17  A.   You have the numbers.  I don't have them in front of me.

18  Q.   Fair enough.

19  A.   But I assume.

20  Q.   I am reasonably confident in my math.  Sounds about right

21  though, doesn't it?

22  A.   Yes.

23  Q.   So between your purchases and your refinances, in that

24  span of about 12 or 13 months you took out $1,965,000 give or

25  take of new debt?

1   A.   You are probably right, yes.

2   Q.   And your tax returns in 2004 showed that you lost $56,000,

3   correct?

4   A.   Yes.

5   Q.   And your tax return for 2005 shows that you lost $72,000?

6   A.   I guess.  I saw that.

7   Q.   Okay.  And it's your testimony that during that time when

8   you acquired all that debt, you did not look one time at any of

9   the documents that we have gone through that you have signed to

10  see what was being listed as your income?

11  A.   No, I did not.

12  Q.   May have I moment, please, Your Honor.

13          THE COURT:  Yes, sir.

14  Q.   Mr. Hite, do you recall when you were first contacted by

15  the FBI?

16  A.   First phone call might have been September or October.  I

17  am not positive.

18  Q.   Of what year, sir?

19  A.   2013.

20          MR. ROSS:  Thank you, Your Honor.

21          THE COURT:  Okay, thank you.

22          Redirect?

23          MR. GILLIS:  Thank you, Your Honor.

24      REDIRECT EXAMINATION

25  BY MR. GILLIS:

D.G. Hite - Redirect

775

1  Q.   Ms. Porter, could you bring up Exhibit 58-H1.  And in

2  particular, the last line.

3       Now, when my worthy opponent asked you about this,

4  you mentioned that you had told the defendant your gross

5  business income, is that right?

6  A.   Yes.

7  Q.   What he showed you here is your adjusted gross income, is

8  that right?

9  A.   Yes.

10  Q.   Now, for that very first loan with the defendant, do you

11  recall a discussion you had with her about the income of

12  self-employed individuals?

13  A.   Yes, somewhat, because it's different than --

14  Q.   Well, explain to the jury what you told her or what you

15  two discussed.

16  A.   Well, to the best of my knowledge for that was just

17  letting her know that, I mean, this is how much money that came

18  into the business from the jobs that I had completed.

19       And then you still had expenses and other things like

20  that to come out before you got to your bottom line.

21  Q.   And were there -- at that time, in that discussion, were

22  there any documents that you offered to give to the defendant?

23  A.   Well, I had my tax returns from 2003 and '4.

24  Q.   And did you offer those to the defendant?

25  A.   Yes.

1    Q.   And what was her response to that?

2    A.   Well, that's when she kind of asked me about getting in

3    touch with David Best about getting that small letter from him

4    stating that he had been doing my tax returns.

5    Q.   Now, on that first loan application with the defendant, do

6    you recall filling in the income portion of the application?

7    A.   It has been so long ago, I don't recall.

8    Q.   The information that you put in that first income -- that

9    first application, was it entirely truthful?

10   A.   Yes, to the best of my knowledge.

11              MR. GILLIS:  May I have one moment, Your Honor?

12              THE COURT:  Yes, sir.

13              MR. GILLIS:  First of all, Your Honor, I move in

14   Government's Exhibit 58-H3.

15              THE COURT:  Any objection?

16              MR. ROSS:  I don't think there is any foundation,

17   Your Honor.

18              MR. GILLIS:  Well, it would have been the foundation

19   that was laid when the --

20              THE COURT:  What is H3.

21              MR. ROSS:  It is the 2006 tax return, Your Honor.

22              THE COURT:  All right.  Well, he has testified about

23   that and identified it now.  It's in.

24              Did you ask him whether he recognized it and

25   identified it?  I thought I heard you say that.

1              MR. ROSS:  H1 and H2, Your Honor, I could be wrong,

2    but I don't think H3.

3              MR. GILLIS:  I am sorry, I will do just that.

4    BY MR. GILLIS:  (Continuing)

5    Q.   Could you take a look at Government's Exhibit 58-H3.  58

6    Hotel 3.

7              Do you see in there your -- in the first -- well,

8    first of all, can you tell me what that is?

9    A.   This is a copy of my 2006 tax return.

10   Q.   And that has not yet been filed, to the best of your

11   knowledge?

12   A.   No.

13   Q.   Do you believe it is accurate at this point, at least in

14   that draft form?

15   A.   Yes.

16             MR. GILLIS:  Your Honor, I move in 58-H3.

17             THE COURT:  All right, it is received.

18   BY MR. GILLIS:  (Continuing)

19   Q.   If you could look, please, at the Schedule C on that, the

20   statement of business -- back one.  The profit and loss from

21   the business.

22             Do you see that?

23   A.   Yes.

24   Q.   And then line 1 there is an item for gross receipts or

25   sales?

1  A.   Correct.  That would be the income I received from the

2  jobs I performed.

3  Q.   And is that -- in general, is that the information that

4  you provided to the defendant?

5  A.   Yes.

6  Q.   Would you look at Government's Exhibit 58-H1 in the same

7  Schedule C.

8         Do you see there -- and if you would like, you can

9  look at the screen to your left there.

10        Do you see again the gross receipts or sales for your

11 business?

12 A.   Yes.

13 Q.   This is one of the two tax returns that you offered to

14 give to the defendant?

15 A.   Yes.

16 Q.   And then if you would look, please, at Government's

17 Exhibit 58-H1.

18        I beg your pardon, 58-H2, to be clear, was your 2005

19 tax return.  Did you say that you had offered -- which tax year

20 did you say --

21 A.   Well, '3 and '4 would have been the ones that would have

22 started everything in '05.

23 Q.   Got it.  So if you would look at Government's

24 Exhibit 58-H1.  And again, the profit and loss.

25 A.   Yes, on Schedule C, 60,349.

1    Q.    Could it be 69,349?

2    A.    No.  H2?

3    Q.    No, no.  I want you to look, sorry, at Government's

4    Exhibit 58-H1.

5    A.    Yes.  The gross receipts for that year were 69,397.

6    Q.    And is this now one of the two tax returns that you

7    offered to provide to the defendant?

8    A.    Yes.

9    Q.    Could I have one moment, Your Honor.

10          Now, after that first discussion with -- the first

11   loan with the defendant, she would send you these tax returns

12   -- I beg your pardon.  She would send you these loan

13   applications?

14   A.    Yes.

15   Q.    Did she give you instructions -- first of all, how did you

16   receive them from her?

17   A.    Fax.

18   Q.    And where did you receive them?

19   A.    At my office at home.

20   Q.    And your office is at home you say?

21   A.    Yes.

22   Q.    Do you spend your day working at home?

23   A.    No.

24   Q.    So where do you spend your day?

25   A.    All over Northern Virginia.

1    Q.   So, after that first loan, when she sent you this fax with

2    the loan application, did she give you instructions along with

3    it?

4    A.   Sometimes it's if we want the deal to go through, she

5    needs to have it on her desk first thing in the morning.

6    Q.   And what did she tell -- what else did she tell you to do?

7    A.   Just to sign where it shows the Xs for me to sign on the

8    applications.

9    Q.   Now, what kind of hours were you working around that time?

10   A.   Farmer's hours.

11   Q.   I beg your pardon?

12   A.   Farmer's hours.

13   Q.   For a nonfarmer, could you explain what that means.

14   A.   Well, it was dusk to dawn, pretty much.

15   Q.   And so, when did you actually receive the faxes that the

16   defendant sent you?

17   A.   Sometimes they would be there when I got home in the

18   evening.  Sometimes they might come in first thing in the

19   morning.

20   Q.   And she told you to do what with them?

21   A.   To sign them and fax them back to her.

22   Q.   And were there -- you mentioned that there was some time

23   pressure involved?

24   A.   Yes.

25   Q.   Was that -- can you tell us, was that seldom, frequent?

1    A.    Usually more frequent than not.

2    Q.    Mr. Hite, do you recall the first time that you realized

3    that these income and rental figures were on the applications

4    that you signed?

5    A.    After I went through all the old paperwork that I had for

6    these properties, after being contacted by the FBI agents to

7    see exactly what was going on.

8    Q.    Okay.  And then what?

9    A.    Well, that's when I set up the appointment with my

10   attorney to sit down and talk to the two agents.

11   Q.    And what was your reaction to seeing the information on

12   these applications?

13   A.    I was shocked a little bit that, you know, this

14   information was on there.  Just rents that were way out of

15   proportion for one thing for what the properties were actually

16   worth.

17   Q.    I believe you told the agents that you felt like a fool --

18         MR. ROSS:  Your Honor, leading.

19         THE COURT:  It's leading.  Sustained.

20         You can refresh his recollection if you want, but you

21   can't make the statement for him.  You know that, Mr. Gillis.

22         MR. GILLIS:  I beg your pardon, Your Honor.  I

23   withdraw the question.

24   BY MR. GILLIS: (Continuing)

25   Q.    Now, you mentioned that the filing of your tax returns had

1    been delayed by all these issues with the properties?

2    A.    Yes.

3    Q.    What did you mean by that?

4    A.    Well, some of the properties, there was phantom income,

5    which is debt forgiveness.  So there are issues that have to be

6    dealt with that.

7    Q.    Well, do you still own the properties?

8    A.    No.

9    Q.    And what happened to them?

10   A.    They all went to foreclosure, including my own house.

11   Q.    Including your own house?

12   A.    Yes.

13   Q.    How about your mom's house?

14   A.    That too.

15            MR. GILLIS:  That's all I have, Your Honor.  Thank

16   you.

17            MR. ROSS:  May I ask limited, Your Honor, on the one

18   exhibit that he had put in?

19            THE COURT:  The tax return?

20            MR. ROSS:  Yes.

21            THE COURT:  Yes.

22            MR. ROSS:  Thank you, Your Honor.

23        RECROSS-EXAMINATION

24   BY MR. ROSS:

25   Q.    Mr. Hite, you do you still have 58-H3 in front of you?

1    A.   No.

2    Q.   58 Harold 3, please.

3         This is your 2006 return, correct?

4    A.   Yes.

5    Q.   Hasn't been filed, correct?

6    A.   No, not yet.

7    Q.   But you believe it's accurate?

8    A.   Yes.

9    Q.   All right.  Let's go to the Schedule C, which is the

10   fourth page.

11   A.   Yes.

12   Q.   I want to make sure I followed your testimony.  The gross

13   income figure on line 7 is the 48,512?

14   A.   Correct.

15   Q.   That's what you say you told Ms. Chittenden?

16   A.   Yes.  Well, at that point this tax return never came into

17   issue.

18   Q.   Understood.  But you gave her generally that figure?

19        MR. GILLIS:  Objection, Your Honor.  There is no

20   foundation that this was --

21        THE COURT:  Overruled.  You went into it.  He can

22   probe further.

23   BY MR. ROSS: (Continuing)

24   Q.   Can you zoom out please, Ms. Porter.

25        So I believe you testified that you gave the $48,000

1  figure to Ms. Chittenden is what you were making, correct?

2  A.   Not at that time, no.  The only income information that

3  came out was in 2005.  There was never any income given to her

4  from that time forward.

5  Q.   So you never told her anything about 2006?

6  A.   No.

7        MR. ROSS:  That's all I have, Your Honor.  Thank you.

8        THE COURT:  All right.  Mr. Hite, you are excused,

9  sir.  Don't discuss the testimony you have given with anyone

10  until our trial is over.

11        NOTE:  The witness stood down.

12        THE COURT:  Next witness.

13        MS. MARTINEZ:  Spencer Brooks, Special Agent Spencer

14  Brooks.

15        NOTE:  The witness is sworn.

16        SPENCER BROOKS, called by counsel for the United

17  States, first being duly sworn, testifies and states:

18        DIRECT EXAMINATION

19  BY MS. MARTINEZ:

20  Q.   Good afternoon.

21  A.   Good afternoon.

22  Q.   Could you introduce yourself to the jury, please.

23  A.   Spencer Brooks.

24  Q.   How are you employed?

25  A.   I am a special agent with the FBI.

1    Q.    How long have you been a special agent with the FBI?

2    A.    About seven-and-a-half years.

3    Q.    Are you on any particular squad within the FBI?

4    A.    I work at the Manassas office, which is attached to the

5    Washington Field Office, and I am on the Financial Institution

6    Fraud Squad.

7    Q.    How long have you been on that squad?

8    A.    For about seven-and-a-half years.

9    Q.    As part of your official duties, were you the lead FBI

10   agent on the investigation that led to this case?

11   A.    Yes.

12   Q.    When did you first become involved in the investigation?

13   A.    We opened it in late 2009.

14   Q.    Have you been involved since the beginning?

15   A.    Yes, I have.

16   Q.    As part of your investigation, were you also involved in

17   collecting the documentary evidence that has been presented

18   throughout the trial?

19   A.    Yes, I was.

20   Q.    Were you also involved in organizing these exhibits?

21   A.    Yes.

22   Q.    And we have had a lot of exhibits that have come into

23   evidence and been discussed that are identified by a number

24   followed by a letter, such as 36 Charlie or 37 Delta.

