IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No.: 1:12-cr-394 |
| ) | |
| LORENE CHITTENDEN, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT LORENE CHITTENDEN'S RESPONSE IN OPPOSITION TO
GOVERNMENT'S CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION
FOR PRELIMINARY ORDER OF FORFEITURE**

Without waiving her previously stated objections,[1] Defendant, Lorene Chittenden, states the following as her Response in Opposition to the Government's Consolidated Memorandum in Support of Motion for Preliminary Order of Forfeiture:

**INTRODUCTION**

Ms. Chittenden was convicted in this Court of bank fraud and conspiracy to commit bank and wire fraud. She was sentenced by the Court on October 3, 2014. She is presently serving a 42-month sentence. The Government here seeks a money judgment against Ms. Chittenden in the amount of $1,684,266.09. Ms. Chittenden concedes that the record supports an entry of forfeiture in the amount of $1,075,453.02. The record does not, however, support a judgment for the remaining $608,813.07. Moreover, no matter the amount of the money judgment, the Government may only enforce that money judgment in accordance with the requirements of 21

---

[1] As argued earlier, by operation of statute, the Federal Rules of Criminal Procedure, and the Federal Rules of Appellate Procedure, this Court lacks jurisdiction to entertain the Government's tardy motion for preliminary order of forfeiture. *See United States v. Shakur*, 691 F.3d 979, 986–89 (8th Cir. 2012) (reversing entry of forfeiture due to Government's wholesale failure to comply with Rule 32.2).

1

U.S.C. § 853; that is, the Government may not enforce a money judgment as if it were an ordinary creditor with a civil judgment. Further, the Government may not enforce a money judgment against "substitute property" unless "as a result of any act or omission *of the defendant*" the proceeds of the crime are unavailable. Here, the Government utterly failed to prove that any act or omission of the defendant caused proceeds to be unavailable. Accordingly, the Government has not carried its burden under the substitute property statute, 21 U.S.C. § 853(p). The Government's citation to inapposite case law and use of sardonic rhetoric cannot override the plain statutory text or the absence of evidence.

## ARGUMENT

At a hearing held by this Court on November 12, 2014, Ms. Chittenden entered into evidence Defense Exhibit 1, which details loans the Government has failed to prove were products of Ms. Chittenden's fraudulent conduct or in furtherance of the conspiracy. The fundamental problem with the Government's theory is that it essentially contends that any fraudulent loan that bore her name as loan officer was necessarily fraudulent due to her direct actions and constituted actions of a co-conspirator that were reasonably foreseeable to her. Yet, this theory is untenable. The Government must prove by a preponderance of the evidence that each loan is sufficiently attributable to the alleged conspiracy through individualized proof; not through generalizations. Ms. Chittenden concedes the Government has carried its burden and may forfeit proceeds in the amount of $1,075,453.02. It has failed to do so for the remaining $608,813.07.

Ms. Chittenden will not here address every point made by the Government in its lengthy pleading, but will instead address the evidence presented at the evidentiary hearing and in the Government's post-hearing affidavit.[2]

A.  **The Government Is Entitled to a Money Judgment of $1,075,453.02**

1.  **Full Document Loans**

The Government has failed to prove the loans designated on Defendant's Exhibit 1 as "Full Doc. Loans" may be used in its forfeiture calculation. Notably, the Government did not offer any evidence regarding these loans during the hearing, but instead chose to rely on a post-hearing affidavit submitted with its motion, denying Defendant an opportunity to cross-examine Agent Brooks regarding its content. *See* Aff. in Support of Preliminary Order of Forfeiture (hereinafter "Affidavit").

*Bernardo Rivera-Palma Loan*. The Affidavit states that Rivera-Palma's loan application stated that he earned $5,791 ($69,492 per year), however, his tax returns reported that in 2006 he earned $34,231 and in 2007 he earned $32,605. The Affidavit then states that RPG Investments was his employer. And Rolando Ponce, a realtor and the bookkeeper at Vilchez & Associates,

