IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> v. ) <br> ) <br> LORENE CHITTENDEN, ) <br> ) <br> *Defendant.* ) <br> ) | Criminal Action No. 1:12-cr-394 |

## MEMORANDUM OPINION

This matter comes before the Court on the government's Motion for Preliminary Order of Forfeiture. Dkt. No. 166. The motion has been extensively briefed by the parties. Dkt. Nos. 177, 192, 200, 201, 202. On November 12, 2014, the Court held an evidentiary hearing and heard argument from counsel. For the reasons set forth below, the motion is granted in part and denied in part.

### I. Procedural Background

On November 21, 2013, a federal grand jury returned a twenty-five count superseding indictment charging Defendant Lorene Chittenden and others with conspiracy to commit bank and/or mail fraud (Count I) and twenty-three counts of bank fraud (Counts III–XXV) related to their fraudulent mortgage loan scheme.[1] Included in the indictment was a forfeiture notice advising Defendant that if she were to be convicted of any of these offenses, she would forfeit to the United States any property constituting or derived from proceeds obtained directly or indirectly as the result of, or traceable to, the counts of conviction, or as substitute assets for those proceeds pursuant to 18 U.S.C. § 982(a)(1) and (a)(2), 28 U.S.C. § 2461, and 21 U.S.C. § 853. The notice further alleged that the forfeitable property includes a sum of money equal to

---

[1] Count II charged co-conspirators Rosita Vilchez and Armando Pino with a continuing financial crimes enterprise.

1

$7,376,000, representing the proceeds of the above offenses.

On May 7, 2014, the jury returned a verdict finding Defendant guilty of conspiracy to commit bank fraud and ten counts of bank fraud. The jury acquitted her of four bank fraud counts.[2] On the evening before the sentencing hearing, the government filed its motion for a preliminary order of forfeiture. Dkt. No. 166. Due to the tardiness of the government's motion, the Court gave Defendant the opportunity to file written objections to the motion within seven days of sentencing. The Court also granted the government the opportunity to respond to the objections. On October 3, 2014, the Court sentenced Defendant to 42 months imprisonment, two years supervised release with special conditions, $1,100 in special assessments, and to pay restitution in an amount to be determined. Having established a briefing schedule, the Court took the forfeiture issue under advisement, and stated in the judgment order "Forfeiture—to be determined." J. Order, Dkt. No. 168.

On October 5, 2014, the government filed a motion to amend or correct the sentence to include its proposed preliminary order of forfeiture, and noticed it to be heard on October 10, 2014. Dkt. Nos. 170, 171. At the hearing, defense counsel argued that Defendant's due process rights were violated when the government failed to comply with the requirements of Federal Rule of Criminal Procedure 32.2. Specifically, defense counsel argued that she was not afforded an evidentiary hearing in which to object to the amount and content of the forfeiture as well as to whether the government had "established the requisite nexus between the property and the offense." *See* Fed. R. Crim. Pro. 32.2(b)(1)(B). After hearing argument from both parties, the Court issued an Order amending its judgment order to clarify that it was only a partial judgment order, as it did not include the mandatory forfeiture order. The Court also ordered the parties to schedule the required evidentiary hearing on the forfeiture issue.

---

[2] Prior to trial, the government dismissed counts three, five through ten, and seventeen.

On November 12, 2014, the Court heard evidence from the government's witness, FBI Special Agent Spencer Brooks regarding the extent of the proceeds of the fraudulent loan conspiracy in which Defendant held a major role as the loan originator. Defense counsel stipulated to the government's ability to prove, by a preponderance of the evidence, the contents of government exhibit 3—detailing the loss amount for the fraudulent loan transactions discussed at trial—as well as the amounts in government exhibit 4 for certain transactions not discussed at trial. 11/12/14 Hr'g Tr. at 11, 21. At the conclusion of the hearing, the Court established a supplemental briefing schedule and took the motion under advisement. Upon review of the government's consolidated memorandum in support of its forfeiture motion, Defendant's response, and the other pleadings, the Court finds that the motion is ripe for disposition.

