**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Criminal Case No. 1:12-cr-394 |
| LORENE CHITTENDEN, | ) ) | |
| *Defendant.* | ) ) ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Lorene Chittenden's Motion to Lift Stay and Release Property (Dkt. No. 209) as well as the government's Motion to Forfeit Substitute Assets. Dkt. No. 210. The motions have been fully briefed by the parties. Because the Court has heard argument on the forfeiture issue on multiple occasions, including at the evidentiary hearing held on November 12, 2014, it finds additional argument unnecessary. For the reasons set forth below, both motions will be granted in part and denied in part.

### I.    Background

The facts and procedural history of this case have been thoroughly laid out in the Court's prior opinion. Dkt. No. 206. Briefly summarized, on November 21, 2013, a federal grand jury returned a twenty-five count superseding indictment charging Defendant Lorene Chittenden and others with conspiracy to commit bank and/or mail fraud (Count I) and twenty-three counts of bank fraud (Counts III–XXV) related to their fraudulent mortgage loan scheme. The indictment included a forfeiture notice advising Defendant that if she were to be convicted of any of these offenses, she would forfeit to the United States any property constituting or derived from proceeds obtained directly or indirectly as the result of, or traceable to, the counts of conviction, or as substitute assets for those proceeds.

1

On May 7, 2014, after a six day trial, the jury returned a verdict finding Defendant guilty of conspiracy to commit bank fraud and ten counts of bank fraud. On October 3, 2014, the Court sentenced her to 42 months imprisonment, two years supervised release with special conditions, $1,100 in special assessments, and to pay restitution in an amount to be determined. The Court took the forfeiture issue under advisement.

Following a hearing on whether the Federal Rules permitted the government to seek a preliminary order of forfeiture after sentencing, the Court ordered an evidentiary hearing to determine "the amount and content of the forfeiture as well as ... whether the government had 'established the requisite nexus between the property and the offense.'" Mar. 6, 2015 Mem. Op. 2 (quoting Fed. R. Crim. P. 32.2(b)(1)(B)). Thereafter, on November 12, 2014, the Court heard evidence from a government witness, FBI Special Agent Spencer Brooks, regarding the extent of the proceeds of the fraudulent loan conspiracy as well as actions taken by the co-conspirators to dissipate those proceeds.

In light of the agent's testimony, and upon review of additional briefing from the parties, the Court found that most of the proceeds of the conspiracy were reasonably foreseeable to Defendant and thus would be included in the forfeiture order. It also found that the proceeds of certain "full doc" loans and family relationship transactions were not reasonably foreseeable to her and therefore would be omitted from the amount to be forfeited. It further held that the doctrine of joint and several liability applies to the substitute assets provision of the forfeiture statute. Due to an insufficient evidentiary showing, however, the Court ultimately denied the government's motion to forfeit substitute assets without prejudice and issued a money judgment only. It then ordered the government to "submit a proposed forfeiture money judgment order within ten days wherein it calculates the forfeited amounts approved in this opinion." The government subsequently filed a notice with the requested calculations (Dkt. No. 207), and

2

Defendant conceded that the loans and amounts identified by the government were correct and "consistent with this Court's Memorandum Opinion." Dkt. No. 208.

Shortly thereafter, on March 31, 2015, Defendant moved to lift the post-indictment restraining order and release her property. Dkt. No. 209. The government responded the following day by filing a motion to forfeit her substitute assets, including a residential property, a BMW, and several bank and/or trust accounts. Dkt. No. 210. Both motions have been briefed by the parties and are now ripe for disposition.

## II. Discussion[1]

To satisfy the $1.5 million money judgment previously issued by the Court, the government seeks to forfeit certain property belonging to Defendant as substitute assets. She raises three principal objections to the motion: first, she contends that the doctrine of collateral estoppel bars the government from making a second attempt to forfeit her restrained property as substitute assets; second, she asserts that *Pinkerton* principles limit the substitute assets provision of the forfeiture statute; and third, she maintains that the government has failed to carry its evidentiary burden to show that her property is forfeitable as substitute assets. The Court will consider each argument in turn.