25            Can you briefly explain the organization of the

1  exhibits to clarify for the jury and the record.

2  A.    Sure.  From the numbers 36 and up, so 36 through 79 or 80,

3  I can't remember off the top of my head, those are an

4  individual loan transaction.  36 is one loan transcription, 37,

5  38, and on up for each number.

6  Q.   So, in other words, if an exhibit starts with a number 36

7  or higher and is followed by a letter, does that mean they are

8  all related to that loan transaction?

9  A.    That's correct.  So all the documents that are in evidence

10  for a particular loan transaction all will be for 36.  And then

11  another loan transaction would be 37.

12          So all the documents related to that transaction are

13  in that number sequence, 36-A, B, C, D.

14  Q.   Where did these documents come from before they were

15  exhibits?

16  A.    Mostly from Cardinal Bank and George Mason Mortgage.

17  Q.   And did all of them in the 36 on through the end series

18  come from Cardinal Bank and George Mason Mortgage?

19  A.    That's correct.

20  Q.   Every single one of them?

21  A.    Mostly.  Not every single one of them in that series,

22  that's correct.

23  Q.   Can you explain further which, if any, did not come from

24  Cardinal Bank?

25  A.    I can.  If you don't mind, I am going to refer to some

1    notes that I made about a few exhibits that were put into those

2    particular loan transactions but didn't come from the bank.

3    Q.   Yes, please.

4    A.   So there are actually three places in general that the

5    exhibits came from.  As we said, primarily they came from the

6    bank, from Cardinal Bank.

7         But there are also a few exhibits that came from

8    witnesses.  And then a few exhibits that came from banks where

9    people, for example, had checking accounts.  So maybe we got

10   their bank statements from that bank.

11        So from witnesses, 58-H1, 58-H2, 58-H3 --

12        MR. DAVIS:  May I request that the short

13   identification of the item be given?

14   BY MS. MARTINEZ: (Continuing)

15   Q.   If you don't mind if we do it this way, since I know you

16   don't have the exhibit list in from you, would you mind if he

17   just states the number.  And if it's okay with Your Honor, I

18   will describe what it was based on how it was described in the

19   testimony --

20        THE COURT:  Don't you have a witness list as well?

21        MR. DAVIS:  Yes, Your Honor, I do.

22        THE COURT:  All right.  Well, the jury is not going

23   to follow these numbers and equate with hundreds literally of

24   exhibits when you go A through D.

25        And so, this is irrelevant for the jury's purpose.  I

1    am sure you have another purpose in mind, but it's not going to

2    help the jury to identify it.

3              So just give us the numbers, Special Agent, and you

4    pick it up from your exhibit list if you are going to use it in

5    cross-examination.

6              MR. DAVIS:  Thank you.

7              THE WITNESS:  Sure, Your Honor.

8    BY MS. MARTINEZ: (Continuing)

9    Q.   If you could start at the beginning, you were talking

10   about exhibits that came from a witness.

11   A.   Yes.  From Mr. Dennis Hite, 58-H1, 58-H2 and 58-H3.

12             And then the only other documents that came from a

13   witness were from Rocio Benavides, and that 36-Z, 37-Z, 38-Z1,

14   and 38-Z2.

15             Then there was one other document or a couple other

16   documents I guess that came from other witnesses.  40-Z1 came

17   from Zenaida Linares.

18             And 60-Z1 and 60-Z2 came from David Best.

19             And then there are, as I said before, a few exhibits

20   that came from banks, not from Cardinal Bank, or the loan

21   files, but banks maybe where we sent a subpoena for checking

22   account information.  Those exhibits are 38-K, 38-L1, 38-L2,

23   41-K, and 44-Z.

24             MS. MARTINEZ:  Thank you.  Your Honor, at this point

25   I would move in exhibits, and I will list them in just a

1    minute, and I understand that defense counsel doesn't have any

2    objection, but for any of the transactions that we've talked

3    about, any of the HUD-1s or the loan applications, either the

4    handwritten or the final, that for one reason or another may or

5    may not have been moved in, if I could just list them and move

6    them in at this time.

7                THE COURT:  Go ahead.

8                MS. MARTINEZ:  36 Charlie 1.  39 Echo 1.  40 Charlie.

9    40 Echo.  42 Charlie 1.  42 Echo 1.  43 Charlie 1.  43 Echo 1.

10   44 Echo 1.  47 Echo 1.  Excuse me, 47 is just 47 Echo.  48

11   Echo.  42 Charlie 1 -- excuse me, 52 Charlie 1.  52 Echo 1.  53

12   Charlie 1.  53 Echo 1.  54 Charlie 1.  54 Echo 1.  55 Echo 1.

13   56 Charlie 1.  56 Echo 1.  57 Charlie 1.  59 Delta.  69 Charlie

14   1.  71 Charlie.  72 Charlie.  73 Charlie.  76 Charlie.  77

15   Charlie.  78 Charlie.  79 Charlie.

16               And then in addition, one underwriting document.

17   Also 49 Mike.

18               THE COURT:  Okay.  All right.  There is no objection

19   to those?

20               MR. DAVIS:  Your Honor, if I might just have a moment

21   about the 70 series, 71 through 79.

22               THE COURT:  Do you want to reserve on those or not?

23               MR. DAVIS:  Yes, we would, just on the 70 series.  I

24   don't think it's a problem.

25               THE COURT:  Okay.

1              MR. DAVIS:  We will reserve.

2              THE COURT:  All right.  We will reserve on the 70s.

3              MR. DAVIS:  The others, no objection.

4              THE COURT:  Okay.

5              MS. MARTINEZ:  Just to lay a little foundation on the

6      70 series.

7      BY MS. MARTINEZ: (Continuing)

8      Q.   On the 70 series, the Rosie Vilchez loans, were you

9      involved in preparing those exhibits?

10     A.   Yes.

11     Q.   And did you review HUD-1 Settlement Statements for each of

12     those loan files?

13     A.   Over the course of the investigation, yes.

14     Q.   And are those HUD-1 Settlement Statements included in the

15     exhibit series in the organizational manner that you discussed?

16     A.   Yes, they are.

17     Q.   Speaking of loan files.  As part of your duties, did you

18     review loan files for this investigation?

19     A.   Yes.

20     Q.   And did you review specifically the loan files for all of

21     the loans that have been discussed throughout this trial?

22     A.   Yes.

23     Q.   And when you did that review, generally speaking what

24     documents did you review?

25     A.   Generally we would review the HUD-1, the loan application,

1    if there is an initial one and a final one.

2              And then other important underwriting documents.  If

3    there is a verification of deposit, or a CPA letter, or an

4    underwriting summary, the general documents that were important

5    to the underwriting.

6              THE COURT:  Where did you get them?

7              THE WITNESS:  We got them from Cardinal Bank, Your

8    Honor.

9              THE COURT:  Okay.

10   BY MS. MARTINEZ: (Continuing)

11   Q.   And from those loan files that you got from Cardinal Bank,

12   were you able to determine the borrower for each of those

13   transactions?

14   A.   Yes.

15   Q.   Were you able to determine the closing date for each of

16   those transactions?

17   A.   Yes.

18   Q.   Were you able to determine the address of the property?

19   A.   Yes.

20   Q.   And the sales price of the property?

21   A.   That's correct.

22   Q.   And were you also from those loan files able to determine

23   the income that was included in the applications for those

24   loans?

25   A.   Yes.

1   Q.   Your Honor, if we could show the witness Exhibit 10-B,

2   which is not yet in evidence.

3           What is that?

4   A.   This is a summary chart that I was involved in preparing

5   that lists the borrowers, and their addresses, and the closing

6   dates, and loan amount, and the income listed on the loan

7   application, but annualized.

8           So, essentially times 12 because it was monthly

9   income listed on the loan application.

10  Q.   Where does the substantive information in that exhibit

11  come from?

12  A.   The loan files.

13          MS. MARTINEZ:  Your Honor, we move 10-B into

14  evidence.

15          THE COURT:  Any objection?

16          MR. DAVIS:  Just to clarify.  Are these from the

17  final loan app docs signed at closing?

18  BY MS. MARTINEZ: (Continuing)

19  Q.   Well, when you say these -- did you get the information

20  about the loan amount from the final documents at closing?

21  A.   That's correct.  We went to the final loan application

22  versus the initial handwritten loan application.

23  Q.   How about the income on the 1003, did you use the final

24  versions of the 1003s?

25  A.   Yes.

1          THE COURT:  All right.  Any objection?

2          MR. DAVIS:  No objection, Your Honor.

3          THE COURT:  All right, it is received.

4     BY MS. MARTINEZ: (Continuing)

5     Q.   Can you just explain what the first two columns in that

6     chart represent.

7     A.   The first column with the header GEX is the Government

8     exhibit series.  So the first one is 36.

9          So, 36-A, B, C, D would all be the exhibits related

10    to borrower Alma de León Reyes and her property on Sanderling

11    Drive.

12         And then on down through 58 and beyond for the

13    Government's exhibit number.

14         Then column two is count number.  So it relates -- if

15    that particular loan transaction relates to a particular count

16    in the indictment, it is noted there.

17    Q.   Thank you.  As part of your duties in this investigation,

18    did you also obtain and review information related to the

19    defendant's compensation during the period of time relative to

20    the indictment?

21    A.   I did.

22    Q.   How did you obtain that information?

23    A.   I sent a subpoena to Cardinal Bank and obtained loan

24    commission information for all of 2005, 2006, and 2007.

25    Q.   And in what form did you receive that information?  If you

1    could sort of briefly describe that.

2    A.    It was either a page or two pages for each month, and it

3    listed -- so for January 2005, there was a page or two,

4    depending upon how many transactions closed that month, and it

5    listed the borrower's last name, listed the loan number, listed

6    the closing date, and then the commissions, and on down the

7    page.

8            And then we had one of those for every more for 2005,

9    2006, and 2007.

10   Q.    And from those documents that you described, were you able

11   to identify the defendant's commissions for each of the

12   transactions that were discussed through the course of trial?

13   A.    Yes.

14   Q.    And how were you able to do that?

15   A.    So we had the borrower's last name, and the loan number,

16   and the closing date.  And I believe even the loan amount were

17   on the commission records.  And then it was just a line.  And

18   as you followed the line over, it either had a commission

19   amount -- there were different kinds of commissions, maybe a

20   basic commission.  And then there are things that are called

21   loan shortages or loan overages.

22           And if you added up that total line for that

23   particular loan, that was how much Ms. Chittenden made on each

24   of those loans.

25   Q.    If we could show the witness Government's Exhibit 10-A, as

1    Alpha.

2            What is that document, sir?

3    A.   This document is a chart that summarizes all Ms.

4    Chittenden's commissions for each of the loan transactions that

5    evidence was put in about during the trial.

6    Q.   Were you involved in making that chart?

7    A.   Yes, I was.

8    Q.   And where did the information in the chart come from?  I

9    think you made that clear, but just to be sure.

10   A.   It came from the loan commission records that we received

11   from Cardinal Bank.

12           MS. MARTINEZ:  Your Honor, I would offer Exhibit 10-A

13   into evidence.

14           MR. DAVIS:  No objection.

15           THE COURT:  It is received.

16   BY MS. MARTINEZ: (Continuing)

17   Q.   And are the first two columns, do they function

18   essentially the same way that the first two columns in the

19   previous chart do?

20   A.   Yes, they do.

21   Q.   And if we could go to the second page -- actually, if we

22   go back to the first page for just one moment.

23           On the first page, we don't need to zoom it, just

24   leave it.

25           Where it says -- the line that starts with 40 in the

1    left-hand column.  If you go all the way over in that line, the

2    commission column says:  No COMM. per DVL.

3              Can you explain why you put that in that particular

4    box.

5    A.   I can.  As you can see, for every other transaction it has

6    a number in there, but in the loan commission records that we

7    reviewed to put this chart together, there is no commission,

8    there are zeros across the board for the Zenaida Linares

9    transaction.  And then there is a note on the right-hand side

10   or an entry on the right-hand side by that line that says No

11   COMM. per DVL.

12   Q.   Were there other transactions in all of these commission

13   sheets where the commission was zero?

14   A.   There were a couple other transactions were the commission

15   was zero.

16   Q.   Did all the --

17             MR. DAVIS:  Objection, relevance.

18             MS. MARTINEZ:  Your Honor, I am simply trying to

19   explain where he got this notation from.  It will become clear

20   with the next question.

21             THE COURT:  All right.  I will allow it.

22   BY MS. MARTINEZ: (Continuing)

23   Q.   Did all of the ones that had a zero have the same notation

24   next to it, or did they not?

25   A.   No, they did not.

1   Q.   All right.  On page 2, at the bottom, it says Total

2   Commissions.

3          What does that represent?

4   A.   If you add up all the numbers in the Chittenden commission

5   column, that's the total commissions for just this chart, for

6   just the transactions where evidence was presented during the

7   trial.

8   Q.   What was the period of time for the transactions on this

9   chart?