---

[2] Although Ms. Chittenden will here address the Government's new factual claims made in the Affidavit, Ms. Chittenden objects to it being considered in this matter. In the civil context, it is entirely improper to file affidavits following a trial or evidentiary hearing. This flows from Federal Rule of Civil Procedure 43 and the principle that a party should not be permitted to supplement the evidentiary record once it has closed. This was precisely the Government's position in *Spivey v. United States*, 912 F.2d 80 (4th Cir. 1990), where it argued "[t]here is no legal basis or rule which would allow this court to consider an affidavit of plaintiffs' counsel following the close of evidence in this case." *Id.* at 85; *see also In re Dews*, 243 B.R. 337, 338 (Bankr. S.D. Ohio 1999) (striking post-trial affidavit saying: "Court recognizes it asked the parties to address in post-trial memoranda the issue of the confirmability of the proposed plan; however, the vehicle of an affidavit of a party not subject to cross-examination attached to a post-hearing memoranda is not what the Court contemplated.").The principles underlying Rule 43 should apply here. The Government should not be permitted to bolster its case by affidavit after having a full and fair opportunity to present evidence. This Court should exercise its discretion and strike the Government's affidavit or simply refuse to consider it as part of the evidentiary record.

was listed as the person at RPG Investments who verified Rivera-Palma's employment information. The Affidavit states that Ms. Chittenden knew Ponce worked for Rosita Vilchez. However, nothing is offered to prove that Ms. Chittenden knew the information Rolando Ponce provided was false or the other documents provided in the file were false. Ponce offered nothing about the loan in question or about his handling fraudulent loans with Ms. Chittenden in his trial testimony. Nor is there any evidence to show Ms. Chittenden was the source of the false information. Nor is it enough to contend it was reasonably foreseeable that the information provided by Ponce was false. This is simply a fallacious "she did it before, she probably did it here" claim, and is insufficient to carry the Government's burden.

*Melvin Villalta Loan*. The Affidavit asserts that Melvin Villalta obtained a loan where the loan application listed him as a self-employed handyman earning $7,170 per month ($86,040 per year). The tax return used to support this figure was purportedly prepared by Martha Castro who was employed by Fredy, Lopez & Company. However, it was discovered that no one by the name of Martha Castro worked for Fredy, Lopez & Company. Also, according to the IRS, Villalta did not file tax returns in 2006 or 2007, and his 2008 return stated approximately $4,000 in income. The loan file also contained a one-page profit and loss statement listing a "net profit" of $21,734.38.

Other than the mere fact that Ms. Chittenden was the loan officer on the file, the Affidavit attempts to tie the fraud in the case to her by stating, "The profit and loss statement, which listed a 'net profit' of $21,734.38, resembles other fraudulent one-page profit and loss statements I have seen in other loan files where Chittenden was the loan officer." (Aff. ¶ 3.) But how did *this* profit and loss statement resemble the others? Was it formatted similarly, was it drafted on a similar stock of paper? Agent Brooks doesn't say. But the Affidavit does say that "fraudulent

profit and loss statements for Vilchez and for three loans obtained by Saul Canas were introduced at trial." (*Id*.)[3] But none of this means that Ms. Chittenden was responsible for this fraudulent transaction or reasonably foresaw it was fraudulent. There is nothing indicating she knew Martha Castro did not exist. Nor is there any evidence showing she created the profit and loss statement or knew it was fraudulent. Most importantly, because the Government has not established the source of the fraudulent information, it is entirely unclear whether the fraud as to this loan was in furtherance of the charged conspiracy.

*Maria Valdivieso Loan*. The Government offers no evidence to tie Ms. Chittenden to the fraudulent Valdivieso loan. The Affidavit merely states that Ms. Chittenden was the loan officer and "the income claimed on the loan application was significantly higher than what appears on Valdivieso's tax returns filed with the IRS. The loan application was supported by a fraudulent VOE that reflected the false income shown on the loan application." (*Id*. ¶ 5.) This does not demonstrate, however, that the fraud was committed by Ms. Chittenden or was reasonably foreseeable to her.

*Wilfredo Vilchez Loan*. The Affidavit makes no mention of this Full Document. Loan.

2.  **Family Relationship Transactions**

*Rolando Ponce Loan*. The Affidavit states only that Ponce's loan application listed a monthly income of $5,000 ($60,000 per year) and $2,500 ($30,000 per year) at a second employer. However, Ponce did not have a second employer and his actual annual salary from the first employer was approximately $28,000. The application also falsely listed two bank accounts with a combined balance of $14,500. (*Id*. ¶ 6.)

---

[3] Notably, the jury acquitted Ms. Chittenden with respect to a number of the loans for which Saul Canas was the realtor.

5

This is insufficient. It does not establish that Ms. Chittenden participated in the fraud, that the loan was in furtherance of the alleged conspiracy, or that Ms. Chittenden reasonably foresaw that Ponce or anyone else had provided fraudulent information. Again, although Ponce testified at trial, he offered no evidence about the loan in question, or Ms. Chittenden's role in it.