## II. Legal Standard

Section 982(a)(2) provides that a court "shall order" a defendant convicted of a bank fraud offense to forfeit "any property constituting, or derived from, proceeds the person obtained, directly or indirectly, as the result of such violation." 18 U.S.C. § 982(a)(2). The plain language of the statute makes clear that such forfeiture is mandatory. *Id.*; *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied." (citing identical language in 21 U.S.C. § 853(a))). Although § 982 does not itself set forth the procedures for forfeiture, it expressly incorporates the provisions in 21 U.S.C. § 853. 18 U.S.C. § 982(b)(1). In addition to providing guidance as to the proper means by which forfeitable property should be seized and disposed of, § 853 defines, more fully than § 982, the property subject to forfeiture.

The procedure for forfeiture of assets in a criminal case is further governed by Federal Rule of Criminal Procedure 32.2. For a court to order forfeiture following a finding of guilt, the

government must first have notified the defendant, either through the indictment or the information, of its intent to seek forfeiture as part of any sentence. Fed. R. Crim Pro. 32.2(a). If the notice requirement is satisfied, the government may then pursue a forfeiture order by demanding a money judgment, specific property, or substitute property. Fed. R. Crim Pro. 32.2(b)(1)(A) & (b)(2)(A); *United States v. Candelaria–Silva*, 166 F.3d 19, 42 (1st Cir. 1999); *United States v. Davis*, 177 F. Supp. 2d 470, 484 (E.D. Va. 2001) (citing *Candelaria* with approval). In cases where the government seeks specific property, "the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim Pro. 32.2(b)(1)(A). The government may alternatively seek a money judgment, which is "especially appropriate where physical assets derived from the conspiracy are no longer traceable or available." *United States v. Blackman*, 746 F.3d 137, 145 (4th Cir. 2014).

If the government is unable to recover the "property constituting, or derived from, proceeds the person obtained directly or indirectly" as the result of a bank fraud offense, it may also seek forfeiture of substitute property. 21 U.S.C § 853(a), (p); *United States v. Wingerter*, 369 F. Supp. 2d 799, 805 (E.D. Va. 2005) (finding that property forfeitable under § 982 includes, by incorporation pursuant to § 982(b)(1), substitute property described in § 853(p)). Section 853(p) applies if, "as a result of any act or omission of the defendant," the proceeds traceable to the offense either: (1) "cannot be located upon the exercise of due diligence"; (2) "has been transferred or sold to, or deposited with, a third party"; (3) "has been placed beyond the jurisdiction of the court"; (4) "has been substantially diminished in value"; or (5) "has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1). If any of these conditions is met, a court must order a defendant to forfeit substitute property up to the value of the tainted property. *Id.* § 853(p)(2); *United States v. Alamoudi*, 452

F.3d 310, 314 (4th Cir. 2006) ("Section 853(p) is not discretionary; rather, the statute mandates forfeiture of substitute assets 'when the tainted property has been placed beyond the reach of a forfeiture.'" (citing *United States v. McHan*, 345 F.3d 262, 271 (4th Cir. 2003)). As is the case under § 982, the government must prove its entitlement to forfeiture of substitute property by a preponderance of the evidence. *See United States v. Tanner*, 61 F.3d 231, 234 (4th Cir. 1995).

Furthermore, a defendant is jointly and severally liable for all reasonably foreseeable proceeds of the conspiracy, as this property was "derived *indirectly* [by the defendant] from those who acted in concert with him in furthering the criminal enterprise." *E.g., McHan*, 101 F.3d at 1043 (emphasis added); *United States v. Bollin*, 264 F.3d 391, 419 (4th Cir. 2001) ("[A]lthough [the defendant] received only about $30,000, he is liable in a forfeiture judgment for the foreseeable conduct of his co-conspirators."). The imposition of vicarious liability in forfeiture proceedings "resonates with established criminal law principles [under which] conspirators are substantively liable for the foreseeable criminal conduct of a conspiracy's other members," including at sentencing. *McHan*, 101 F.3d at 1043 (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)). With these principles in mind, the Court turns to the instant motion.