### A. Collateral Estoppel

Defendant first argues that the government is barred under the doctrine of collateral estoppel from seeking to forfeit her property as substitute assets because the issue has already been litigated and decided by this Court. The Supreme Court has described collateral estoppel as "mean[ing] simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any *future lawsuit*." *Ashe v. Swenson*, 397 U.S. 436, 444 (1970) (emphasis added); *see also Montana v.*

---

[1] Because the instant motions involve the same issues, the Court will address them together.

3

*United States*, 440 U.S. 147, 153 (1979) ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in *subsequent suits* based on a different cause of action involving a party to the prior litigation." (emphasis added)). Although developed in the civil context, the doctrine is embodied within the Double Jeopardy Clause of the Fifth Amendment of the Constitution and thus is equally applicable in criminal cases. *Ashe*, 397 U.S. at 443; *United States v. Benkahla*, 530 F.3d 300, 306 (4th Cir. 2008) (noting that guarantee against double jeopardy "prohibits *twice prosecuting or punishing* a person for the same offense" (emphasis added) (citation omitted)).

It is clear to this Court that Defendant's first objection rises and falls on the same standard she has laid out in her pleadings—that is, that there must be a "subsequent suit" for the doctrine of collateral estoppel to apply. *E.g.*, *Montana*, 440 U.S. at 153; *accord Ashe*, 397 U.S. at 444. There is no *subsequent* action in this case, as the government's forfeiture motion is clearly a part of the *original* criminal prosecution against Defendant. Furthermore, its decision to order a money judgment did not bar the government from seeking substitute assets at a later date because once the conditions of § 853(p) are satisfied, the forfeiture of substitute assets is "not only permitted but *mandated*." Mar. 2, 2015 Mem. Op. 10–11 (quoting *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006)). For these reasons, the Court concludes that the doctrine of collateral estoppel does not preclude the government from moving again to forfeit Defendant's substitute assets under § 853(p).

B. *Whether* Pinkerton *Liability Principles Limit § 853(p)*

Defendant alternatively asserts that the government is prohibited from seeking substitute assets based on the acts of her co-conspirators that were not "part or in furtherance of the charged conspiracy." Def.'s Opp'n 10. To support her position, she cites the firmly established *Pinkerton* doctrine, which provides that a defendant will be held liable for the acts of her co-conspirators if

4

the acts: (1) were "done in furtherance of the conspiracy"; (2) "f[e]ll within the scope of the unlawful project"; or (3) could "be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946). These principles also apply at sentencing. *E.g.*, *United States v. Irvin*, 2 F.3d 72, 73–79 (4th Cir. 1993) (applying *Pinkerton* principles at sentencing to determine the amount of narcotics attributable to each defendant convicted of drug conspiracy charge).

With the above objection, Defendant has merely reiterated, albeit in a slightly different fashion, legal arguments already addressed in the prior opinion. After the first round of briefing on the issue, the Court held that joint and several liability applies to the substitute assets provision, 21 U.S.C. § 853(p), in part because it "resonates with established criminal law principles"—namely, the *Pinkerton* doctrine. *United States v. Chittenden*, No. 1:12-cr-394, 2015 WL 1515186, at *3 (quoting *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996) (citing *Pinkerton*)). In the Court's view, this conclusion was a natural extension of the Fourth Circuit's holding that joint and several liability applies to the substantive forfeiture provision because "[j]ust as conspirators are substantively liable for the foreseeable criminal conduct of a conspiracy's other members, they are responsible at sentencing for co-conspirators' reasonably foreseeable acts and omissions ... in furtherance of the jointly undertaken criminal activity." *McHan*, 101 F.3d at 1043 (citations and internal quotation marks omitted).