10  A.   I believe it was June 2005 to August 2007.

11  Q.   In your review of the defendant's commissions in these

12  documents that you obtained from the bank, were you also able

13  to identify other commissions the defendant had earned from

14  clients of Rosie Vilchez?

15  A.   Yes.

16  Q.   And how did you go about doing that?

17  A.   We had a lot of loan files throughout the course of the

18  investigation, and a lot of loan files related to borrowers

19  that were Vilchez & Associates clients.

20          And when we compiled sort of all the information for

21  all those borrowers and all those loans, there are different

22  places in the documents where Vilchez & Associates would be

23  noted as the entity involved.

24          For example, in the sales contract, it might have a

25  Realtor listed that is from Vilchez & Associates, and below

S. Brooks - Direct

798

1    their name it would say Vilchez & Associates.

2            Or on the HUD-1, at the top of the second page it

3    would say:  Commission paid to Vilchez & Associates.

4            So we were able to determine which transactions that

5    Ms. Chittenden did were Vilchez & Associate clients as well.

6    Q.   And what period of time was this over?  Of the documents

7    that you reviewed, what period of time?

8    A.   Generally 2005, 2006, 2007.

9    Q.   Can we show the witness Government's Exhibit 10-C.

10           Do you have 10-C in front of you?

11   A.   I do.

12   Q.   What is that?

13   A.   This is a summary chart that I helped put together that

14   lists the borrower, the address, the closing date, and the

15   commission for Ms. Chittenden.  But this is just for

16   commissions related to Vilchez & Associates clients.

17           MR. DAVIS:  Objection, Your Honor.  May we approach

18   and show you the chart?

19           THE COURT:  Yes.

20           NOTE:  A side-bar discussion is had between the Court

21   and counsel out of the hearing of the jury as follows:

22   AT SIDE BAR

23           MR. DAVIS:  This is 10-C, Your Honor.  The

24   Government's objection is that this particular -- I am sorry, I

25   forget.  Pardon my --

1        THE COURT:  Shocked that it was only one time.

2        MS. MARTINEZ:  I am too.

3        MR. DAVIS:  The defense had no objection to the

4   commission chart for the loans proved in this case, both the

5   loans charged in the indictment and all the other loans not

6   charged in the indictment.  That shows about $99,000 over two

7   years total commissions.

8        This exhibit, as I understand it, is a compilation of

9   Vilchez & Associates loans over some period of time, and most

10  of them there is not a shred of evidence about and no

11  information before this jury about.

12       And so, to present evidence of her commissions on

13  specific loans is prejudicial, and it is not probative because

14  it is not proving any count in the indictment.

15       THE COURT:  Doesn't it go to the extent of the

16  relationship between your client and Vilchez & Associates?

17       MR. DAVIS:  It does, Your Honor, and we would not

18  object to a question about the number of loans.  But to put in

19  front of them a financial number is just more prejudicial than

20  probative.  This is the way they get 225,000 in front of the

21  jury when, even with all the good work in this case, they

22  couldn't quite get to 100.

23       MS. MARTINEZ:  Your Honor, the amount of money that

24  the defendant made off of clients involved with Vilchez &

25  Associates is completely probative, as Your Honor stated, to

1    the nature of that relationship.

2            It also goes to the question of why she would

3    continue to take business from that company and how closely she

4    would pay attention to those loans.  She was making a huge

5    amount of money from it.

6            And that is probative to our argument that she was

7    paying attention to these loans and to the loans of Rosie

8    Vilchez which they also processed.

9            THE COURT:  I am going to allow it.  Your exception

10   is noted.  And you can cross-examine on the fact that the

11   majority of those are all legitimate transactions.

12           MR. DAVIS:  Thank you.

13           NOTE:  The side-bar discussion is concluded;

14   whereupon the case continues before the jury as follows:

15   BEFORE THE JURY

16           MS. MARTINEZ:  Your Honor, we would move 10-C into

17   evidence.

18           THE COURT:  It is received.

19   BY MS. MARTINEZ: (Continuing)

20   Q.   Could you explain to jury what each of these columns

21   represents.

22   A.   Yes.  On the left-hand side, the Borrower column, that has

23   the borrower's last name.  We put the last name because the

24   loan commission records just have the last name in them.

25           Then we put the address and the closing date.  And

1    then added up the commissions from the different portions of

2    the commission in the commission records for that transaction.

3    Q.   And over what period of time do the transactions on this

4    chart extend?

5    A.   I just want to clarify, I think I misspoke earlier when

6    you asked me about transaction dates for the prior chart.  I

7    think I gave an answer for this chart.

8            This chart is June 2005 to August 2007.

9    Q.   And so that you can clarify, on Government's Exhibit 10-A,

10   the commissions that actually relate to the transactions that

11   were put into evidence throughout the course of this trial,

12   what was the time period on that chart?

13   A.   If I can review it for just a minute.

14   Q.   Absolutely.

15   A.   It appears to be about February '06 to maybe August '07.

16   Q.   Thank you.  Going back to 10-C.  And actually if we could

17   go to page 3.

18           What does this total number at the bottom represent?

19   A.   That represents all the commissions just on this chart,

20   which are the Vilchez transactions that -- Vilchez and Ms.

21   Chittenden transactions that we had commission records for and

22   documents for where we knew it was a Vilchez transaction.

23   Q.   In your review of these commission records, were you also

24   able to determine the total commission that the defendant

25   received from all of the loans that she processed in this

1  period of time?

2  A.   Yes.

3  Q.   And what percentage of the defendant's overall commissions

4  in this period came from clients on this chart?  In other

5  words, Vilchez & Associates clients?

6  A.   About 21-and-a-half percent.

7  Q.   Agent Brooks, during the course of this trial we heard

8  something about called a 4506-T.  Is that something that you

9  are familiar with as apart of your duties as an FBI agent on

10  the squad that you said you were on which, if I am right, is

11  the Financial Institution Fraud Squad?

12  A.   Yes, I am familiar with the 4506-T.

13  Q.   Would you tell the jury briefly what a 4506-T is?

14  A.   4506-T is a form that a mortgage company or a bank may

15  have a borrower sign that says either during the course of the

16  loan transaction or maybe after the loan transaction is closed

17  if another bank is buying the loan, if a 4506-T is signed, the

18  bank has the ability to request the file tax transcripts from

19  the IRS so that they then compare it to the income that was

20  listed in the loan file.  Or maybe if there were tax returns in

21  the loan file, they could compare the two of them.

22  Q.   Thank you.  During the course of your investigation, did

23  you have the opportunity to interview the defendant?

24  A.   I did.

25  Q.   How many times?

1  A.    Twice.

2  Q.    When was the first time?

3  A.    In August 2010.

4  Q.    When was the second time?

5  A.    It was in January 2012, I believe.

6  Q.    What were the circumstances of the second interview?

7  A.    During the second interview I was sitting at my desk and

8  she called me.  And she was inquiring about the status of the

9  investigation since we had interviewed her quite awhile before.

10  Q.    In either interview, did the defendant say anything to you

11  about having any suspicions at any point in time about Rosie

12  Vilchez?

13  A.    During the first interview she described one incident in

14  2001 where she believed she caught Rosie Vilchez forging a

15  prequalification letter, forging Ms. Chittenden's signature on

16  a prequalification letter.

17  Q.    And did she indicate whether or not that had been reported

18  to the FBI?

19  A.    Yes, she said it had been reported to the FBI.

20  Q.    When she gave you that information, did you subsequently

21  go and review FBI files to determine whether or not such a

22  report had in fact been made?

23  A.    I did.

24  Q.    What you did find?

25  A.    I found a report from April of 2001.  It was unclear

1   whether or not the bank had reported it or maybe Ms. Chittenden

2   had reported it herself, but it certainly had been reported to

3   the FBI.

4   Q.   What was the substance of that report, in brief?

5   A.   That Ms. Chittenden had discovered through talking to a

6   settlement company that was handling a transaction that they

7   had a copy of a prequalification letter that had her signature.

8   She obtained a copy of that letter and said it was not her

9   signature.  And ended up confronting, I believe, Rosie Vilchez

10  about it.

11  Q.   Based on your review of these FBI records, were you able

12  to identify any other instance of a report -- of the defendant

13  making a report after April of 2001 either about Rosie Vilchez

14  or any other fraud?

15  A.   No.

16  Q.   No you were not able to or no you found -- could you

17  clarify.

18  A.   I found no other reports by the defendant about other

19  fraud.

20  Q.   Or about Rosie Vilchez?

21  A.   Or about Rosie Vilchez.

22          MS. MARTINEZ:  Thank you, Agent Brooks.

23          Nothing further at this time, Your Honor.

24          THE COURT:  All right.  Cross-examination.

25      CROSS-EXAMINATION

1   BY MR. DAVIS:

2   Q.   Showing you Exhibit 13 for identification, Agent Brooks.

3            Is that the FBI report made by Lorene -- or that has

4   Lorene Chittenden's name on it that is in the FBI official

5   records?

6   A.   Yes, it is.

7            MR. DAVIS:  Your Honor, I move to admit Exhibit 13

8   into evidence.

9            MS. MARTINEZ:  No objection, Your Honor.

10           THE COURT:  It is received.

11  BY MR. BROOKS: (Continuing)

12  Q.   Could you read the text of the report, or we can publish

13  it I think is easier.

14  A.   I am happy to read it from the paper.  Would you like me

15  to read it or --

16  Q.   Maybe we could do both.  If I could have it for the ELMO

17  please, Agent Brooks.

18  A.   Sure.

19  Q.   Thank you.  This is an FBI internal database, is that

20  right?

21  A.   That's correct.  I am sorry, Mr. Davis, would you like me

22  to read it?

23  Q.   I think the jury can read it.  Thank you very much, Agent

24  Brooks.  Let me just let the jury read the text of the first

25  page, please.

1              If we are good, we will go to page 2.

2              Just a question, it does appear that Ms. Chittenden

3    is informing the agent, Ms. Chittenden herself is speaking to

4    the FBI, is that right?

5    A.   I saw that as well, and it certainly could be that way.

6    My only -- what I said earlier, sometimes banks report

7    information as well.  And if she reported it to her

8    supervisors, potentially it came that from way.  It was just

9    unclear from the document on its face.

10             But it was either she called in herself, and it

11   certainly makes reference to an agent, I didn't know if that

12   meant a settlement agent or an FBI special agent.

13   Q.   Okay.

14   A.   I just didn't know for sure.

15   Q.   Okay.  We are at the last line:  Ms. Chittenden has

16   reviewed the approval letter and -- we go one more page --

17   certifies that although the letter is signed with her name,

18   that her signature has been obviously forged.

19             Right?

20   A.   Yes, that's what it says.

21   Q.   Okay.  You were not in the FBI back in 2001, correct,

22   Agent Brooks?

23   A.   Nope.  The next year I was, but not in 2001.

24   Q.   So your squad didn't get this lead and hop on it back

25   then?

1    A.    I was not there.

2    Q.    All right.  Thank you.  Agent Brooks, this investigation

3    has gone on since 2009, is that right?

4    A.    That's correct.

5    Q.    How many people have you interviewed in this case?

6    A.    It is hard to estimate, but I think probably over a

7    hundred.

8    Q.    You have been in the FBI seven-and-a-half years, right?

9    A.    I have been an agent for seven-and-a-half years.  I was a

10   budget analyst for about four years before that with the FBI.

11   Q.    Have you had other cases besides this one?

12   A.    Yes.

13   Q.    How many interviews have you done?

14   A.    In total?

15   Q.    In total in the case.

16   A.    I am sorry, in this case or in all cases?

17   Q.    Sorry, in this case.

18   A.    In this case.

19   Q.    In this investigation.

20   A.    As I said, probably at least a hundred, maybe more.

21   Q.    And have you worked with Special Agent Moriarty in the

22   case?

23   A.    Yes, I have.

24   Q.    And Special Agent Moriarty is from the FDIC, is that

25   correct?

1  A.    That's correct.

2  Q.    And have you had occasion to work with other federal

3  agents in the case?

4  A.    Certainly.  At different times there have been other

5  agents from my squad that have been involved and other agents

6  from Agent Moriarty's squad.

7  Q.    And have IRS agents contributed?

8  A.    Certainly we had an individual or an agent from ICE

9  helping us involved in the investigation at one point, but --

10 correct me if you have got a document, but I do not recall the

11 IRS.

12 Q.    Was Department of Homeland Security involved?

13 A.    Yes, that was Immigration and Customs Enforcement.

14 Q.    Okay.  Now, you are on a fraud squad, correct?

15 A.    That's correct.

16 Q.    And you have had lots of training in fraud cases?

17 A.    That's correct.

18 Q.    Would you agree with me that for business fraud, e-mail is

19 often a very important piece of evidence?

20 A.    That certainly can be.

21 Q.    Would you agree with me that in many, many fraud cases one

22 of the important investigative steps is the issuance of

23 subpoenas and sometimes even search warrants to obtain e-mail

24 records of business transactions?