*Armando Pino Loan*. The Affidavit states that Pino refinanced property and his loan application fraudulently stated that he was a U.S. citizen and he earned monthly income of $12,500 per month ($150,000). (*Id*. ¶ 7.) Again, this does not establish that Ms. Chittenden participated in this particular fraud or reasonably foresaw that Pino or anyone else had provided fraudulent information, or that the loan was in furtherance of the conspiracy.

A review of the remaining paragraphs of the Affidavit shows that each entry regarding the remaining paragraphs (paragraphs 8-10) follows the same pattern: (1) Ms. Chittenden was the loan officer and (2) the loan application contained a fraudulent entry. But this does not prove that with that particular loan the fraudulent conduct was attributable to Ms. Chittenden, was in furtherance of the alleged conspiracy, or was reasonably foreseeable.

### 3. The Remaining Loans

The Government has similarly failed to establish the required connection between Ms. Chittenden and the remaining loans listed on Defendant's Exhibit 1. Indeed, the Government made no attempt to make an individualized showing but generally states that any fraudulent information—whether handwritten on mortgage applications or contained in fraudulent tax letters or tax returns—came directly from the Defendant or was reasonably foreseeable by her. This contention is insufficient to establish forfeiture liability as to these loans even under a preponderance of the evidence standard.

6

In particular, for many of the loans in question, the Government alleges only that, as shown by an IRS tax return, the borrower overstated his or her income in the loan application. But *borrowers* are not among the conspirators identified in Count One, and a loan in which the borrower simply misstated his or her income—without the knowledge or involvement of an identified realtor or other member of the conspiracy—would *not* be an act in furtherance of the conspiracy. And if a particular loan was not a conspiratorial act (even though it involved fraud by the borrower), Ms. Chittenden was not criminally liable for the loan, and any resulting commissions were not "proceeds" of the charged conspiracy.

B. **The Government Has Failed to Establish that Ms. Chittenden's Property Qualifies as "Substitute Property" Under 21 U.S.C. § 853.**

The Government claims that under 21 U.S.C. § 853(p), Ms. Chittenden must forfeit the entirety of her assets—the full balance of her life's work—as substitute assets for property of her co-conspirators. The Government's argument that it can reach Ms. Chittenden's property under this theory fails. What is more, the Government has offered no evidence to prove by a preponderance of the evidence that Ms. Chittenden's acts or omissions rendered any proceeds unavailable.

That the Government may properly obtain a money judgment in criminal forfeiture does not free it from the restrictions set forth by statute. That is, the Government may not enforce a criminal forfeiture money judgment as if it were the equivalent of a civil money judgment. *See United States v. Vampire Nation*, 451 F.3d 189, 202 (3d Cir. 2006) ("[T]he *in personam* forfeiture judgment may also be distinguished from a general judgment *in personam*. The judgment *in personam* here is one in forfeiture and is limited by the provisions of [§ 853]."); *United States v. Poulin*, 690 F. Supp. 2d 415, 431 (E.D. Va. 2010), *aff'd*, 461 F. App'x 272 (4th Cir. 2012) (explaining entry of forfeiture money judgment does not permit Government to forfeit

7

property indiscriminately and requiring Government to satisfy its judgment through traceable proceeds or forfeiture of substitute property). The Government here wishes to satisfy the full amount of its judgment through substitute property owned by Ms. Chittenden. This requires that it satisfy the strictures of § 853(p).

The inquiry begins—and here, ends—with the plain language of the statute. *Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001) (citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917)) ("unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language . . . ."). Section 853(p) provides, in relevant part, that a defendant's property can be seized as substitute property only where "*as a result of any act or omission of the defendant*" tainted property:

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty.

*Id*. § 853(p)(1). Thus, "[p]ursuant to § 853(p), forfeiture of substitute property cannot occur until . . . a determination by the trial court that the *defendant's* act or omission resulted in the court's inability to reach § 853(a) assets." *United States v. Jarvis*, 499 F.3d 1196, 1204 (10th Cir. 2007); *accord United States v. Perkins*, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014). This showing is made with evidence that the defendant transferred property, through transactions separate and distinct from her underlying criminal conduct, or otherwise made the property unavailable. *See, e.g.*, *United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011) (reversing substitute property forfeiture order where evidence failed to show property was unavailable due to acts of