### III. Analysis

The government seeks a money judgment against Defendant in an amount equal to the gross proceeds of the conspiracy. It submits that a conservative estimate of such proceeds in this case is $1,684,266.09. To satisfy the money judgment, the government does not seek to forfeit specific property traceable to the offense, but rather only substitute property. Defendant raises two principal objections to the government's motion: the first as to the amount of the money judgment and the second as to the specific assets that will be subject to forfeiture. The Court will address each in turn.

### A. The Amount of the Money Judgment

Defendant concedes that the government may seek a money judgment and that the record supports an entry of forfeiture against her in the amount of $1,075,453.02. She disputes, however, the government's ability to forfeit an additional $608,813.07 in proceeds of the conspiracy.

The forfeiture amount sought by the government derives from three sources: (1) the loan origination fees received by Defendant from the fraudulent loans; (2) the real estate commissions on those loans received by her co-conspirators; and (3) the cash-out proceeds from the fraudulent refinancing of certain loans by co-defendant Rosita Vilchez and another conspirator. Dkt. No. 200 at 2. At the evidentiary hearing, the government submitted government exhibits 3 and 4 ("GEX 3", "GEX 4") to establish that the underlying transactions were fraudulent and therefore the proceeds are forfeitable. Defense counsel stipulated to the accuracy of GEX 3 and, subject to their prior objections, that the government could prove by a preponderance of the evidence that the amounts reflected in it were proceeds of the fraud proven at trial. 11/12/14 Hr'g Tr. at 11, 21. Defense counsel also stipulated to certain transactions contained in GEX 4 that involved a fraudulent loan application in the defendant's handwriting. *Id.* at 21.

Defendant argues that the government has failed to prove its entitlement to forfeiture with respect to other transactions in GEX 4 that were not mentioned—and thus not proven—at trial. The government need only prove the forfeiture amount by a preponderance of the evidence. *E.g., United States v. Cherry*, 330 F.3d 658, 669 (4th Cir. 2003). Moreover, the Court's determination may be based not only on evidence presented and proven at trial, but also on additional "relevant and reliable" evidence submitted by the parties. Fed. R. Crim. P. 32.2(b)(1)(B). As the Court stated at the sentencing hearing, the government and FBI agents

used conservative means to identify the loss figures in this case, and expended an enormous amount of effort to do so. 10/3/14 Hr'g Tr. at 13. Consequently, the Court finds that GEX 4 is reliable and certainly relevant, and will therefore consider it in making its forfeiture determination.

At the outset, Defendant argues that the Court should not consider the affidavit of Special Agent Brooks affidavit, submitted by government after the evidentiary hearing, because doing so would deny her the "opportunity to cross-examine Agent Brooks regarding its content." Def.'s Resp. Opp'n Gov't's Consol. Mem. Supp. Mot. Forfeiture ("Def.'s Opp'n") at 3. In support of her argument, she cites Federal Rule of Civil Procedure 43, which has been interpreted as prohibiting a party from supplementing the evidentiary record once it has closed. *Spivey v. United States*, 912 F.2d 80, 85 (4th Cir. 1990) (vacating damages award in tort case where district court admitted post-trial affidavit).

The Federal Rules of Civil Procedure typically do not apply in criminal forfeiture proceedings. *United States v. Mosavi*, 138 F.3d 1365, 1366 (11th Cir. 1998) (holding that a defendant cannot challenge criminal forfeiture order under the Federal Rules of Civil Procedure); *see also United States v. Grapes*, No. 10-7612, 2011 WL 195672 (4th Cir. Jan. 21, 2011) (holding that a defendant cannot challenge criminal judgment under Federal Rules of Civil Procedure). Although the criminal forfeiture rule, Fed. R. Crim. P. 32.2., incorporates some of the civil procedure rules, it does not adopt Fed. R. Civ. P. 43. More importantly, Defendant's perceived prejudice in not being able to cross-examine the agent on his affidavit is not substantiated, as she has had access to all the information contained within the affidavit, which was produced in discovery before trial, since at least April 2014. The Court will therefore consider Brooks' affidavit in resolving Defendant's specific objections to the figures contained

in GEX 4, addressed below.