Importantly, when taken to its logical conclusion, Defendant's interpretation of § 853(p) is wholly at odds with the purpose of the forfeiture statute. Indeed, Congress has commanded the courts to construe the forfeiture statute, including the substitute assets provision, "liberally to effectuate its remedial purposes." 21 U.S.C. § 853(o); *Alamoudi*, 452 F.3d at 316. As the government points out, § 853(p) only comes into play after a defendant has been convicted and sentenced, likely long after the conspiracy has ended. If the Court were to accept Defendant's

5

constrained view, the substitute assets of a vast majority of defendants would be insulated from forfeiture because, no matter how inevitable or foreseeable, the "dissipation, commingling, and transfer of proceeds by her co-conspirators ... would almost never be in furtherance of the conspiratorial agreement." Gov't Reply Br. 3–4. Such a rule would render § 853(p) a nullity in conspiracy cases where *McHan* governs.[2] This is so because a defendant that has been held jointly and severally liable for the proceeds obtained by her co-conspirators pursuant to *McHan* most probably would not be in possession of those proceeds.

Furthermore, the extent of Defendant's liability has *already* been limited by *Pinkerton* principles in the prior opinion, in which the Court deducted approximately $181,000 from the amount sought by the government to be forfeited because those proceeds were the result of co-conspirators' acts that were not reasonably foreseeable to her. *Chittenden*, 2015 WL 1515186, at *4–8; *see also Irvin*, 2 F.3d at 75 (holding that *Pinkerton* "controls questions of an individual defendant's criminal *liability* for acts done by others in furtherance of conspiratorial activity" (emphasis added)). Defendant has cited to no authority that suggests the Court must apply *Pinkerton* principles yet again to determine *how* the government may seek to enforce the money judgment entered against her. Accordingly, in adherence to the congressional mandate that it construe the statute "liberally to effectuate its remedial purposes," 21 U.S.C. § 853(o), the Court reiterates its prior conclusion that Defendant's substitute assets must be forfeited if the government has made a sufficient showing as to the prerequisites of 21 U.S.C. § 853(p).

### C. Whether the Government Has Met Its Evidentiary Burden

Finally, Defendant maintains that the government has failed to establish the prerequisites of § 853(p) on its second attempt to forfeit her property as substitute assets. The federal forfeiture

---

[2] The exception would be those few cases where the conspirators *explicitly* contemplated and agreed on the methods by which they would dissipate or transfer the proceeds of the criminal enterprise.

statute provides that if the government is unable to recover tainted property—that is, the

"property constituting, or derived from, proceeds the person obtained directly or indirectly" as the

result of the convicted offense—it may seek forfeiture of the defendant's substitute assets.  21

U.S.C § 853(a), (p).  The substitute assets provision, § 853(p), applies if the tainted property:

> as a result of any act or omission of the defendant –
> (A) cannot be located upon the exercise of due diligence;
> (B) has been transferred or sold to, or deposited with, a third party;
> (C) has been placed beyond the jurisdiction of the court;
> (D) has been substantially diminished in value; or
> (E) has been commingled with other property which cannot be
> divided without difficulty.

21 U.S.C. § 853(p)(1).  If any of these conditions is met, a court must order the defendant to

forfeit substitute property up to the value of the tainted property.  *Id.* § 853(p)(2); *Alamoudi*, 452

F.3d at 314 ("Section 853(p) is not discretionary; rather, the statute mandates forfeiture of

substitute assets 'when the tainted property has been placed beyond the reach of a forfeiture.'"

(citing *McHan*, 345 F.3d at 271)).

"Courts interpret this provision liberally so as to 'thwart efforts by a defendant to

circumvent the economic impact of an anticipated criminal forfeiture sentence.'" *Alamoudi*, 452

F.3d at 315–16 (quoting *McHan*, 345 F.3d at 272); *see also* 21 U.S.C. § 853(*o*).  Substitute assets

orders have been issued based on an agent's statement in an affidavit that "based on the

government's attempts to locate the missing proceeds, [the defendant has] 'dissipated or

otherwise disposed of the proceeds of his crimes.'" *United States v. Seher*, 562 F.3d 1344, 1373

(11th Cir. 2009); *United States v. Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999) (upholding

substitute assets order based on identical language in agent's affidavit).  The government's

burden to establish that it has met the prerequisites of § 853(p) is therefore not high.  Rather, like

in other aspects of sentencing, the government must prove its entitlement to forfeiture of

substitute property by a preponderance of the evidence. *See United States v. Tanner*, 61 F.3d 231, 234 (4th Cir. 1995).