25 A.    Yes.

1   Q.   And you have done that yourself in other investigations, I

2   assume?

3   A.   Yes.

4   Q.   And you will agree with me that this case is also a

5   business fraud kind of case, it is about the mortgage industry,

6   right?

7   A.   Yes, that's correct.

8   Q.   It's about applications and processing and underwriting

9   and settlement and then the sale of loans to investors, right?

10  That's what we're investigating here?

11  A.   That's correct.

12  Q.   And all of those things can be expected as of about

13  mid-2000s at least, can be expected to be accompanied by a lot

14  of e-mail traffic, wouldn't you agree?

15  A.   I think in the mid-2000s certainly there was a lot of

16  e-mail traffic regarding loans and settlements.

17  Q.   And people were e-mailing each other about the details of

18  loans every hour of every day, right?

19  A.   I am sure they probably were.

20  Q.   The only e-mails you have in this case are from Rocio

21  Benavides, is that right?

22  A.   Ultimately that we have, I believe that's correct.

23  Q.   And tell the jury about how you actually found the Rocio

24  Benavides e-mails.  What happened?

25  A.   At some point in an interview with Ms. Benavides within

1    the last five months, we asked her if she had any e-mails with

2    Ms. Chittenden.  And she told us she would go and check.  And

3    we said, let us know.

4             And then at a subsequent interview, which was not

5    that long ago, she said, I finally checked and I do have some.

6             And so, I went with her to check her phone.  And as

7    she was pulling them up, it turns out she had quite a few.

8             So I asked for her consent to essentially turn over

9    her e-mail account to me so I can change the password and lock

10   her out for a time being so that no e-mails would inadvertently

11   get deleted, and then I could do a search of her e-mail and

12   find any e-mails that were relevant.

13   Q.   Okay.  And you then went and searched her e-mails and

14   identified relevant e-mails?

15   A.   Yes.  What I did was I did a search of the last name

16   Chittenden and then printed all those e-mails.

17   Q.   Did you print every e-mail that had Ms. Chittenden on it?

18   A.   I did.

19   Q.   And then you accurately, as you have done throughout this

20   case, presented to Mr. Gillis those documents which he produced

21   to us in discovery, right?

22   A.   That's correct.

23   Q.   All right.  Now, showing you Exhibit 1, Defense Exhibit 1,

24   there is a set of Bates stamped e-mails between Rocio Benavides

25   and Lorene Chittenden, right?

1    A.    That's correct.

2    Q.    Okay.  And are you holding that now in front of you?

3    A.    I am.

4    Q.    And can you tell, I don't ask you to look at every page,

5    but can you tell that the Bates stamps are every single e-mail

6    that you produced and that was produced to the defense in the

7    case?

8    A.    As far as I know, this is all the e-mails.

9    Q.    There are no other e-mails that you know of, right?

10   A.    Correct.

11   Q.    All right, thank you.  Now, what about George Mason

12   Mortgage e-mails?  What did you do about those?

13   A.    We sent a subpoena to George Mason Mortgage and requested

14   Ms. Chittenden's e-mails fairly early on in the investigation,

15   I honestly don't remember exactly when.  We certainly wanted

16   them.

17         But George Mason Mortgage explained to us that there

18   had been IT changes and it was going to be quite an undertaking

19   to essentially rebuild or -- rebuild is probably the best word,

20   her inbox.  And she was no longer there, she had left in 2008.

21   I think we probably did this somewhere in 2010.

22         And because they said it was going to be a massive

23   undertaking, they were going to ask the Government ask to bear

24   the cost.  And so they got a cost estimate and said it was

25   going to be somewhere in the neighborhood $150,000 to do that.

S. Brooks - Cross

812

1   Q.   How much, I am sorry?

2   A.   $150,000 to do that.  To go through the -- I am not an IT

3   person, so frankly I don't know what it was going to entail,

4   but they told us that it was going to cost approximately

5   $150,000 to go through the process of rebuilding Ms.

6   Chittenden's e-mail inbox and then provide those e-mails to us.

7   And we chose --

8   Q.   So 150,000 spent four years ago, the United States

9   government could have had a complete e-mail record of what Ms.

10  Chittenden did at George Mason Mortgage in the relevant period

11  of this case, but that was too much money, right?

12  A.   That's correct.

13  Q.   Any idea how much this investigation has cost?

14  A.   I don't know.

15  Q.   What about Vilchez & Associates e-mails, did they have an

16  e-mail server?

17  A.   By the time that we opened the case in 2009, Vilchez &

18  Associates, as far as we knew, it had been shut down for a

19  while and the office was closed.  We had no real ability to get

20  any e-mails.

21  Q.   Did they have their own server, or was there e-mail on a

22  separate ISP, do you know?

23  A.   I honestly do not know.

24  Q.   Do you know whether Vilchez & Associates when they came on

25  board were given unique e-mail addresses in a Vilchez &

1  Associates domain or not?

2  A.    I believe they probably were.  I think potentially of all

3  the folks that we interviewed at Vilchez & Associates, they may

4  have mentioned e-mail addresses.  But I honestly don't know a

5  whole lot about their e-mail system.

6  Q.    You didn't get that?

7  A.    No.

8  Q.    And what about Levy Corp., did they have an e-mail server?

9  A.    I believe they had an e-mail just the same.  But again, we

10  do not have those.

11  Q.    Okay.  I want to ask you a little bit about these

12  particular kinds of mortgage loans that George Mason Mortgage

13  was selling.

14        Do you understand what the term "locked" means?  That

15  there is an investor lock at the time the loan closes?

16  A.    An investor lock?  Not really.  The term lock in terms of

17  a mortgage that I would be familiar with would be locking your

18  interest rate in.

19  Q.    Locks your interest rate.  And I would be familiar with

20  that too.  And I am not sure I am familiar with what I was

21  asking you about, but I am trying.

22        But were you aware that the loans that were being

23  closed by George Mason Mortgage already had a guaranteed buyer?

24  A.    I certainly think that we learned about the Countrywide

25  portion of the way George Mason Mortgage had a relationship

S. Brooks - Cross

814

1  with Countrywide, and they had a Countrywide underwriter on

2  site, and those loans were very quickly, after being approved

3  and funded, were then sort of automatically sold to Countrywide

4  barring any issues.

5  Q.   Sorry?

6  A.   I am sorry.

7  Q.   You said barring any issues?

8  A.   Barring any issues in the contract between them.

9  Q.   And then what would happen to those mortgage loans?

10 A.   Just based on my experience, I believe that they would be

11 probably bundled and sold in the secondary market.  But I

12 certainly can't say that I know that that happened with

13 individual particular ones, but I think that happened with most

14 mortgages.

15 Q.   And particularly in this time in our history as a nation,

16 right, the mid-2000s leading up to 2008, right?

17 A.   You are asking if that happened at that time?

18 Q.   Yes.

19 A.   Yes.  I think they were, as we are all aware at this

20 point, there was a lot of bundling of mortgages going on.

21 Q.   When you say bundling, are you referring to mortgage

22 backed securities?

23 A.   Yes, mortgages that were put in packages together as one

24 security and sold on Wall Street.

25 Q.   All right.  And Wall Street investors are buying up these

1    mortgages that have been bundled together and made into a

2    security, almost like a stock, right?

3             MS. MARTINEZ:  Your Honor, at this point I am going

4    to object to the relevance of this line of questioning.

5             THE COURT:  I am curious as well.  Are we going to

6    get into the Wall Street frauds that were never prosecuted?

7             MR. DAVIS:  It's offered as to loss and risk of loss,

8    Your Honor.

9             MS. MARTINEZ:  At some point it also goes beyond the

10   scope of this witness' knowledge.

11            THE COURT:  I am not worried about that.  I will

12   allow that.  Go ahead.

13            MR. DAVIS:  Thank you.

14   BY MR. DAVIS: (Continuing)

15   Q.   All right.  What did I ask you?

16   A.   I am sorry, could you repeat the question?  I don't

17   remember.

18   Q.   The point is, George Mason Mortgage made a loan to

19   someone, but it didn't then start a 30-year relationship that

20   most of us think of when we think about a bank and a borrower,

21   right?

22   A.   I don't think so, no.  I think they sold most of their

23   loans.

24   Q.   George Mason Mortgage makes this loan and immediately

25   sells it, right?

1    A.   I think that's what happened in many cases.

2    Q.   And we had some evidence about that from Mr. Bergstrom

3    about the different fees and money that George Mason Mortgage

4    is making when it sells that loan, right?

5    A.   Yes, I believe he spoke about that.  To be totally honest,

6    I don't understand the full breadth of that.

7    Q.   But you investigated this case for five years, you have

8    familiarity with the mortgage industry that you are looking at,

9    right?

10   A.   That's correct, I certainly have familiarity with the

11   mortgage industry.

12   Q.   Okay.  And George Mason Mortgage is making money every

13   single time it closes one of those loans and it sells it to an

14   investor, right?

15   A.   I believe they are.

16   Q.   Okay.  Now, is it true that your first contact with my

17   client was in 2009, December of '09?

18   A.   That I recall?  No.  I know we interviewed her in August

19   of 2010.  If there was a prior event --

20   Q.   Do you know whether or not Mr. Moriarty, your partner,

21   contacted Ms. Chittenden in December of 2009?

22   A.   If that happened, I don't recall.

23   Q.   Okay.  But you were there in August of 2010 to meet with

24   Ms. Chittenden?

25   A.   That's correct.

1    Q.    How many agents participated in that meeting?

2    A.    There were three of us.

3    Q.    All men?

4    A.    Yes.

5    Q.    And where did the meeting occur?

6    A.    At the Panera Bread Company in Fairfax.

7    Q.    Okay.  And you have told the jury about Ms. Chittenden

8    telling you that she had reported Rosie Vilchez to the FBI,

9    right?

10   A.    That's correct.

11   Q.    But you also talked to her about a lot other stuff, right?

12   A.    Yes, we did.

13   Q.    How long did that interview last?

14   A.    I remember it being a lengthy interview.  It was probably

15   an hour or two, but I don't have specific recollection of

16   exactly how long it took.

17   Q.    Okay.  Do you remember saying things to Ms. Chittenden

18   during that interview with your two colleagues?

19   A.    Do I remember saying things to her?

20   Q.    Yes.

21   A.    I am certain I said things to her.

22   Q.    You are generally cordial and polite, right?

23   A.    I hope so.

24   Q.    Okay.  Who took notes about that interview?

25   A.    Special Agent Moriarty did.

1  Q.   And did he write the report about that interview?  Again,

2  this is August 25, 2010?

3  A.   Yes, he did.

4  Q.   Okay.  Do you recall telling Ms. Chittenden that it did

5  not matter if she did not believe fraud was in the loans?  Do

6  you remember telling her that?

7  A.   I am sorry, I don't.

8  Q.   Did you say that to her?

9  A.   Not that I recall.

10  Q.   All right.  Now -- and I'm sorry, I think you've already

11  answered this, how long did that interview go?

12  A.   Probably an hour or two.  It was certainly a fairly

13  lengthy interview.

14  Q.   And Mr. Moriarty is writing notes the whole time about

15  what Ms. Chittenden is saying?

16  A.   Yes.

17  Q.   And he produced a report about it, right?

18  A.   Yes.

19  Q.   The report goes on for, what, four pages?

20  A.   I can refer to my report if you would like --

21  Q.   Do you recall whether it is a four-page report?

22  A.   It could have been three or four pages.

23  Q.   Do you have it with you right now?

24  A.   I do have it with me.

25  Q.   Okay.  If you could look, please.

1   A.   You are correct, it was a four-page report.

2   Q.   Okay.  Now, you also talked about another conversation or

3   really your next conversation with Lorene Chittenden, right?

4   A.   Yes.

5   Q.   And that was January 6 of 2012, about 18 months later or

6   so?

7   A.   That's correct.

8   Q.   You are still investigating the case?

9   A.   Correct.

10  Q.   And you are sitting at your desk, right?

11  A.   That's correct.

12  Q.   What time of day?

13  A.   I believe it was early evening.  My recollection is I was

14  about to go home and my phone rang.

15  Q.   You had worked a long hard day, right.  And so had, Ms.

16  Chittenden, she is a worker too, right?

17  A.   Correct.

18  Q.   So she calls you up out of the blue?

19  A.   Pretty much, yes.

20  Q.   And no lawyer on a three-way call, it is just her, right?

21  A.   Correct.

22  Q.   She is calling Special Agent Spencer Brooks, FBI, right?

23  A.   Yes.

24  Q.   And she wants to ask you about this investigation and

25  what's happening, right?

820

1    A.    That's correct.

2    Q.    And how long did you talk to her then?

3    A.    It wasn't as long as the first time, but it could have

4    been 20 or 30 minutes.

5    Q.    Could it have been 72 minutes long?

6    A.    It could have been.

7    Q.    So could have been more than an hour long, the two of you

8    talking on the phone, right?

9    A.    Correct.

10   Q.    Okay.  Now, did you write notes as you spoke to Lorene

11   Chittenden that January 6 of 2012?

12   A.    I wrote one line of notes.

13   Q.    And you once again faithfully preserved it and turned it

14   over, right?