defendant); *United States v. Hovind*, 305 F. App'x 615, 618, 623 (11th Cir. 2008) (affirming forfeiture of substitute property where defendants transferred assets involved in their offenses to third parties and used them to pay business expenses); *United States v. Javaherpour*, 78 F. App'x 452, 456–57 (6th Cir. 2003) (holding that, where defendant sold the property used to facilitate his narcotics crimes, forfeiture of the proceeds of the sale of the property was proper pursuant to § 853(p)); *United States v. Sokolow*, 91 F.3d 396, 415 (3rd Cir. 1996) (upholding forfeiture of substitute property where defendant transferred his assets to family members and other third parties); *see also United States v. Barajas*, 200 F. Supp. 2d 575 (E.D.N.C. 2002) (denying order of forfeiture where Government failed to adduce evidence connecting defendant in "wide-ranging conspiracy" to "the proceeds of the conspiracy or the property connected to the conspiracy"). This reading of the statute is neither, as the Government claims, "unique" nor "creative"; it is a common sense reading of statutory text. It is also consistent with the purpose of the forfeiture law, which is to deprive a perpetrator of his ill-gotten gains, not as a means of imposing a fine. *Cf. United States v. Casey*, 444 F.3d 1071, 1076 (9th Cir. 2006) (explaining that unlike fines a forfeiture order is not unlimited but rather tied to the defendant's gains).

The Government claims that the text should be read more broadly to give effect to the theory of joint and several liability among co-conspirators. It argues that had courts adopted Ms. Chittenden's reading of "singular subjects," courts would have never reached the conclusion that joint and several liability applies in the forfeiture context. Not so. Courts reached the issue and decided defendants are jointly and severally liable in forfeiture based on a plain reading of § 853(a), which expanded a defendant's liability to property gained "indirectly." Courts had no need to read "defendant" as "defendants" or "co-conspirators." Congress had granted room for

the *Pinkerton* doctrine to operate in the text of § 853(a). As stated by one of the first cases to consider the question:

> The phrase 'any property constituting . . . any proceeds obtained, directly or indirectly, as the result of such violation,' under its clear meaning is not limited to property acquired solely or wholly by the defendant but encompasses property *derived by the defendant indirectly* from those who acted in concert with him in furthering the criminal enterprise and produced the property derived from the violation.

*United States v. Benevento*, 663 F. Supp. 1115, 1118 (S.D.N.Y. 1987), *aff'd*, 836 F.2d 129 (2d Cir. 1988) (emphasis added). The Fourth Circuit in *United States v. McHan*, 101 F.3d 1027 (1996), expressly relied on *Benevento* and accepted its reading of § 853(a).

The Government next notes that, while no court has squarely considered the issue (or as the Government states in disdain: "been squarely presented with the opportunity to reject the. . . argument"), the First Circuit has implicitly done so in *United States v. Hurley*, 63 F.3d 1 (1st Cir. 1995), by ordering "the forfeiture of a defendant's substitute assets up to the $136 million total obtained by the co-conspirators even though the individual defendant was a low-level participant who had not obtained the funds." (Doc. No. 200 at 16.) But the First Circuit in *Hurley* did not consider the forfeiture of *a* defendant's substitute assets; it considered the forfeiture of substitute assets of *eight* appellants who were involved in laundering money to a notorious Columbian drug kingpin. *Id*. at 6 ("The eight appellants challenge their convictions, sentences and forfeitures for their participation in an extensive money laundering operation organized by Stephen Saccoccia."). Moreover, there was no discussion regarding the findings the district court made to justify forfeiture of substitute property. Nor did the court indicate that a "low level participant" was ordered to forfeit substitute property to repay the full amount of the criminal enterprise's receipts. There is only this: "On July 16, 1993, the government moved in the district court to amend the forfeiture provisions of its judgments to substitute other property of the appellants for

the $137 million in laundered funds. After a hearing, the court granted these motions." *Id*. at 23. The Government's claim that *Hurley* implicitly rejected Ms. Chittenden's argument is inaccurate.

The Government's related contention that the Fourth Circuit in *United States v. McCrea*, 2014 WL 5088139, at *1 (4th Cir. Oct. 10, 2014) (*per curiam*), implicitly rejected Ms. Chittenden's argument is likewise erroneous. In *McCrea*, the court summarily affirmed the district court's order granting the Government's motion to substitute assets of a defendant found guilty of involvement in a drug and money laundering conspiracy. But the Government fails to address, however, the district court opinion affirmed by Fourth Circuit in which the district court employed an analysis entirely consistent with Defendant's reading of § 853(p). *United States v. McCrea*, 2014 WL 123172 (W.D. Va. Jan. 13, 2014). The *McCrea* district court conducted a comprehensive hearing in which the Government established that substitute assets were forfeitable by showing that "McCrea dissipated the proceeds on travel and dining, and, despite due diligence, the government was unable to recover an amount that could satisfy the forfeiture money judgment." *Id*. at *3.