### i. *Full Document Loans*

Defendant first objects to the Court including the proceeds of full document ("full doc") loans in its calculation of the forfeiture amount. The only full doc loans included in the government's request are those of Mr. Rivera-Palma and Mr. Villalta, resulting in proceeds to the conspiracy of $6,875 and $3,137.50, respectively.[3] The Rivera-Palma transaction, for which Defendant received a commission as the loan officer, involved a full doc loan application in which the borrower's income was falsely reported as more than double his actual income. The fraudulent verification of employment for this loan came from Rolando Ponce, a witness at trial who was a realtor and bookkeeper at Defendant's employer, Vilchez & Associates. Defendant argues that the government has offered no evidence to show that she knew—or that it was reasonably foreseeable to her—that the information provided by Ponce was false.

The government attempts to tie the Rivera-Palma transaction to Defendant by relying on the trial testimony of co-conspirator J. David Levy regarding her participation in a fraudulent full doc loan transaction involving another client, and by stating that Defendant knew Ponce worked for Vilchez. This evidence does *not* show, however, that Defendant knew or reasonably foresaw that the information provided for *this* loan application was fraudulent. Because the jury did not make a specific finding as to whether the full doc loans mentioned at trial were fraudulent, the Court is not obliged to credit Levy's testimony on that issue here. The Court thus finds that the evidence fails to support the government's claim that Defendant knew or could reasonably foresee that the information provided for the Rivera-Palma loan was fraudulent.

---

[3] GEX 4 originally contained "full doc" loans for Vilchez's Parkgate Drive property and the Valdivieso property. The government has since removed those figures from the amount it now seeks in forfeiture. **Dkt. No. 200 at 3 n.2.**

8

The government's showing on the Villalta full doc loan is similarly deficient. Brooks states in his affidavit that Villalta's loan application contained a fraudulent tax return prepared by Martha Castro, an employee at the tax preparation firm Fredy Lopez & Company. It was later discovered that no person by that name had ever worked for the firm. The loan application also contained a profit and loss statement for Villalta for the first months of 2007. Brooks asserts that the statement "resembles other one-page profit and loss statements I have seen in other loan files where Chittenden was the loan officer," and that such statements for loans obtained by realtor Saul Canas had been introduced at trial. Brooks Aff. at ¶ 3.

Defendant disputes that any of the above facts tie this transaction to her involvement in the conspiracy. Indeed, there is no evidence before the Court that Defendant knew or reasonably foresaw that Martha Castro did not exist or that the profit statement was fraudulent. Moreover, Brooks' assertion that the statement "resembles other[s,]" without providing more detail as to *how* it resembles others, is too vague to make such a finding. Accordingly, the Court will deduct the proceeds for the two full doc loan transactions in dispute from the forfeiture amount.

*ii. Family Relationship Transactions*

Defendant also objects to the Court including the proceeds of "[Vilchez] family relationship transactions," comprising of loans made to Rolando Ponce, Armando Pino, and Maria Delgado,[4] in its forfeiture order. Defendant argues that Brooks' affidavit does not establish that she participated in those frauds, that she reasonably foresaw that the income information provided for these loans was fraudulent, or that the loans were even a part of the same conspiracy. For each of these contested loans, Brooks states that: (1) Defendant received commissions as the loan officer for each of the loans; and (2) the applications contained fraudulent information. Contrary to the government's assertions, these statements, without more,

---

[4] All of these individuals were related to or worked for Vilchez. Pino, for instance, is her brother.

do not establish that "the players and the essential nature of the fraud were all part of one common conspiracy." Gov't's Consol. Mem. Supp. Mot. Forfeiture at 10. Given the meager evidence presented, the Court declines to find Defendant vicariously liable for the proceeds of these "family relationship" transactions, as the fraud perpetuated through these loans was not reasonably foreseeable to her.