Here, the government has submitted the sworn affidavit of FBI Special Agent Moriarty, in which he declared that:

> [S]ince November 2009, agents of the FBI and the FDIC OIG[3] have conducted an extensive review of bank accounts, tax returns, bankruptcy records, and financial documents associated with Vilchez and her co-conspirators. We have diligently searched for the proceeds fraudulently obtained by the Vilchez conspiracy from several mortgage companies and federally-insured financial institutions, including the $1,513,378.82 in proceeds obtained from George Mason Mortgage, but have not been able to locate any funds traceable to the $1,513,378.82. Based on my experience and training, I have concluded that as a result of acts or omissions of Vilchez and her co-conspirators, including the defendant, the $1,513,378.82 has been transferred to, or deposited with a third party; placed beyond the jurisdiction of the Court; substantially diminished in value; or commingled with other property that cannot be divided without difficulty. Thus, despite the exercise of due diligence, we have been unable to locate the property subject to forfeiture.

Moriarty Aff. ¶ 20. The above language tracks that of the affidavit in *Alamoudi*, which the Fourth Circuit held was sufficient to satisfy the prerequisites of § 853(p). *Alamoudi*, 452 F.3d at 316. Defendant asserts that the holding in *Alamoudi* did not rest on such conclusory statements, but instead was based on the affidavit's "specific details of the defendant's acts and omissions," including his admission that he "engag[ed] in a sophisticated scheme to conceal the proceeds of his conduct to keep the property beyond the Government's reach." Def.'s Opp'n 18 (citing *Alamoudi*, 452 F.3d at 316). Defendant also challenges the other cases relied upon by the government to persuade the Court that its affidavit is sufficient. She stresses that in both of those cases, unlike here, the government's affidavit "recounted specific efforts to locate the tainted property" and detailed the acts and omissions that placed the proceeds beyond the reach of the

---

[3] This acronym stands for the Federal Deposit Insurance Corporation Office of the Inspector General.

government. *Id.* at 19 (citing *United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999) and

*United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009)).

The government has countered by citing to numerous cases in which substitute assets

motions have been granted based on similarly conclusory language in an agent's affidavit. For

example, the Fourth Circuit recently upheld this Court's issuance of a substitute assets order

based on an agent's statement that "she has been unable to locate any identifiable proceeds

derived from the health care fraud offense in any of the Defendant's financial records ... [and]

that this is because the proceeds appear to have been commingled with legitimate billing receipts

and then spent on both business and personal expenses." *United States v. Poulin*, 690 F. Supp. 2d

415, 431 (E.D. Va. 2010) *aff'd*, 461 F. App'x 272 (4th Cir. 2012) (per curiam). Likewise in

*United States v. Gordon*, the Tenth Circuit held that statements by an agent that "[d]ue to acts or

omissions of [Mr. Gordon], additional property directly traceable to the conspiracy ... is

unavailable for forfeiture," and that law enforcement personnel "have been unable to locate,

through the exercise of due diligence, any other assets ... that are traceable to the offenses" were

sufficient to permit the district court to "infer ... that the money was dissipated due to Mr.

Gordon's conduct," thereby satisfying the requisites of § 853(p).  710 F.3d 1124, 1166 (10th Cir.

2013).

Here, in addition to the conclusory paragraph above, Special Agent Moriarty recounted in

detail the efforts that the FBI and the FDIC OIG took to locate the proceeds of the conspiracy for

which Defendant has been convicted. He averred that multiple business accounts at Wells Fargo

Bank used by co-conspirator Vilchez were "very active during the time of the conspiracy," which

spanned from "approximately 2002 to November 2007." Moriarty Aff. ¶¶ 2–3. He stated that an

analysis of all the records from these accounts revealed that "no money remained in these

accounts by the time the investigation was initiated by the FBI in November 2009." *Id.* Vilchez

also had personal and business bank accounts at Wells Fargo and other institutions, but "these accounts were closed by the end of 2007." *Id.* ¶ 4.