15   A.    That's correct.

16   Q.    What did the one line say, do you recall?  Do you have it

17   in front of you?

18   A.    I don't have it in front of me.

19   Q.    All right.  But it was about something Lorene said, and

20   you noted that.  But that was the only thing you wrote down?

21   A.    That's correct.

22   Q.    But you later produced a report, right?

23   A.    Correct.

24   Q.    And is that later document actually a report?  What is

25   that -- that is an FBI question.  It is not a 302, right?

1   A.   It is a 302.

2   Q.   Okay.  I thought it was a different form.  But anyway, you

3   wrote up a 302, meaning an FBI interview report, of that

4   telephone conversation with Lorene?

5   A.   That's correct.

6   Q.   And was that the conversation you said she raised the

7   issue about reporting Rosie?

8   A.   No.

9   Q.   She had already said that to you back in August of 2012,

10  right?

11  A.   That's correct.

12  Q.   Okay.  Now, did you say anything to her, Ms. Chittenden,

13  in that interview?  Surely you did.  You were speaking to her.

14  A.   Yes.  I remember that more as a conversation.  She called

15  to ask me about the status of the investigation.  And I

16  informed her that I couldn't tell her what was going on with

17  the investigation, but it was still ongoing.

18           And I had her on the phone, so I asked her a few

19  questions.  And we really had a, sort of a back-and-forth

20  discussion about what was going on back at her time at George

21  Mason.

22  Q.   And you said to her during that call, I know you don't

23  think there was fraud, but I assure you there is.

24           Did you say that?

25  A.   I don't recall.  I remember generally the topics that we

1    discussed, but I do not recall exactly what I said.

2    Q.   Could you have said that to Ms. Chittenden in

3    January 2012?  I know you don't think there was fraud, but I

4    assure you there is?

5    A.   I certainly may have said, I assure you there was fraud.

6    But to be honest, I don't recall other than the general topics

7    that we discussed that day.

8    Q.   Your notes were limited, right?

9    A.   Correct.

10   Q.   Okay.  Do you remember saying toward the end, you don't

11   even believe Rosie committed fraud.

12        Do you remember saying that?

13   A.   If she had responded during the conversation that she

14   didn't believe Rosie had committed fraud, maybe I said, you

15   don't believe Rosie committed fraud.

16        But I frankly don't have a recollection of exactly

17   what was discussed other than the general topics.

18   Q.   Okay.  Let's talk about Linares because you have been

19   interested in the Linares transaction for a long time --

20        THE COURT:  Have we got a new topic coming up?

21        Why don't we take our afternoon break at this time.

22   And we will take 15 minutes and we will come back and hear

23   further testimony.  We will break at 5:20.

24        NOTE:  At this point the jury leaves the courtroom;

25   whereupon the case continues as follows:

S. Brooks - Cross

823

```
1    JURY OUT

2              THE COURT:  All right.  Let's take 15 minutes, and we

3    will come back at quarter after.

4              And of course, you are in the middle of your

5    testimony, so don't discuss it with anybody.

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  All right.  We are in recess.

8              NOTE:  At this point a recess is taken; at the

9    conclusion of which the case continues in the absence of the

10   jury as follows:

11   JURY OUT

12             THE COURT:  Ready for our jury?

13             All right, let's get our jury, Joe.

14             NOTE:  At this point the jury returns to the

15   courtroom; whereupon the case continues as follows:

16   JURY IN

17             THE COURT:  All right, please be seated.

18             Mr. Davis, continue when you are ready, sir.

19             MR. DAVIS:  Thank you, Your Honor.

20   BY MR. DAVIS:  (Continuing)

21   Q.   Agent Brooks, you testified in the grand jury in this case

22   on November 21 of 2013, right?

23   A.   That's correct.

24   Q.   So just before last Thanksgiving, right?

25   A.   Yes.
```

1    Q.   And that's when Ms. Lorene Chittenden, my client, was

2    indicted in this case, right?

3    A.   That's right.

4    Q.   And you were the summary case agent who presented the

5    evidence to the grand jury, right?

6    A.   That's correct.

7    Q.   And when you are the summary case agent, you testify

8    basically about the different charges in the indictment and

9    sort of wrap it up for the grand jury to let them know what

10   evidence is, right?

11   A.   That's correct.

12   Q.   And you are under oath and it is transcribed, right?

13   A.   That's correct.

14   Q.   And you prepare thoroughly for it, correct?

15   A.   Correct.

16   Q.   And you were well familiar with the indictment in this

17   case that you were presenting to the grand jury, right?

18   A.   Correct.

19   Q.   You actually helped draft the indictment in this case,

20   right?

21   A.   Yes.

22   Q.   Okay.  And one of the things that you were asked about was

23   the Linares deal, which involved the amended tax return, right?

24   A.   Okay.

25   Q.   And you told the grand jury -- you summarized the evidence

1   about that amended tax return for the grand jury, right?

2   A.   I may have.  I don't remember which exact transactions I

3   spoke of, but --

4   Q.   I have the transcript provided in discovery, if you wish.

5        Let me ask you if you said this.  You said:  We're

6   told by David Levy that he was present when the Realtor working

7   for him that handled this deal, a gentleman names Francisco

8   Ramos -- I am sorry, it's Page 24 -- got a phone call from Ms.

9   Chittenden saying, we've got to get those tax returns filed

10  because we've got a big problem, the investor realized that

11  there were fake tax returns in the file, so we've got to get

12  them filed to sort of shore this up and try to correct it, end

13  quote.

14       Right?

15  A.   If that's what the transcript said, sure.

16  Q.   Let me show you -- I am not marking it, although I am

17  happy to, but let me just show you page 24 of your grand jury

18  transcript.  And I am happy to let you keep that.

19  A.   Okay.

20  Q.   That's what you said on November 21, just last fall,

21  right?

22  A.   Yes.

23  Q.   When the grand jury is getting evidence to indict Ms.

24  Chittenden?

25  A.   Yes.

1    Q.   Now, was that accurate?

2    A.   I think so.

3    Q.   Well, let's review your investigation on the point.  Mr.

4    Levy was someone early on who was talking to you in January of

5    2012, right?

6    A.   I believe that's when he first started cooperating.

7    Q.   And you wrote reports about interviewing Mr. Levy in

8    January of 2012, correct?

9    A.   I know that's when he started cooperating.  He was

10   interviewed many times.

11   Q.   And do you recall Mr. Levy telling you that first

12   interview, January 11 of 2012 -- I am sorry.  You were not

13   present at that interview, were you?

14   A.   The David Levy case was technically another case agent.

15   The cases were sort of merged at the U.S. Attorney's Office.

16   So I wasn't present for some of his initial cooperation

17   meetings.  I certainly was at future ones and met him.

18   Q.   And Agent Moriarty was present and Agent Moriarty wrote

19   this particular report, right?

20   A.   That looks like an FDIC document.

21   Q.   And you have read this report many times because this is

22   one of the first -- this is the first report for David Levy in

23   this investigation, correct?

24   A.   I certainly have read it.

25   Q.   Right.  Your report showed -- or not your report, but Mr.

1    Moriarty's report showed that Mercado had been indicted -- and

2    Mercado was the Union Hispana head guy, right?

3    A.   Osvaldo Mercado was the owner of Union Hispana

4    Multiservices.

5    Q.   Right.  He was one of the tax letter persons, right?

6    A.   Correct.  He owned and operated that business.

7    Q.   And he pleaded guilty in this investigation?

8    A.   That's correct.

9    Q.   Mr. Levy told the investigators that he had read the

10   indictment about Mr. Mercado, and in that indictment was the

11   Linares transaction, right?

12        Do you recall that?

13   A.   If that's what he said in that interview?

14   Q.   Yes.  I will show it to you if you like.

15   A.   I am sorry, there was a lot of Mr. Levy interviews.  I

16   think that sounds correct.

17   Q.   Does that refresh your recollection as to the first Mr.

18   Levy interview, January 11 of 2012?

19   A.   Yes.

20   Q.   Okay.  Now, hang on to that, if you would.  Mr. Levy said

21   in that interview, and again this is January 2012, he said

22   three months ago Levy contacted Ramos and asked him about the

23   Linares deal, right?

24   A.   Okay.

25   Q.   Do you see it in that report?

1    A.    It is multiple pages, I will be happy to look for it.

2    Q.    Do you see that?

3    A.    Yes, I do.

4    Q.    So David Levy is telling the investigators, first meeting,

5    that three months ago he talked to Ramos and Ramos told him

6    about this deal, right?

7    A.    Yes.

8    Q.    So he is talking about the fall of 2011, right?  He is

9    saying he had a conversation with Ramos in the fall of 2011

10   about Linares, right?

11   A.    Yes.

12   Q.    Fair, right?  That's what that says?

13   A.    That's correct.

14   Q.    Okay.  And he says further, he says that Ramos told Levy

15   that three weeks prior to the deal closing he, that is Ramos,

16   received a call from Lorene Chittenden, and Chittenden told

17   Ramos that he needed to get Linares' tax returns amended before

18   this deal could be approved, right?

19   A.    Right.

20   Q.    And please check it.  You have got it in front of you,

21   right?  It's Mr. Moriarty's report.  Your investigation.

22   Right?

23   A.    That's what it says.

24   Q.    So Levy is telling the investigators that he talked to

25   Ramos in the fall of 2011 and that Ramos told him that three

1   weeks before the closing in the Linares transaction he received

2   a call from Lorene Chittenden saying he needed to get the tax

3   returns amended before the deal could be approved, right?

4   A.   Yes.

5   Q.   All right.  Now, we know now that doesn't make any sense,

6   right?  Strike that.

7        We know that amended tax returns already had been

8   provided to George Mason Mortgage and Lorene Chittenden before

9   the deal closed because they are in the loan file.  And Kerri

10  Thomas has reviewed and initialed them.  And that deal closed

11  August 17 of 2006.  Right?

12       MS. MARTINEZ:  Objection, compound question, Your

13  Honor.  There is more information there --

14       THE COURT:  If you understand the question, you can

15  answer it.

16  A.   Sorry, Mr. Davis if you don't mind repeating.

17  BY MR. DAVIS:  (Continuing)

18  Q.   It was a long question, sorry.  I want to make sure I have

19  my year right.  Was it 2006 or 2007?

20  A.   It was 2007.

21  Q.   It was one of the last deals, correct?

22  A.   Right.

23  Q.   August 17 of 2007 is the closing of the Linares deal,

24  right?

25  A.   That's correct.

1  Q.   And in the file that has long since gone through Lorene

2  Chittenden, loan officer, and also gone through Kerri Thomas,

3  processor or underwriter, and settlement, in that file is an

4  amended tax return already, right?

5  A.   That's correct.

6  Q.   As of August 17, and certainly before that because it has

7  been -- it closes on August 17, right?

8  A.   Correct.

9  Q.   And that's an amended tax return.  And we know that

10  because the amount claimed for Ms. Linares, the income amount

11  is something like $86,000, which is a lot more than she made

12  that year, right?

13  A.   That's correct.

14  Q.   That's not the true return?  That's the amended return and

15  it's already in the file?

16  A.   That's correct.

17  Q.   Okay.  So, Levy is telling you guys January 11 of 2012

18  that he happened to talk to Ramos back in the fall of 2011 and

19  Ramos said that three weeks before the deal closed, which would

20  have been the end of July 2007, right?  That's about three

21  weeks before August 17, right?  He is saying three weeks before

22  that deal closed he received a call from Lorene Chittenden?

23       MS. MARTINEZ:  Your Honor, counsel is not even

24  stopping and waiting for answers, he is just testifying at this

25  point.

1           THE COURT:  Sorry, one more time.

2           MS. MARTINEZ:  He is not evening stopping and waiting

3    for answers.  He is just testifying.

4           THE COURT:  Okay.  Ask questions.

5    BY MR. DAVIS: (Continuing)

6    Q.   All right.  We get the point, right?  The deal had already

7    closed August 17, right?

8    A.   That's the closing date.

9    Q.   And amended tax returns had long since already been in

10   that file, right?

11   A.   Not her true tax returns, yes.

12   Q.   Yes.  But Levy is telling you that he talked to Ramos in

13   late 2011, and that there had been this call, and the tax

14   returns needed to be amended before the deal could be approved,

15   right?

16   A.   Correct, that's what he says.

17   Q.   Okay.  And then, of course, we also know that there was a

18   trip on September 1 because Ms. Linares remembers it, right?

19   And that was to go and sign the tax returns, right?

20   A.   That's correct.

21   Q.   And file them?

22   A.   Correct.

23   Q.   Okay.  That happened September 1, which was two weeks

24   after the closing, right?

25   A.   Correct.

1    Q.    Okay.  But that wasn't the only statement Levy made to you

2    guys in the many, many interviews you had with David Levy,

3    right?

4    A.    That's correct.

5    Q.    Okay.  And then on March 1 of 2012 Mr. Levy talks about

6    the same subject.  Do you recall that interview?  I think you

7    were present, and you have it in the stack that I gave you.