Abandoning its struggle with the text of § 853(p), the Government next claims that Ms. Chittenden's offense conduct amounted to an "act or omission" that made the tainted property unavailable. But, as shown more specifically below, that claim does not square with the statute. It was not an act or omission of Ms. Chittenden that caused Vilchez to transfer property to Peru or purchase a Ferrari. Nor were these acts—if indeed they occurred—in furtherance of the alleged conspiracy. And the Government's own witness testified that Ms. Chittenden took no action that placed the ill-gotten gains of others outside the reach of the Government. (Tr. 44:1–47:1.)

Looking farther afield for a theory that saves its substitute assets argument, the Government contends that the defendant's position is "factually incorrect" because "the gross proceeds from the defendant's bank fraud violations were the monies extended to the unqualified borrowers to purchase the real estate," and the loans in question "would never have been made *but for* the defendant's fraud." (Gov't Consolidated Mem. at 16-17). The Government concludes that "[o]bviously, the loan proceeds are long gone—directly as a result of the defendant's own actions." (*Id.* at 17.) But the Government's last-ditch effort cannot carry the day, for several reasons.

First, the claim is internally inconsistent, since in the indictment and throughout the forfeiture proceedings the Government has alleged that the "proceeds" in this case are the commissions earned by the realtors and Ms. Chittenden, as well as the "cash-out" proceeds received directly by co-conspirators. Until now, the Government has never maintained that the proceeds of the charged conspiracy include "the monies extended to the unqualified borrowers to purchase the real estate." So late in these protracted proceedings, this Court should not countenance any attempt by the government to so radically alter the legal and factual landscape. Rule 32.2, and the Due Process Clause of the Fifth Amendment, do not permit it.

Second, the Government's last-gasp theory ignores that in most mortgage loan transactions, including many involving Ms. Chittenden, the loan funds go, not to the borrower in the form of cash, but directly to pay off the seller of the home and any lienholders. Although in some real estate transactions the borrower may receive some cash at the closing, more often all of the mortgage funds are used to buy the property in question. In such a transaction, *the borrower receives no money at closing*, and the true "proceed" of the loan is the real property that it is used to purchase, not the "monies" that the "unqualified borrowers" never obtained or

controlled. In this case there is no showing, and no evidence, that those brick and mortar real properties are "long gone," as the Government puts it, or that the defendant did anything to place the real properties—purchased, presumably, at their then-appraised value—beyond the government's reach.

Third, and most importantly, the government's late-breaking theory conflates the distinction between the "proceeds" of a completed offense, and funds involved in a bank fraud crime that is not yet complete. Proceeds, by definition, are the fruits of a completed offense, obtained as the "result" of a particular crime. In the bank fraud context, "proceeds" are the funds of a financial institution whose attainment is the object of the executed "scheme or artifice." In this case, the scheme and artifice alleged in Count One generated "proceeds" in the form of commissions and other payments directly to the co-conspirators. Until such a commission was paid out and received by the conspirator in question, the funds in question were not "proceeds" at all, but the property of George Mason Mortgage.

This point matters because under § 853(p)'s plain language, the defendant's act or omission can only pertain to "property described in subsection (a)," 21 U.S.C. § 853(p)(1). Section 853(a)(1), in turn, describes "property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result" of the criminal violation. It follows that under § 853(p) the defendant is accountable *only for acts or omissions directed at proceeds*, and not for acts or omissions intrinsic to the charged offense that involve, for example, a disposition of bank-owned funds. In other words, the issue under § 853(p) is not whether the defendant as a loan officer at George Mason Mortgage was at least partly responsible for causing loan closings at which some of GMM's property was transferred to conspirators in the form of commissions, but instead whether the defendant performed any act or omission to place the "proceeds"

*resulting* from the offenses beyond the government's reach. And, as the government effectively concedes, there is no such evidence, since the defendant had no knowledge of or control over what the co-conspirators did with any proceeds they obtained. In summary, because § 853(p) pertains only to acts or omissions directed at proceeds, the government's essential claim – that "[w]hen the defendant extended these loans, her own actions put Vilchez's commissions beyond the government's reach," (Gov't Consolidated Mem. at 18)—must fail.[4]