### iii. Loan Applications Without Defendant's Handwriting

Defendant further objects to the Court holding her vicariously liable for fraudulent stated income loan transactions in which the original handwritten applications are not on the record. This is so because, for certain transactions, the agents obtained the loan documents from the settlement company rather than directly from the bank. Defendant claims that the government cannot connect her to the fraud involved with these loans without showing that the applications contained her handwriting.

The Court finds otherwise. Defendant testified that for nearly every fraudulent stated income loan presented at trial, the income and asset information on the loan applications was either in her own handwriting or that of her sister. She also admitted that even if the application was in her sister's handwriting, her sister obtained the information from her. Additionally, the realtors involved consistently testified that Defendant alone was responsible for filling in the income and asset information on the applications. The evidence at trial revealed that this was her principal role in the conspiracy—plugging in invented income and asset figures to satisfy the underwriters of the stated income loans. Based on the above, the Court finds that it is more likely than not that Defendant either knew or reasonably foresaw that the information provided on these applications was fraudulent, despite the fact that the record does not contain the original

handwritten applications. The Court therefore declines to deduct these figures from the forfeiture amount.

    *iv.   Fraudulent Tax Letter Loans*

Defendant also objects to the proceeds of the loans involving fraudulent tax letters being included in the forfeiture calculation. Tax preparers write what are known as CPA letters to show a lender that a borrower is self-employed and that the preparer has done that person's taxes for some years prior. During the course of the conspiracy, Vilchez employed various tax preparers to issue fraudulent CPA letters so that her clients would qualify for stated income loans. According to Defendant, there is no evidence that she knew about the letters or that their use by co-conspirators was reasonably foreseeable to her. Not so. At trial, Rocio Benavides testified that she overheard a conversation between Defendant and Vilchez on the topic:

> Rosie was – in one of the reunions we have – we had at that time, Rosie was telling us that if a client – there was no way that a client could come to the office and get out without a house. And even more, if they told us to ask the client if they had a side job, that *anybody could get qualified with that side job because we could get a CPA and they will get qualified.* So the reunion ended, and everybody went to their side of the office. And apparently after that meeting, Rosie went to her office, and I was sitting behind on the side of the office because I was sitting there at that time, and *Lorene said to her, Rosie, not 100 percent of the loans can be CPAs, the underwriter won't believe it.* So that's why I remember because it was a contradiction to what Rosie said.

Trial Tr. at 66–67 (emphasis added). Benavides also stated that Defendant would instruct her to get a CPA letter if a client had a side job, without asking any questions about the client's income from that side job. Levy's testimony provides additional support for finding that Defendant had knowledge of the fraudulent letters. Regarding a stated income loan application for a client, Ms. Campos, Levy testified that he did not provide the income information that appeared on the

11

application to Defendant, nor had Ms. Campos ever met with Defendant.[5] Levy later obtained a CPA letter for the application, which he discussed with Defendant. She instructed him to amend the CPA letter to state "the years specifically, 2005 and 2006, instead of the last two years." *Id.* at 351. The natural inference from this testimony is that Defendant put false figures on Ms. Campos' loan application, which were later "corroborated" by the fraudulent CPA letter obtained by Levy. Based on the above, the Court finds it likely that Defendant was aware of the fraud involving the CPA letters. It was, at the very least, foreseeable to her. The proceeds from these fraudulent transactions will therefore be included in the amount to be forfeited.