Special Agent Moriarty also declared that "[b]etween January 2006 and June 2007 ... Vilchez sent at least $582,000 from her Wells Fargo Bank accounts to bank accounts in Peru." *Id.* ¶ 5. Later, after successfully filing for bankruptcy, Vilchez opened multiple business accounts at Alliance Bank. *Id.* ¶¶ 6, 8–9. Between July 2011 and May 2012, the investigation revealed that Vilchez transferred "at least $330,000" from these accounts to her accounts in Peru. *Id.* ¶ 10.

Special Agent Moriarty also described at length the various public records searches to identify ownership interests in real property by Vilchez and the other co-conspirators in this case. *Id.* ¶¶ 7, 14, 19. The FBI and FDIC OIG were "unable to locate any significant property interests" as a result of these searches. *Id.* The investigating entities also analyzed the co-defendants' bank records, "but no significant assets or any leads ... were found." *Id.* ¶ 18. Special Agent Moriarty further declared that a search of all available databases and public records had been performed to "locate any assets identified in the defendants' presentence reports." *Id.* ¶ 19. For three of the defendants, the investigation failed to reveal any "real property, vehicles, or accounts with sufficient equity for forfeiture." *Id.* As to defendant Yoza, the investigation revealed an individual retirement account belonging to him and/or his wife, which is not subject to forfeiture due to his declaration of bankruptcy. *Id.* It also revealed three bank accounts in defendant Mercado's name totaling approximately $90,000. *Id.* Although the agents did not have "sufficient records to determine whether those funds are traceable to proceeds of the conspiracy, ... it is quite likely that any proceeds were so commingled with other funds that it would be practically impossible accurately to trace the proceeds." *Id.* With respect to defendants Edgar Vilchez and Luis Rosero, Special Agent Moriarty asserted that the investigation revealed no real property belonging to either that is forfeitable. *Id.* Rosero was discovered to be the owner of a

2005 Chevrolet Aveo, but with a value of less than $1,725, it "is not worth the expense of seizing and disposing of it." *Id.*

Notably, Defendant does not dispute any of the factual averments within the affidavit. It therefore remains uncontested in the record. Instead, she emphasizes what the affidavit fails to do—that is, identify any specific acts or omissions that *she* took to place the proceeds beyond the government's reach. In fact, the affidavit makes no mention of Defendant's acts or assets at all, and instead focuses on those of her co-conspirators. This apparently purposeful omission is consistent with the testimony heard at the evidentiary hearing, wherein the government's sole witness stated that he was "unaware of" any acts taken by Defendant to dispose of or dissipate her portion of the proceeds. Nov. 12, 2014 Hr'g Tr. at 44–45. The government also stipulated at the hearing that her restrained assets were not proceeds traceable to the fraud. There is thus no evidence on the record currently before the Court that shows that the tainted property received by Defendant—$231,000 in fraudulent loan commissions—was placed beyond the reach of the government.

This is not the end of the inquiry, however, because Defendant is nevertheless responsible for the acts and omissions of her co-conspirators that resulted in the dissipation, commingling, or transferring of proceeds beyond the reach of the government. *See supra* Part II.B. The agent's affidavit is more than sufficient to establish that, due to the acts or omissions of Defendant's co-conspirators, the government has been unable to locate, through the exercise of due diligence, the majority of the proceeds traceable to the conspiracy. The averments regarding Vilchez's transfer of nearly a million dollars abroad certainly supports this conclusion.[4] Moreover, the details

---

[4] It is certainly more likely than not that the transfers by Vilchez of at least $582,000 to Peru during the time frame of the conspiracy constituted transfers of tainted property. Regarding the transfers of at least $330,000 years after the conspiracy had ended, Vilchez's regular shuffling of money between multiple business accounts following her fraudulent discharge in bankruptcy allows this Court to conclude that it is more likely than not that this second transfer also comprised of illegal proceeds of the conspiracy.

regarding the investigators' unsuccessful efforts to locate proceeds of the other co-defendants are sufficient to permit this Court to draw the reasonable inference that their portion of the proceeds was either dissipated or commingled to such a degree that it would be practically impossible to trace them.