8    March 1 of 2012.

9              Do you see that interview report?

10             And do you recall whether Ramos, according to Levy on

11   that date, Ramos told Levy that Chittenden called Ramos a week

12   or two before the closing and told Ramos that Linares did not

13   qualify for the loan and that Linares needed to get her taxes

14   amended.

15   A.    I apologize, I was looking for the report.  I think I

16   heard most of that, but if you can give me just a second.

17   Q.    Do you mind finding the March 1 report?

18   A.    I have got the March 1 report.

19   Q.    Okay.  Do you see the reference to the Linares deal?

20   A.    I do.

21   Q.    Okay.  And do you recall that Levy was again talking about

22   Ramos talking to him?

23   A.    That's correct.

24   Q.    Okay.  That was March 1 of 2012, right?

25   A.    Correct.

1    Q.    Now, you also interviewed Mr. Francisco Ramos, right?

2    A.    I don't think I did that interview, but I know that he was

3    interviewed over the phone, I believe.

4    Q.    There was a telephone interview of Francisco Ramos in July

5    of 2013, right?

6    A.    That sounds about right.

7    Q.    And that was Special Agents Moriarty and Connor?

8    A.    Yes.

9    Q.    Okay.  And I will show you that as well.  That was part of

10   your investigation and part of the reports that you were

11   reviewing?

12   A.    Correct.

13   Q.    Okay.

14   A.    Okay.

15   Q.    Mr. Francisco Ramos at the time was in Canada, right?

16   A.    That's correct.

17   Q.    And as far as we know, that's where he is still today,

18   right?

19   A.    That's right.

20   Q.    Probably not coming back to the United States voluntarily

21   any time soon, is that fair?

22   A.    Most likely.

23   Q.    All right.  On July 11 of 2013 Mr. Ramos told the agents

24   that he did not remember getting a call from Lorene Chittenden,

25   right?

1    A.    That's what he said.

2    Q.    He was specifically asked about this, right?

3    A.    He was.

4    Q.    And he's the guy that actually had the conversation

5    supposedly, right?

6    A.    Correct.

7    Q.    Okay.  And then there was another interview with Mr. Levy

8    going back to your pile --

9              THE COURT:  Mr. Davis, do you think this is proper?

10   You are trying to impeach --

11             MR. DAVIS:  Your Honor, I am trying to impeach the

12   grand jury testimony -- and this is the last one.  And this is

13   -- I am trying to impeach the accuracy --

14             THE COURT:  Using different statements that Linares

15   made?  He is a fugitive and a defendant?

16             MR. DAVIS:  Ramos.

17             THE COURT:  Oh, Ramos.  Using Linares' statements?

18             MR. DAVIS:  I am sorry, if I used Linares, I

19   misspoke.  This is Ramos' statement.

20             THE COURT:  Okay.  All right.  Go ahead.

21             MS. MARTINEZ:  Your Honor, just to clarify, Ramos is

22   the person who is in Canada.

23             THE COURT:  Okay.  All right.

24             MR. DAVIS:  This is the last one I want to ask about.

25   BY MR. DAVIS:  (Continuing)

1    Q.    David Levy talked to you again on October 1 of 2012 about

2    this supposed conversation with Ramos, right?

3    A.    Yes.

4    Q.    And this time the beach came up, right?

5    A.    If I can refer to the report for that particular

6    reference.

7    Q.    Please.

8    A.    But I remember that he told us about being with Mr. Ramos

9    on a vacation.

10   Q.    At a beach, right?

11   A.    At a beach.  I am sorry, the date of that?

12   Q.    October 1, 2012.

13   A.    That's correct.

14   Q.    Okay.  So on October 1, 2012, David Levy tells you that

15   Lorene Chittenden called Ramos -- it's now one to two weeks

16   before the Linares loan closed -- to tell Ramos that Linares

17   did not qualify and her tax returns needed to be amended.

18         And David Levy said then, Ramos and Levy were

19   together at the beach when Ms. Chittenden called Ramos.

20         Right?

21   A.    Yes, that's what he said.

22   Q.    And David Levy also said that Ramos currently has the same

23   cellular telephone number that he had when he worked at Levy

24   Corporation, right?

25   A.    Yes.

1   Q.   And that's all in the report, October 1 of 2012, right?

2   A.   Correct.

3   Q.   Now, would you agree with me, that's the first time in

4   this whole investigation that David Levy is claiming that this

5   conversation with Ramos, which is so critical to the case,

6   occurred back when it was happening, back before the Linares

7   deal closed, back in 2007, right?

8   A.   It's the first time he is saying he is present, is that

9   what you are saying?

10  Q.   Yes.

11  A.   Yes.

12  Q.   And that he was present at the very same time Ms.

13  Chittenden was calling, right?

14  A.   Correct.

15  Q.   And did David Levy say in that report to you that he could

16  hear exactly what Lorene Chittenden was saying?

17  A.   No, I don't think so.

18  Q.   He didn't say that, did he?

19  A.   No.

20  Q.   All right.  Now, up until then you had always thought that

21  David Levy's first conversation with Ramos on this subject was

22  the fall of 2011?

23         MS. MARTINEZ:  Your Honor, at this point we are going

24  to object to this line of impeachment and this continued

25  questioning.

```
 1              MR. DAVIS:  I am almost done, Your Honor.

 2              THE COURT:  You told me that three or four minutes

 3    ago and you have been going strong, Mr. Davis.  Let's wrap it

 4    up.

 5              MR. DAVIS:  All right.

 6    BY MR. DAVIS: (Continuing)

 7    Q.   Did you do a cell phone check?

 8    A.   For?

 9    Q.   For a call from Lorene Chittenden to Francisco Ramos at a

10    beach vacation in 2007?

11    A.   No, I don't think we have those records.

12    Q.   Have you done a travel records check to prove that David

13    Levy was at a beach vacation with Francisco Ramos when some

14    conversation occurred that he is telling you about in October

15    of 2012?

16    A.   I have not.  My understanding is that was a nearby

17    location, I thought, and not somewhere where they would have

18    flown to.

19    Q.   Have you done anything to corroborate Mr. Levy's third

20    story about this conversation with Ramos when he moves it four

21    years back in time?

22              MS. MARTINEZ:  Your Honor, I object to this line of

23    questioning.

24              THE COURT:  Overruled.  Last question.  You can

25    answer that question.
```

1    A.    Forgive me, Mr. Davis, what's the last question?

2         THE COURT:  Did you do anything to corroborate the

3    conversation that Levy said he had with Ramos at the beach?

4         THE WITNESS:  No.

5         THE COURT:  That there was a telephone call from Ms.

6    Chittenden.

7         MR. DAVIS:  Beyond talking to Mr. Levy about it, no.

8         THE COURT:  All right, let's move on.  Move on.

9         MR. DAVIS:  All right, Your Honor.

10   BY MR. DAVIS: (Continuing)

11   Q.    When you were in the grand jury, do you recall being asked

12   whether any of the transactions in the indictment had resulted

13   in a -- in the loan being sent back by the investor?

14        Do you recall being asked that?

15   A.    I am sorry, I don't recall the specific questions, but I

16   probably was.

17   Q.    I think you have my copy of the transcript.  Do you see

18   page 36?

19        Let me just ask, do you know as you sit there whether

20   any of these loans was the subject of a -- when I say these

21   loans, I mean the loans that are charged in this indictment

22   before this jury.  Whether any of those loans was the subject

23   of a buy-back request by any investor?

24   A.    Off the top of my head, I can't recall of any of these

25   particular loans being buy-backs.  The loan that I discussed in

1    the grand jury that you are asking me about is the Zenaida

2    Linares transaction.  And I believe that my words were it

3    ultimately wasn't purchased by Countrywide.

4            Which is my understanding of what happened, that they

5    denied the purchase after doing the 4506-T before they

6    purchased it.

7    Q.   When the investor, which was Countrywide, found out that

8    the tax return hadn't even been filed, right?

9    A.   Correct.

10   Q.   All right.  You said to the grand jury on page 36:  The

11   only one I can think of off the top of my head is the Zenaida

12   Linares transaction.

13           Is that right?

14   A.   That's what I said.

15   Q.   Okay.  May I have back, please, my reports.

16   A.   Sure.

17           MR. DAVIS:  Thank you.  Nothing further.

18           THE COURT:  All right.  Thank you.  Any redirect?

19           MS. MARTINEZ:  Yes, Your Honor.

20       REDIRECT EXAMINATION

21   BY MS. MARTINEZ:

22   Q.   Agent Brooks, keeping your attention on the Zenaida

23   Linares file, is the amended return that is in that file signed

24   and filed, or just something that was in the loan file?

25   A.   It was not signed and filed.  It was just in the loan

1    file.

2    Q.    Were you present for Mr. Levy's testimony in court?

3    A.    I was.

4    Q.    Did you hear him testify about a phone call between the

5    defendant and Mr. Ramos in 2007?

6    A.    Yes.

7    Q.    And in the course of interviews in this investigation with

8    Mr. Levy, has Mr. Levy also recounted that 2007 call during one

9    or more of his interviews?

10   A.    Yes.

11   Q.    Do you understand -- and have you also heard about a 2011

12   call that counsel asked you about?  That Mr. Levy recounted

13   during one of his interviews between him and Mr. Ramos?

14   A.    Yes.

15   Q.    Is it your understanding that that call in 2011 and the

16   call in 2007 are separate calls?

17           MR. DAVIS:  Objection, leading.

18           THE COURT:  Well, I am going to allow the question.

19   If he can't answer that a call in 2007 is different than a call

20   in 2011 -- you mean the substance of the call?

21           MS. MARTINEZ:  That they were separate calls.

22           THE COURT:  Just that they were separate calls?

23           MS. MARTINEZ:  Yes, Your Honor.

24           THE COURT:  You can answer that question.

25   A.    Yes.  There was, based on what Mr. Levy said, there was a

1    phone call that happened in approximately the fall of 2011.

2    And he later discussed -- the topic of that discussion on that

3    call, I believe it was the same substance of the other calls

4    that he discussed in 2007.

5    BY MS. MARTINEZ: (Continuing)

6    Q.   Can we show the witness Government's Exhibit 40-Z1 on the

7    screen.

8            Were you involved in obtaining this document in the

9    course of your investigation?

10   A.   Yes, I was.

11   Q.   Where did it come from?

12   A.   Zenaida Linares gave it to us.

13   Q.   And would you say that this document corroborates

14   communication between the defendant and Ramos regarding

15   Linares' tax returns back in 2007?

16   A.   Yes.

17   Q.   Counsel also asked you about a number of interviews, many

18   interviews that you conducted in the course of this

19   investigation.  Do you recall that?

20   A.   I do.

21   Q.   Focusing particularly on people whom you interviewed who

22   were communicating directly with the defendant about loan

23   transactions, did those people indicate how they typically

24   communicated with the defendant, what method of communication?

25            MR. DAVIS:  Objection.  It is so general as to be not

1    probative of anything, Your Honor.

2              THE COURT:  Well, it is certainly hearsay.

3              MS. MARTINEZ:  Your Honor, it is not being offered

4    for the truth of the matter asserted, but Agent Brooks was

5    attacked for his methods in collecting e-mails ad nauseam

6    before the break, and this is to explain his investigative

7    tactics.

8              THE COURT:  Ask him based on his investigation how he

9    believed that the customers communicated with the loan

10   officers.

11   BY MS. MARTINEZ: (Continuing)

12   Q.   Based on your investigation, interviews or otherwise, do

13   you have an understanding of how the folks who communicated

14   directly with the defendant about individual loan transactions,

15   be they real estate agents or borrowers, how they typically

16   communicated with the defendant?

17   A.   Mostly via fax.  Sometimes via e-mail.

18   Q.   And did that understanding influence the way that you

19   conducted your investigation?

20   A.   We believed that a lot of the loan transactions and

21   documentations were faxed and not e-mailed, but we still

22   pursued e-mails if we thought some were there.

23   Q.   Did you collect documentation that had been sent over fax?

24   A.   Yes.

25   Q.   Have we seen a lot of that in court?

S. Brooks - Redirect

843

1   A.   Yes.

2   Q.   I would like to ask you about the phone call that you had

3   with the defendant that counsel asked you about as well.

4        At the time that the defendant called you, was she a

5   target of the investigation?

6   A.   Yes.

7   Q.   And at the time of that phone call, did you believe that

8   she didn't know about the fraud?

9   A.   No, I believe she knew.

10  Q.   How long after that phone call did you write your report?

11  A.   Either that -- I believe I started it that evening.

12  Q.   Do you usually write your reports the same evening as an

13  interview?

14  A.   Not typically.

15  Q.   Why did you do that in this case?

16  A.   Because it had been a phone call or interview of a subject

17  of an investigation.  And it was really a back-and-forth

18  conversation on the phone, not an interview where I was taking

19  a lot of notes, clearly because I only took really one line of

20  notes.  So I wanted it to be fresh in my mind, so I started

21  writing it pretty much right away.