Finally, all of the deficiencies in the Government's last-ditch arguments underscore a more fundamental point: that the government has almost completely failed to undertake the due diligence investigation necessary to establish § 853(p)'s factual predicates. Under that statute, the government is required to show (1) that proceeds of the offense existed; (2) that those proceeds either cannot be located, or have been transferred to a third party, or have been placed beyond the court's jurisdiction, or have been substantially diminished in value, or have been commingled with other property which cannot be divided without difficulty; and (3) that the circumstances just described are the result of an "act or omission of the defendant." Courts routinely require the government to demonstrate its due diligence to locate proceeds, and to trace those proceeds in transactions undertaken by the defendant. *See United States v. Alamoudi*, 452 F.3d 310, 316 (4th Cir. 2006). For example, in *Alamoudi* the court found the following evidence sufficient to satisfy the demands of § 853(p):

> In this case, the Government submitted a sworn affidavit of FBI Special Agent LaPrevotte in which she declared that, '[s]ince 2003, agents of the Internal

---

[4] The Government also fails to fill in several gaping factual holes in its theory, including showing how or why GMM's mere payment of a commission to Rosie Vilchez was enough to place the funds "beyond the Government's reach." Surely additional "acts" not involving Ms. Chittenden, such as wiring the proceeds outside the United States, were necessary to accomplish that end. Likewise, the government has not shown that Vilchez used any specific "proceeds" of the charged offenses to purchase vehicles, or, even if they were, that the vehicles in question are now beyond the government's reach.

> Revenue Service and I have conducted an extensive review of bank account[s], tax returns and financial documents associated with Alamoudi,' that we 'have searched for the $570,000 Alamoudi received from Lybia but have not been able to locate it.' Based on her "experience and training,' Agent LaPrevotte concluded that, 'as a result of acts or omissions of the defendant,' the $570,000 had 'been transferred to, or deposited with a third party; placed beyond the jurisdiction of the court; substantially diminished in value; or commingled with other property which cannot be divided without difficulty.' Thus, "despite the exercise of due diligence," the Government had been unable to locate the property subject to forfeiture.

*Id*. at 316.

Here, by contrast, the Government never made such a showing—even though several of the supposed "insiders" in the charged conspiracy—Benavides, Levy, Ponce, and others not called as witnesses—were signed up as Government cooperators and could presumably have provided detailed information about where their own proceeds went, and how other conspirators disposed of theirs.[5] Instead, the Court is essentially left to guess at what happened to the proceeds in this case. Before the federal government can seize as substitute assets the entirely untainted life savings of a good and hard-working woman who made a mistake, section 853(p) requires more.

In summary, the Government may seek to forfeit substitute property only to the extent that it has established that the defendant committed some act to make tainted property unavailable for forfeiture. Unlike § 853(a), § 853(p) contains no language declaring that a defendant may do this *indirectly* through the acts of a co-conspirator. Because the Government has failed to establish the prerequisites of § 853(p) with respect to the defendant, the Government's motion to forfeit substitute property must be denied.

---

[5] When asked if Ms. Chittenden had taken any action to conceal or dissipate proceeds received by Rosie Vilchez, Rocio Benavides, or David Levy, Agent Brooks also testified that he was not aware of any actions that Ms. Chittenden took to prevent the Government from locating property subject to forfeiture. (Tr. 45:11–46:13.)

15

## CONCLUSION

Subject to Ms. Chittenden's objections, the Government is entitled to a forfeiture money judgment in this case limited to $1,075,453.02. Moreover, because the Government has made no showing that an order for substitute property is warranted, the Government's attempt to forfeit substitute property must be denied.

Respectfully submitted,

**LORENE CHITTENDEN**

_____/s/ John S. Davis_____

John S. Davis
Joseph R. Pope
Williams Mullen
200 South 10th Street, 16th Floor
Richmond, VA 23219
Phone: 804-420-6000
Facsimile: 804-420-6507
jsdavis@williamsmullen.com
jpope@williamsmullen.com


F. Douglas Ross
Odin Feldman Pittleman PC
1775 Wiehle Ave., Suite 400
Reston, VA  20190
Phone:  703-218-2100
Facsimile:  703-218-2160
Douglas.ross@ofplaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 2, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

    James P. Gillis
    Assistant U.S. Attorney
    Eastern District of Virginia
    2100 Jamieson Ave.
    Alexandria, VA 22314

                                                            /s/ John S. Davis