v. *Still Performing Loans*

Finally, Defendant objects to the proceeds of "still performing" loans being included in the Court's forfeiture calculation. As the government established at the evidentiary hearing, these stated income loans, for which Defendant was the loan officer, were fraudulent in the same manner that the stated income loans proven at trial were fraudulent. Contrary to Defendant's assertions, whether or not the loan is performing is irrelevant to the inquiry. Because forfeiture disgorges the unlawful *proceeds* of a crime from a criminal, it is of no matter that there has not yet been a loss. *See, e.g., Blackman*, 746 F.3d at 143; *United States v. Annabi*, 746 F.3d 83, 85 (2d Cir. 2014) (holding criminal forfeiture statute "requires forfeiture of the entire amount of the fraudulent loan, regardless of whether it was repaid"). The distinction invoked by Defendant is pertinent in restitution proceedings, which restore losses to a victim, but not here. The Court thus overrules her objection and will include the proceeds from these loans in the amount to be forfeited.

---

[5] As all the realtor witnesses testified at trial, Defendant alone was responsible for filling in the income and asset information on these applications.

In sum, of the transactions objected to in Defense Exhibit 2 ("DEX 2"), the Court will deduct the proceeds resulting from the full doc loan and family relationship transactions from the ultimate amount to be entered against Defendant in forfeiture. The proceeds of the remaining transactions, which were reasonably foreseeable to Defendant, will be included in the Court's forfeiture order.

## B. Substitute Assets

Defendant maintains that the government may not forfeit her restrained assets as substitute property because it has offered no evidence that her "acts or omissions rendered any proceeds unavailable." Def.'s Opp'n at 7. She bases her argument on the language of the substitute assets statute, which requires the Court to order the forfeiture of substitute property if the tainted property:

> *as a result of any act or omission of the defendant –*
> (A) cannot be located upon the exercise of due diligence;
> (B) has been transferred or sold to, or deposited with, a third party;
> (C) has been placed beyond the jurisdiction of the court;
> (D) has been substantially diminished in value; or
> (E) has been commingled with other property which cannot be divided without difficulty.

21 U.S.C. § 853(p) (emphasis added). As she reads the statute, the government must show that the tainted proceeds of the conspiracy are unavailable as a result of an act or omission on *her* part. This, she contends, it has failed to do. She reasons that "unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language." Def.'s Opp'n at 8 (citing *Hillman v. IRS*, 263 F.3d 338, 342 (4th Cir. 2001)). Additionally, in her view, the presence of the word "indirectly" in 18 U.S.C. § 982(a)(2), the substantive forfeiture

provision,[6] and its absence in the substitute assets provision makes clear that although *Pinkerton* liability applies to the former, it does not apply to the latter.

The government claims that Defendant's interpretation of the statute would be wholly inconsistent with the well-established concept of joint and several liability in the criminal forfeiture context. For example, in *United States v. Hurley*, 63 F.3d 1 (1st Cir. 1995), the court stated:

> Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. Using the same concept, the Sentencing Guidelines attribute to a defendant at sentencing the foreseeable conduct of co-conspirators. It would be odd ... to depart from this principle of attributed conduct when it comes to apply the forfeiture rules . . . .

*Id.* at 22. Relying upon the decisions of its sister circuits, which had "unanimously concluded that conspirators are jointly and severally liable for amounts received pursuant to [the conspiracy]," the Fourth Circuit reached the same conclusion. *McHan*, 101 F.3d at 1043 (citing *Hurley*, 63 F.3d at 22; *United States v. Masters*, 924 F.2d 1362 (7th Cir. 1991); *Fleischhauer v. Feltner*, 879 F.2d 1290 (6th Cir. 1989); *United States v. Caporale*, 806 F.2d 1487 (11th Cir. 1986)). As the government points out, most of these other courts did not even mention the "indirectly" language, let alone premise their holdings upon it. Although it is true that the Fourth Circuit construed the clause as authorizing joint and several liability, it went on to hold that:

> [t]he imposition of vicarious liability under § 853 also resonates with established criminal law principles. *Just as conspirators are substantively liable for the foreseeable criminal conduct of a conspiracy's other members, they are responsible at sentencing for co-conspirators' "reasonably foreseeable acts and omissions . . . in furtherance of the jointly undertaken criminal activity*[.]"
> Because a criminal forfeiture ordered under § 853(a) is "an

---

[6] The statute provides that a court "shall order that the person forfeit ... any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." 18 U.S.C. § 982(a)(2).