However, the government has made *no* showing as to the unavailability of the proceeds received by Defendant herself, roughly $231,000. This is likely due to the fact that it would contradict the testimony of the government's sole witness at the evidentiary hearing, during which he essentially stipulated that Defendant took no action to "make it difficult for [the government] to locate any of her property," "to transfer or sell or dispose of to a third party," to "transfer[ her proceeds] to some other jurisdiction," or to "commingle[] those assets in some way to make it impossible to divide them out and identify and get." Nov. Nov. 12, 2014 Hr'g Tr. 44:8–45:6. Therefore, because the government has not shown that this tainted and directly forfeitable property is unavailable due to an act or omission by Defendant or one of her co-conspirators, the Court will deduct Defendant's share of the proceeds from the amount to be forfeited out of her restrained assets as substitute property.

The Court also finds that the government did not do its due diligence with respect to a search for vehicles belonging to Rosita Vilchez. She was known to the government to own "one or two Maseratis" with an approximate value of $250,000 "back in the time of the fraud, 2005 to 2007." Nov. 12, 2014 Hr'g Tr. 52:16–17. In contrast with the investigation of other defendants, in which an FBI special agent in the assets forfeiture squad performed a search of all vehicle records, the affidavit does not indicate any attempt by the government to search for vehicles belonging to Vilchez.[5] This omission is quite curious given that the government itself has

---

[5] In its reply, the government states that "it is implicit in the agents' affidavits and testimony that Vilchez's Maserati could not be located." Gov't Reply Br. 8 n.4. The Court finds that it would abuse its discretion if it were to make

suggested that the Maseratis were tainted property purchased with proceeds of the conspiracy: "When Vilchez spent [the proceeds]– on her two Maserati, for example – it was the legal equivalent of the defendant having spent them." Dkt. No. 201 at 14. As a result, it is possible that these vehicles are directly forfeitable as tainted property under § 853(a). Unless and until the government has demonstrated that these vehicles, previously proffered as tainted property, cannot be located upon the exercise of due diligence, the Court will not order Defendant to forfeit the equivalent amount of her property as substitute assets when directly forfeitable assets may still exist.

## IV.    Conclusion

For the foregoing reasons, the Court will order the forfeiture of Defendant's substitute property in an amount equivalent to the money judgment ($1,513,378.82) minus the value of the two Maseratis (approximately $250,000) as well as Defendant's portion of the proceeds (roughly $231,000 in loan commissions). The Court finds that this amount represents the value of the tainted property that the government has shown it has been unable to locate through the exercise of due diligence. For the same reasons, Defendant's motion to release her restrained property will be granted in part and denied in part.

The Court recognizes that its decision ordering the forfeiture of Defendant's "untainted life savings" appears unfair, given that she profited only marginally from her unlawful conduct. Def.'s Opp'n 1. This result, however, is the unfortunate consequence of her voluntary participation in a broad conspiracy. Because of Defendant's most unwise decision to associate with the co-conspirators and serve as the hub of the conspiracy, the fruits of her labor acquired

---

such an assumption on this record. The affidavits make absolutely no mention of the Maseratis. More tellingly, Special Agent Moriarty's affidavit states that "[f]or all of the defendants, an FBI special agent ... performed a search of all available databases [and] vehicle records," and goes on to list for each defendant what this investigation "revealed." Moriarty Aff. ¶ 19. He then declares that, for those defendants without assets, the investigation did not identify any "real property, vehicles, or accounts with sufficient equity for forfeiture." *Id.* Vilchez was notably omitted from this discussion, nor does such information appear elsewhere in the affidavit.

before and after her involvement will be lost. The Court is persuaded that such a drastic outcome was Congress's intent. To better achieve the remedial purposes of the forfeiture statute, Congress included the substitute assets provision "to thwart efforts by a defendant to circumvent the economic impact of an anticipated criminal forfeiture sentence." *Alamoudi*, 452 F.3d at 316. As outlined above and in the prior opinion, this objective is no less important when the relevant conduct is committed by a defendant's co-conspirators.

An appropriate Order shall issue.


May 21, 2015

Alexandria, Virginia


_____ /s/

Liam O'Grady
United States District Judge