22       MS. MARTINEZ:  Thank you.  No further questions, Your

23  Honor.

24       THE COURT:  All right.  You can resume your seat,

25  sir.  Thank you.

844

1          THE WITNESS:  Thank you, Your Honor.

2          NOTE:  The witness stood down.

3          THE COURT:  Government have any other witnesses?

4          MS. MARTINEZ:  We have no further witnesses, Your

5   Honor.  I would offer again the exhibits that the objection was

6   held on.  71-C, 72-C, 73-C, 76-C, 77-C, 78-C, 78-M, 79-C.

7          THE COURT:  All right.

8          MR. DAVIS:  No objection.

9          THE COURT:  All right, they will all be received.

10         All right.  Let me have you take a break while we

11  talk about some different matters, and we will get you back

12  here as soon as we can.  All right.

13         Thank you, you are excused at this time.

14         NOTE:  At this point the jury leaves the courtroom;

15  whereupon the case continues as follows:

16  JURY OUT

17         THE COURT:  Okay.  Any motion, Mr. Davis?

18         MR. DAVIS:  Yes, Your Honor.  If I may have just a

19  moment.

20         THE COURT:  Yes, sir.

21         MR. GILLIS:  Your Honor, I have -- I didn't

22  understand that we had rested.  I have one more exhibit that --

23         THE COURT:  Go ahead.

24         MR. GILLIS:  -- I would like to introduce.  It's

25  Exhibit 40-Z2.  It's an e-mail from the loan file for the

845

1    Zenaida Linares transaction.  And we have a 902(11)

2    certification for those loan files.  And I believe that at

3    least with respect to the authenticity and business record

4    nature of it, that we have agreed upon that.  Of course, they

5    have reserved on relevance.

6            But we submit that since it relates directly to this

7    transaction, it should be admitted.

8            MR. ROSS:  40-Z2?

9            MR. GILLIS:  40-Z2?  40Z, as in Zebra, 2.

10           MR. DAVIS:  It is a two-page document?

11           MR. GILLIS:  It is, yes, that's correct.

12           MR. DAVIS:  No objection.

13           THE COURT:  All right.  It is received.

14           MS. MARTINEZ:  Your Honor, we now rest.

15           THE COURT:  Thank you.

16           MR. DAVIS:  Should I proceed, Your Honor.

17           THE COURT:  Yes, sir.

18           MR. DAVIS:  Your Honor, the defendant moves for a

19   judgment of acquittal pursuant to Rule 29 of the Rules of

20   Criminal Procedure.

21           First, with respect to Count 1, the conspiracy count,

22   on the ground that no reasonable jury could find this defendant

23   guilty of membership in the conspiracy charged in Count 1.

24           At most, the Government has proved different

25   conspiracies, different individual conspiracies, one with Rocio

1   Benavides, again giving all inferences in favor of the

2   Government, as the Court must at this point, and another with

3   Levy Corporation.  But none of the transactions proved is in

4   furtherance of the conspiracy charged in Count 1.

5          The charged conspiracy includes 44 overt acts.  The

6   Government failed to introduce any evidence of about 37 of

7   those 44 overt acts.  And the remaining seven that evidence was

8   introduced on, which we, of course, vigorously dispute, but

9   those remaining seven involve two people.  One was Levy and his

10  company long after he left Vilchez & Associates.  And the other

11  was Rocio Benavides after she left Vilchez & Associates.

12         There was no evidence and there is no evidence that

13  Levy and Benavides at that point in late 2006/2007 had any

14  ongoing connection with Vilchez & Associates, any

15  communications with them, and existed as anything other than

16  competitor Realtors doing separate deals.

17         Now, the reason I raise this unusual motion is

18  because the manner and means of Count 1 are quite specific in

19  this case.  And they over and over again emphasize and require

20  the involvement of Vilchez & Associates and Vilchez &

21  Associates employees.

22         The one exception really is paragraph 20.  And

23  paragraph 20 talks about targeting Hispanic clients who were

24  not proficient in spoken or written English and, therefore,

25  were unable to read and unaware of the false statements made.

847

1         But all of the other manner and means are more

2    specific than that.  Paragraph 19 talks about the defendant

3    submitted and directed Vilchez & Associates employees to submit

4    fraudulent loan documents with material misstatements.

5         Paragraph 21 talks about Rosie Vilchez routinely

6    directing Vilchez & Associates employees to attend events

7    frequented by members of the Hispanic community in Northern

8    Virginia and to obtain from them information to be used by a

9    Vilchez & Associates call center, which I still don't I think I

10   have ever heard of, in Trujillo, Peru that would and did

11   solicit them to purchase real estate.

12        Paragraph 23 talks about the defendants creating and

13   directing Vilchez & Associates employees to create fraudulent

14   verifications of employment and verifications of deposit that

15   were submitted to the lenders.

16        Paragraph 23 talks about the defendants obtaining and

17   directing Vilchez & Associates employees to obtain fraudulent

18   tax preparer letters.

19        Paragraph 24 talks about holding meetings with

20   Vilchez & Associates employees to discuss then current

21   difficulties they were having in qualifying their clients.

22        And paragraph 25 talks about to make it appear to

23   lenders that Vilchez & Associates clients had sufficient assets

24   to qualify for a loan, the defendants directed the Realtors and

25   processors to find a family member or friend of the client and

848

1   add the client's name to the account.

2          The last manner and means paragraph relevant is

3   paragraph 26.  And that talks about directing Vilchez &

4   Associates employees to temporarily deposit funds from Vilchez

5   & Associates into clients' accounts, et cetera, et cetera.

6          It also talks about defendant Edgar Vilchez, again no

7   evidence as far as I recall, also temporarily deposited funds

8   from his own bank account into clients' bank accounts for the

9   same purpose.

10          Your Honor, on this evidence given what has actually

11   been proved involving Lorene Chittenden, no reasonable juror

12   could find prove beyond a reasonable doubt of my client's

13   membership in or agreement to join that conspiracy that is

14   charged in Count 1.

15          And we respectfully submit that the evidence is

16   insufficient.

17          And further, that to permit this jury to convict

18   Lorene Chittenden of membership in the conspiracy charged in

19   Count 1 would be to permit an impermissible constructive

20   amendment in violation of the Fifth Amendment grand jury right.

21          This case has changed and morphed so entirely that

22   this is a constructive amendment case, not just a variance.

23          Lastly, Your Honor, we would note for the record that

24   the evidence is insufficient to show that the alleged wire

25   fraud object affected a financial institution since George

1    Mason Mortgage is not a financial institution.  Cardinal Bank

2    is, although it did not even acquire George Mason until

3    July 2004, which is two-and-a-half years into the charged

4    conspiracy.

5           And there is no evidence that any of the few acts

6    proved in furtherance of this conspiracy affected Cardinal Bank

7    at all.  And Cardinal Bank is the only financial institution

8    identified in the indictment.

9           The only property that was the object of the alleged

10   mail fraud is the garden variety commissions, commissions that

11   were paid to Realtors and commissions that were paid to Lorene

12   Chittenden.  And there is insufficient evidence to find that

13   there is an effect within the meaning of the mail fraud statute

14   and the accompanying statute of limitations for this jury to

15   find prove of that object, the mail fraud object of the

16   conspiracy.

17          Your Honor, for all those reasons, we -- and again,

18   we understand that the burden is a very heavy one, but a fair

19   reading of that indictment and all of the overt acts alleged

20   and all the manner and means charged compared to what was

21   actually proved in this case says that they didn't prove it.

22   And that if there is a conspiracy here, these are multiple

23   separate conspiracies, but the defendant is entitled to be

24   acquitted on Count 1.

25          Now I can address -- I also want to address the other

1    counts more briefly.

2              THE COURT:  Okay.  Go ahead.  Do it all now.

3              MR. DAVIS:  Your Honor, a brief -- the defendant

4    moves for a judgment of acquittal on Count 14, which is Mr.

5    Carranza.  Mr. Carranza in Count 14 is the Exhibit 56 series.

6              That series is the only one that shows a SunTrust

7    approval and SunTrust underwriting of the loan.  The other

8    loans in the Government's exhibits have Exhibit M series

9    numbers, and these are the underwriting summaries and

10   transmittals.  And these show that there were, at least

11   arguably they show that there was material information in the

12   loans that went through Countrywide and went through George

13   Mason Mortgage that is material to the underwriting guidelines

14   being applied.

15             There is no evidence in this case, and there is no

16   document in the case as to Count 14 that shows what the

17   underwriting guideline standards were that shows what was

18   important to SunTrust and what wasn't important.  And there was

19   no testimony on behalf of SunTrust in this case.

20             So there is no evidence on what actually influenced

21   the underwriting approval decision.

22             Materiality, of course, is an element of Count 14,

23   Your Honor, and we would move to dismiss.

24             Lastly, Your Honor, as to all of those substantive

25   counts, which are 11 through 16 and 18 through 25, the

1    defendant moves for a judgment of acquittal on each count for

2    failure to prove -- to offer sufficient evidence that would

3    allow a finding of guilty.

4            First of all, on execution or attempted execution of

5    a scheme or artifice to defraud Cardinal Bank.  There is no

6    evidence in this case that any co-conspirator targeted Cardinal

7    Bank, looked at Cardinal Bank, understood Cardinal Bank's

8    relationship with George Mason Mortgage, and in any other way

9    executed a scheme to defraud Cardinal Bank.  The only evidence

10   is about George Mason Mortgage.

11           THE COURT:  It's a subsidiary of Cardinal Bank,

12   right?

13           MR. DAVIS:  Which is a wholly-owned subsidiary as of

14   July 2004 and certainly for all of the substantive counts.

15   But, Your Honor, that is not enough.  And I would direct the

16   Court to the United States versus Bennett, B-e-n-n-e-t-t.  I am

17   sorry, I don't have -- I think I have it in my hotel room.  But

18   that's -- the Government is prepared.  The Government will

19   respond.

20           But that's a Ninth Circuit case, 621 F.3d, 1131, Your

21   Honor.  But it analyzes this question in this context regarding

22   a wholly-owned subsidiary situation.  And the issue is in part

23   subjective intent.  And as the defendant has proffered as I

24   think the jury instruction clearly needs to be, these

25   defendants, and this defendant particularly, has to have a

852

1    specific intent to defraud Cardinal Bank.

2          There is no evidence of an intent to defraud Cardinal

3    Bank.  And based on Bennett and also based on United States

4    versus that Nkansah, which is N-k-a-n-s-a-h, 699 F.3d 743,

5    which is the Second Circuit 2012, the Government's case fails

6    on that ground.

7          Similarly, we would argue and do argue that there is

8    no execution or attempted execution of a scheme or artifice to

9    obtain money or property owned by or under the custody or

10   control of Cardinal Bank by means of false or fraudulent

11   statements.

12         That argument is twofold.  First, that the money and

13   property that are the object of this alleged bank fraud scheme

14   are the money and property of George Mason Mortgage.  And there

15   is no evidence to the contrary.  These again are just basic

16   commissions.  That's what the bank fraud is executed to do and

17   that's what they obtained.

18         In addition, the law -- and this is a very

19   interesting issue because it is now on appeal to the Supreme

20   Court in the Loughrin case, I think it is.  It is a case that

21   has been argued and will be decided this term.  It is not

22   exactly like our case, but it is close.  But another issue in

23   the case is whether under 1344 the false or fraudulent

24   statement that is alleged must be submitted to the financial

25   institution as opposed to some other entity.

853

1          And in our case we don't -- well, let me add that the

2     Solicitor General in that Supreme Court case has suggested that

3     the proper reading of 1344(2) is to require that the defendant

4     know that the false or fraudulent statement being made at least

5     in the ordinary course will be presented to the financial

6     institution and could affect what it does.

7          In this case, in these unique facts, which are about

8     loans that are securitized, locked, sold, go out the door, and

9     go downstream to investors at a profit to George Mason every

10    single time, there is no evidence or there is insufficient

11    evidence that a false or fraudulent statement, which again

12    assuming there is a false or fraudulent statement on these loan

13    apps, would be presented to Cardinal Bank in the ordinary

14    course of financial affairs and could affect its dealings.

15         And so for that reason, Your Honor, the Government

16    has not proved under either 1344(1), which requires a scheme to

17    defraud, or a financial institution, which is Cardinal Bank, it

18    hasn't proved it and 1344(1) or (2), and we respectfully ask

19    for dismissal of all of the substantive Counts 11 through 16

20    and 18 through 25.

21         Thank you.

22         THE COURT:  Thank you.  Ms. Martinez.

23         MS. MARTINEZ:  Your Honor, I will attempt to respond

24    to those arguments approximately in the order that they were

25    made.

854

1          THE COURT:  All right.

2          MS. MARTINEZ:  Certainly feel free to interrupt me if

3    I am missing anything or if you have questions, Your Honor.

4          First, with respect to the conspiracy count, Count 1.

5    Counsel I understood raised, in essence, three separate issues

6    there.  The first thing that I will point out there is that

7    1349 does not actually require an overt act.  It is not an

8    element of 1349.