14

> element of the [defendant's] sentence," it follows that conspirators
> should be liable under § 853 for their drug partnerships' receipts.

*Id.* at 1043 (emphasis added) (citations omitted).

Under the same principles, the government contends that the doctrine of joint and several liability extends to the substitute assets provision of the forfeiture statute. This Court agrees. Other courts, along the same lines, have ordered the forfeiture of a defendant's substitute assets when the tainted property was unavailable as a result of the acts or omissions of co-conspirators. *See Hurley*, 63 F.3d at 20–24 (affirming substitute assets order against defendant for the full amount of the proceeds of the conspiracy where two of his co-conspirators wired the money out of the country); *see also United States v. Bermudez*, 413 F.3d 304 (2d Cir. 2005) (per curiam) (affirming substitute assets order against defendant for full amount of proceeds where he and co-conspirators laundered money out of the country).

Although the Fourth Circuit has not had occasion to address the issue directly, its decision in *United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001), indicates that it would be of the same opinion. In that case, the defendant challenged the entry of a forfeiture order against him arising from his joint and several liability. He argued that the forfeiture was "excessive in light of his minor role in the money laundering activities, the small personal benefit that he received, approximately $30,000 in legal fees, and his lesser culpability compared to that of the other defendants." *Id.* at 418. He also challenged the district court's denial of his request to pay his attorney from funds in an untainted retirement account, with an approximate value of $80,000, which had previously been restrained as substitute assets.

The Fourth Circuit's resolution of these issues persuades this Court that it would reject Defendant's interpretation of the substitute assets provision. Citing *McHan* and *Hurley*, the Fourth Circuit held in *Bollin* that the $1.2 million forfeiture judgment was not excessive because

"although [he] received only about $30,000, he is liable in a forfeiture judgment for the foreseeable criminal conduct of his co-conspirators." *Id.* at 419. It further held that:

> [t]here is probable cause to believe that at least a significant portion of the $1.2 million in laundered funds is no longer available; the funds were transferred to overseas accounts beyond the jurisdiction of the district court and were used to repay investors and other individuals. As a member of a conspiracy, Gormley is vicariously liable for the reasonably foreseeable conduct of his co-conspirators, both substantively and at sentencing. His substitute assets thus may be subject to forfeiture in the event the laundered funds are determined to be unavailable.

*Id.* at 421–22 (citations and footnote omitted). The Court agrees that the above commentary, in conjunction with a holding that "affirm[ed] the restraint of substitute assets in an amount more than double the defendant's proceeds, is a compelling indication that the Fourth Circuit would use the same vicarious liability principles to construe the substitute assets provisions as it used to impose the forfeiture liability in the first place." Gov't's Reply Br. at 8.

This is especially so given the congressional mandate that courts construe the forfeiture statute "liberally to effectuate its remedial purposes." 21 U.S.C. § 853(o); *see also Blackman*, 746 F.3d at 143 ("Realistically, a victim's hope of getting paid may rest on the government's superior ability to collect and liquidate a defendant's assets [through forfeiture]."). The Fourth Circuit has made clear that this directive applies to the substitute assets provision "so as to thwart efforts by a defendant to circumvent the economic impact of an anticipated criminal forfeiture sentence." *Alamoudi*, 452 F.3d at 316 (citation and internal quotation marks omitted).