9          So although there are certainly overt acts listed in

10   the long indictment, in the speaking indictment, and we have

11   proven some and not all of those, there is not an overt act

12   required in order to prove 1349 and to get over the Rule 29

13   bar.

14         Nonetheless, we have proved a number of the overt

15   acts listed in the conspiracy.  But counsel is completely right

16   that there are a number of things in this lengthy indictment

17   that were not offered into evidence.  That does not mean that

18   this conspiracy -- that a different conspiracy has been proven.

19         Quite the contrary.  There is only one defendant on

20   trial here, and there were multiple people indicted, and Rosie

21   Vilchez is one of those people.  Conspiracy law is quite clear,

22   as Your Honor well knows, that co-conspirators don't have to be

23   involved or even know about every aspect of the conspiracy.

24         So it's quite natural when there is only one

25   defendant on trial --

1            THE COURT:  His argument is the manner and means of

2    the conspiracy, beyond the fact that only seven of the overt

3    acts referenced are -- there is any proof of it, but his

4    argument is that the manner and means goes to the conspiracy

5    between Rosie Vilchez and others, including the defendant.  And

6    the acts that you proved went to Levy and company and Ms.

7    Benavides.  And that the manner and means demonstrates that

8    that was the focus of this conspiracy and that your evidence

9    doesn't fit.

10            MS. MARTINEZ:  Yes, Your Honor, absolutely.  With

11   respect to that, there has been numerous testimony about the

12   conspiracy, about the exact manner and means that are listed

13   here, beginning on page 7 and extending on to page 8 of the

14   indictment.

15            Roughly in order of testimony, Rocio Benavides

16   testified at length about her experience while working at

17   Vilchez & Associates.  She also testified about transactions

18   that she engaged in after that, which was a continuation of

19   that conspiracy, continuation of the exact same scheme, the

20   exact same manners and means between her and the defendant.

21   But she testified at length about what was going on at Vilchez

22   & Associates.

23            Levy testified about that as well.  And as you know

24   from the testimony, both Levy and Benavides got their start at

25   Vilchez & Associates and carried on those same tactics as they

1    left on their own.

2         Looking specifically at the manners and means of the

3    conspiracy, the first one is defendants and their

4    co-conspirators would and did submit and direct Vilchez &

5    Associates employees to submit fraudulent loan documents.

6         Certainly we have shown that this defendant and her

7    co-conspirators did submit fraudulent loan documents that

8    materially misstated the borrowers' employment, income, assets,

9    intent to occupy the premises, and citizenship status.  All of

10   that has been presented in multiple transactions throughout

11   this case.

12        Paragraph 20.  The defendants and their

13   co-conspirators would and did target Hispanic clients, and that

14   goes on.  That has certainly been shown by the numerous

15   borrowers who spoke in Spanish with the aid of a translator in

16   court.  As well as from the testimony of the Realtors, in

17   particular David Levy and Rocio Benavides.

18        21 is specifically about Rosie Vilchez.  I don't see

19   any particular reason that we need to prove what the

20   co-conspirator who is not on trial directed employees to do.

21   Although I will say that Rocio Benavides did talk about Rosie

22   Vilchez directing employees at Vilchez & Associates.

23        22, to substantiate the false statements in the loan

24   applications, the defendants and their co-conspirators would

25   and create and direct Vilchez & Associates employees to create

1    fraudulent verifications of employment and verifications of

2    deposit.  We have heard about that both on direct and cross.

3    That was rampant throughout this conspiracy.

4            Your Honor, I could continue, but I think it might be

5    a waste of the Court's time.  Certainly we have presented

6    evidence on those exact means and methods of the conspiracy.

7            In terms of proving her membership or her agreement,

8    we have had an awful lot of testimony about that.  Rocio

9    Benavides has talked about that.  David Levy has talked about

10   that.  There has been testimony that has established that Ramos

11   was part of this conspiracy at a later point in time in 2007.

12           And then Vilchez herself, Rosie Vilchez has not been

13   absent from this trial other than in body.  There has been

14   numerous testimony about many transactions that involved Rosie

15   Vilchez.

16           And in particular, Your Honor, there is evidence and

17   documents submitted about loans that Rosie Vilchez herself

18   obtained from the defendant.  Which you can see on Government's

19   Exhibit 10-B.

20           And looking at the 1003 annualized income, you can

21   see that the income goes all over the place in the manner of a

22   couple months.

23           Added to the fact that the defendant was profiting

24   greatly from these commissions and from commissions that she

25   was getting from Vilchez & Associates' clients, I think there

1    has been a clear connection, a clear establishment of a

2    conspiracy between the defendant and Rosie Vilchez.

3            THE COURT:  Okay.  Go on and talk about whether or

4    not Cardinal Bank is the proper entity to identify in the

5    substantive counts.  You have got this Ninth Circuit case --

6            MS. MARTINEZ:  Count 14, Your Honor?  Are you

7    reserving counsel's argument with respect to Count 14?

8            THE COURT:  I was talking about 11 through 16 and --

9            MS. MARTINEZ:  11 through 16.

10           THE COURT:  -- 18 through 25.  If you want to do 14

11   first, that's fine.

12           MS. MARTINEZ:  Whatever you prefer, Your Honor.

13           THE COURT:  Well, I am thinking about the Cardinal

14   Bank bank issue.

15           MS. MARTINEZ:  I will jump right to then, Your Honor.

16           Your Honor, there is actually a reasonable amount of

17   case law that is instructive on this point.  We had testimony

18   from Chris Bergstrom, who was an employee of Cardinal Bank, the

19   Chief Credit Officer of Cardinal Bank, and he established a

20   number of facts that are relevant to this legal question.

21           I am going over them just quickly.  Not everything

22   that he said, but the ones that I have highlighted in my notes.

23   He testified that George Mason Mortgage is a subsidiary of

24   Cardinal Bank and has been since July of 2004.  All the

25   transactions that we have been talked about are after July of

1    2004 during this trial.

2         THE COURT:  Shared some directors.  They have a close

3    association, clearly.

4         MS. MARTINEZ:  Yes, Your Honor.  He testified that

5    George Mason Mortgage's profit and loss affected Cardinal Bank.

6         He testified that Cardinal Bank is FDIC insured and

7    regulated.  And that because of that, regulators examine the

8    books and records of both Cardinal Bank and George Mason

9    Mortgage.

10        He testified that the George Mason loan funds, the

11   funds that were used to fund these loans that were at issue in

12   this case, came from Cardinal Bank through a warehouse line of

13   credit.  And those funds were wired out to pay for the loans,

14   and that came from that line of credit.

15        And then when investors purchased the loans, the

16   money went back through the line of credit back to Cardinal

17   Bank.  There is a direct financial effect there.

18        He also testified that wasn't an immediate

19   turn-around.  There was a 30 to 60-day delay between the draw-

20   down on the line of credit and the sale to the investor banks.

21        In addition to that, he testified that if George

22   Mason is forced to buy back a loan from an investor, it affects

23   George Mason's bottom line.  Which in turn affects the bottom

24   of Cardinal Bank.

25        Your Honor, if I could direct you to just a couple

860

1    cases that are instructive on this case.  First let me address

2    the case, the Ninth Circuit case that counsel raised.  Whish is

3    U.S. versus Bennett.  In that case -- and the citation is 621

4    F.3d 1131.  In that case, in that Ninth Circuit case, the Court

5    found that because the Government relied solely on Equicredit's

6    starts as a wholly-owned subsidiary and presented no evidence

7    indicating what kind of parent/subsidiary relationship actually

8    existed, any inference drawn from Equicredit's wholly own

9    subsidiary status would be impermissible speculation.

10          That is clearly not the case here.  We have had ample

11   testimony.

12          And so, I would suggest that Your Honor would find it

13   helpful to consult U.S. versus -- I am not sure how to

14   pronounce it, but it is B-o-u-y-e-a.  And that is a Second

15   Circuit case, 152 F.3d 192.  In that case, the same issue was

16   at stake.  There was a mortgage company that was a wholly-owned

17   subsidiary of an FDIC insured bank.

18          And in that case the Second Circuit went through the

19   types of information that were presented in the trial that

20   allowed them to conclude that the affect on the wholly-owned

21   subsidiary did in fact affect the parent company.

22          The evidence listed there included --  well, similar

23   things that were included here.  Including shared officers and

24   directors.  Including a direct effect, financial effect when

25   the subsidiary is affected.

1          And Your Honor can certainly consult that case as

2    well.  But I would argue that that case is much more

3    instructive than is this Ninth Circuit case where the

4    Government apparently failed to introduce any of that evidence.

5          THE COURT:  Go on to Count 14 then, unless you want

6    to give me any other cites.  I am going to reserve on this and

7    look at the case law.

8          MS. MARTINEZ:  Absolutely.  Your Honor, I would also

9    direct you to U.S. versus Walsh, which is a First Circuit case.

10   And that is 75 F.3d 1.

11         And then I would direct you as well to another First

12   Circuit case, which is U.S. versus Brandon.  And that's 17 F.3d

13   409.  I believe all of those are useful in this particular

14   analysis.

15         THE COURT:  Okay, thank you.

16         All right, address Count 14, if you would.

17         MS. MARTINEZ:  Yes.  Count 14, I believe that the

18   issue that counsel raised with respect to Count 14 is which

19   bank was underwriting the loan.

20         And the testimony that we had at trial from two

21   underwriters, primarily the underwriters, but the processors in

22   essence as well, was that income was always material.  And

23   although they were certainly talking about the underwriting

24   that was done with Cardinal Bank and with -- pardon me.  And

25   with -- well, with Cardinal Bank specifically and with

1   Countrywide, sorry, that was the word I was searching for, they

2   also talked more generally.

3          And these are folks who have been underwriters for

4   years and years and years and have worked in a number of

5   different banks.  And I believe that viewing the evidence most

6   favorably to the Government, as is proper at the Rule 29, the

7   jury can certainly conclude from that testimony that it's

8   always important that the income be truthful, and that the

9   income always affects whether or not the loan is granted.  I

10  think that is a very reasonable conclusion to take from that

11  testimony.

12         And so, I would submit that despite the existence of

13  a different bank underwriting, which I admit I am not

14  completely sure whether or not the testimony established that,

15  but I am happy to give that point to counsel, even assuming

16  that that's true, I think that there is more than enough

17  testimony to allow a reasonable jury to conclude that in fact

18  income, false income in Count 14 was material.

19         THE COURT:  Okay.  All right, thank you.

20         All right.  Well, I will look at whether Cardinal

21  Bank is the proper institution to have been identified.

22         It's a loose conspiracy.  And the Government, as Mr.

23  Davis has highlighted, has continued to -- has decided in its

24  presentation to veer from the overt acts identified.  But I

25  think that the testimony of several witnesses about Vilchez &

1  Associates, their association with Vilchez & Associates, their

2  work with the defendant during their time with Vilchez &

3  Associates and then having gone off on their own, is sufficient

4  to establish the facts necessary to keep the conspiracy count

5  in the case.

6          So, I will not deny Count 1, the Rule 29 motion.  I

7  will deny the motion to dismiss Count 1.

8          And I will look at 14, and 11 through 16, and 18

9  through 25 after listening to argument with counsel.  We will

10  move forward as if they will remain in the case.  And actually

11  we will look at that tomorrow and I will get you an answer

12  tomorrow on those as we are not sitting.

13          So we will be ready Monday at 9 a.m. to begin your

14  case, is that right?

15          MR. DAVIS:  Yes, Your Honor.

16          THE COURT:  Okay.  Joe, let's bring our jury in just

17  so I can tell them not to do anything that they will regret.

18          NOTE:  At this point the jury returns to the

19  courtroom; whereupon the case continues as follows:

20  JURY IN

21          THE COURT:  All right.  Please be seated.

22          The Government has rested their case, and the

23  defendant's case will begin Monday at 9 a.m. with their

24  witnesses and testimony.

25          As I said many times now, it's very important that

1    you not do any investigation, or research, or talk to anybody

2    about the case, but just instead enjoy the workday tomorrow, I

3    assume, and then the weekend.  And we will see you on Monday

4    morning at 9 o'clock.

5            Thank you very much.  Have a good weekend.

6            NOTE:  At this point the jury leaves the courtroom;

7    whereupon the case continues as follows:

8    JURY OUT

9            THE COURT:  Okay.  Anything else tonight?

10           MR. DAVIS:  Nothing, Your Honor.  Thank you.

11           THE COURT:  All right.

12           MS. MARTINEZ:  Have a nice weekend, Your Honor.

13           THE COURT:  Same to you all.  We will see you at

14   9 a.m. on Monday morning.

15           All right.  We are in recess.

16           NOTE:  The May 1, 2014 portion of the case is

17   concluded.

18       ------------------------------------------------

19

20

21           I certify that the foregoing is a true and

22       accurate transcription of my stenographic notes.

23

24

                   /s/  Norman B. Linnell
25                 Norman B. Linnell, RPR, CM, VCE, FCRR