At the evidentiary hearing, Special Agent Brooks testified on the government's efforts to locate the assets of Defendant and her co-conspirators in the United States and abroad. Between 2005 and 2007, the time frame of the conspiracy, Vilchez sent "4 or $500,000" to bank accounts

in Peru. 11/12/14 Hr'g Tr. at 17–18. The government sent MLATs[7] to Peru requesting her bank statements and to freeze her assets. Peru's response to the MLAT was apparently very delayed and resulted in the agents finding only a few thousand dollars in those accounts. Vilchez eventually filed for bankruptcy and fled the country in 2009 or 2010. Brooks testified that "the only asset that I can think of in the United States that we ever really found at any point" was "20 or $30,000" in an account at Alliance Bank in Vilchez's name. *Id.* at 18–19. Although it is likely that the "4 or $500,000" transferred abroad by Vilchez was tainted property based on the timing of those transfers, the government has not made a sufficient showing as to the *amount* of tainted property that is beyond its reach and thus forfeitable as substitute assets. The Court cannot enter an order against Defendant to forfeit substitute assets in the imprecise amount of "4 or $500,000."

The statute only permits forfeiture of substitute assets when the government establishes that the acts of a defendant or her co-conspirators resulted in its inability to locate *the tainted property* despite the exercise of due diligence. 21 U.S.C. § 853(p). With respect to Vilchez's two Maseratis, the government has not shown either that she used proceeds of the conspiracy to purchase the vehicles or that they are now beyond the government's reach. With respect to Defendant's assets, Brooks testified that agents had identified various bank and investment accounts as well as certificates of deposit. The government stipulated at the hearing that these assets, which have been restrained, were not proceeds traceable to the fraud. Brooks also testified that he was "unaware of" any acts by Defendant to dispose of or dissipate her portion of the proceeds. 11/12/14 Hr'g Tr. at 44–45. There is thus no evidence on the record by which the Court could conclude that the tainted property received by Defendant—$231,000 in fraudulent loan commissions—was placed beyond the reach of the government. Likewise, the government

---

[7] The Court understands Brooks' testimony to refer to a request under a "Mutual Legal Assistance Treaty."

has not made a sufficient showing that the proceeds that went into the pockets of other co-conspirators, such as Levy and Benavides, have been dissipated or otherwise disposed of. Accordingly, an order requiring Defendant to forfeit substitute assets is not appropriate at this time.

There does not appear to be a bar to the government seeking substitute assets from Defendant at a later date. *See Alamoudi*, 452 F.3d at 312, 316 (upholding substitute assets order entered a year and a half after initial consent order of forfeiture); *see also Hurley*, 63 F.3d at 23–24 (upholding entry of substitute assets order following initial forfeiture order, despite pending appeal, because the matter was "not inconsistent with the pendency of the appeal"); *United States v. Poulin*, 690 F. Supp. 2d 415, 430–31 (E.D. Va. 2010) (holding government may seek to amend forfeiture money judgment to require forfeiture of tainted as well as substitute property). Moreover, the Fourth Circuit has made clear that the forfeiture of substitute assets is "not only permitted but *mandated*...if the conditions of § 853(p) [are] satisfied." *Alamoudi*, 452 F.3d at 314 (emphasis added). Other courts have issued substitute assets orders based on an agent's statement in an affidavit that "based on the government's attempts to locate the missing proceeds, [the defendant has] 'dissipated or otherwise disposed of the proceeds of his crimes.'" *United States v. Seher*, 562 F.3d 1344, 1373 (11th Cir. 2009); *United States v. Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999) (upholding substitute assets order based on identical language in agent's affidavit). Based on the foregoing, the Court declines to order the forfeiture of Defendant's substitute assets at this juncture and will enter a money judgment only.

## IV. Conclusion

For the foregoing reasons, it is hereby

ORDERED that the government's Motion for Preliminary Order of Forfeiture (Dkt. No.

166) is GRANTED IN PART AND DENIED IN PART. The Court will issue an order for a money judgment against Defendant forthwith. It is further

ORDERED that the government submit a proposed forfeiture money judgment order within ten days wherein it calculates the forfeited amounts approved in this opinion. Along with the proposed order, the government shall also file a detailed itemized list of the loans approved by the Court for inclusion in the money judgment. Defendant will then have ten days to file any objections to the government's calculations in its submission.

IT IS SO ORDERED.

March 6, 2015

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge